1    THE COURT:  I understand.  If something happens in

2  California, I'll know it happens in California, and whatever

3  you say is the result in California, it comes to me after

4  the case is stayed and I can take advantage of all the work

5  done in California.

6    It strikes me that these cases should not proceed

7  no matter what the answer is on jurisdiction and the subject

8  matter and personal jurisdiction, they should not be

9  proceeding along parallel courses.  You have to give me a

10  very strong argument why I should not exercise my discretion

11  no matter what happens to just stay this case until

12  California is concluded.

13    MR. ROTH:  Because the Federal Circuit has

14  indicated that where the action in dismissing for discretion

15  that you have, the case that I mentioned, the Electronics

16  For Imaging, that is not a very broad discretion because you

17  have to consider the consequences.

18    THE COURT:  The case you're talking about and

19  there's another case somewhere pending in which some of the

20  issues are, were alive, and you run the risk of having an

21  inconsistent judgment?

22    MR. ROTH:  This is a case in which in the

23  footnotes, they talk about the fact that there was

24  litigation in Nevada, there was litigation in the Northern

25  District of California, there was litigation in Arizona, and

1    they talk about the different actions that happened.  This

2    happens to be a reversal of a District Court Judge for

3    dismissing the declaratory judgment claim related to the

4    patent issues.

5              THE COURT:  How about staying the case?

6              MR. ROTH:  Your Honor, the stay issue, if you were

7    to determine you have subject matter jurisdiction and you

8    have --

9              THE COURT:  I can't do anything until I determine

10   I have jurisdiction.

11             MR. ROTH:  Right.

12             THE COURT:  But I determine I have jurisdiction

13   and I stay the case.

14             MR. ROTH:  That is within your discretion;

15   however, we would like an opportunity to be heard on that

16   because that will not address the issues that are in the 256

17   action because Bovio and Frame were not parties in

18   California.

19             THE COURT:  I understand that.  What that will do

20   is that it gives you a chance to litigate this case in

21   California, and whatever happens in California, you can come

22   back here and litigate the question and quiet Bovio and

23   Frame, for all time?

24             MR. RESCH:  Can I address the issue?

25             MR. ROTH:  In the interim, we can't.  We cannot

1    for the time that the case is pending and being resolved out

2    in California, we cannot quiet and stay Bovio.  They're not

3    parties to that.  The Court I don't believe would enter an

4    Order as to them to stop supporting these public statements

5    in magazines about a billion dollar claim against our

6    clients.

7            THE COURT:  The fact of the matter, this case is

8    going to proceed after the case in California because the

9    case in California is farther along, and, in fact,

10   everything you say is happening in California will continue

11   to happen in California during the pendency of this case.

12           MR. ROTH:  Your Honor, there was a motion that was

13   heard today, and I don't know what the outcome of it was,

14   but the motion was to require transfer of a number of claims

15   to the arbitration which is going on in New York.  And that

16   transfer motion --

17           THE COURT:  Yet another forum for this case?

18           MR. ROTH:  Because we have no choice, because the

19   contract between DEC and LGE has an arbitration provision

20   that requires things to be arbitrated, but, yes, it is

21   another forum, but part of that motion that was heard by

22   Judge Marshall today -- I don't know whether it was

23   decided -- was to stay proceedings on those claims because

24   under the Federal Arbitration Act, we believe that that is

25   required.

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

Page 54

1          So,  --

2          THE COURT:  What do you say about the stay?

3          MR. RESCH:  Your Honor, very much opposed to a

4    stay because, as I pointed out, there is no subject matter

5    jurisdiction, in light of the promise not to sue.  I'll hit

6    these points quickly because we've been over them.

7          THE COURT:  I don't want to hear that again.

8          MR. RESCH:  But this is an important point,

9    Mr. Roth represented to the Court that Vanguard is a case

10   where there was a promise.  That is not true, your Honor,

11   that is not true.

12         THE COURT:  Can I just let him finish, please.

13         MR. RESCH:  Sure.

14         THE COURT:  I don't want to go over that again.  I

15   was going to let you speak to the state.

16         MR. RESCH:  Okay, the state.  We're opposed to it

17   for the following quick reasons.

18         THE COURT:  I can't do anything until I have

19   jurisdiction.

20         MR. RESCH:  Two, that doesn't resolve the

21   problems; and third --

22         THE COURT:  But you and Mr. Roth agree, which

23   probably means I'm right.  You agree under that, it doesn't

24   resolve the problem, it means I'm right, but I may be not

25   able to get to it because I don't have jurisdiction.  That's

1    a different question.   Go ahead, Mr. Roth, speak to personal

2    jurisdiction.

3            MR. ROTH:   Personal jurisdiction as to the issue

4    as to Bovio, there is personal jurisdiction because the

5    analysis is as follows, what is the dispute?   The dispute is

6    who is invented side-mounting technology in 1996 and 1997.

7    In order to determine whether the Court has specific

8    jurisdiction, you look at the contacts that Bovio had with

9    Massachusetts at that time as to that issue.

10           THE COURT:   Would you make the same argument if

11   this had happened 30 years ago and Mr. Bovio had been living

12   in Italy for 30 years?

13           MR. ROTH:   Yes, as a matter of law, yes, that is

14   right, and the thing that is at issue there is not whether

15   that is right or wrong, but that has to do with whether

16   there is a statute of limitations.   In a normal case, for

17   example, a car accident that happens in Massachusetts, if

18   somebody moved away before the lawsuit was filed, we

19   wouldn't say we're free and clear, there's no jurisdiction

20   of the court over you.   We would say we would look at when

21   it happened.   Now, the thing that stops it from extending

22   back indefinitely is that there's a statute of limitations

23   in Massachusetts on those kinds of claims.

24           THE COURT:   On what kind of claims?

25           MR. ROTH:   For example, a tort claim involving --

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

Page 56

1    THE COURT:  You say there is a limitation on how

2  long Mr. Bovio can claim being an inventor of this?

3    MR. ROTH:  Your Honor, the Section 256, when you

4  look at it, does not have a statute of limitations.

5  Presumably, there is a point determined in equity at which a

6  person has waited too long, and I would suggest that

7  obviously if the patent has expired, which is 17 years as to

8  some patents, 20 as to another, that there's nothing really

9  there to be disputing.

10    THE COURT:  Let's not make it 30 years, let's make

11  it 12 years, the patent hasn't expired and Mr. Bovio sits

12  quietly in Italy until somebody like CPT comes to him, has

13  that same conversation I mentioned before, do you know

14  anything about this technology, Mr. Bovio?  He says, Yes, I

15  invented it, and then the lawyer says, Well, will you come

16  to California or will you participate in a lawsuit in

17  California by giving us a declaration?  He says, Yes, and

18  whatever he did he did 12 years ago in Massachusetts.

19    MR. ROTH:  Your Honor, as to 256, the issue is

20  where did he make the claim to be the inventor?  He made the

21  claim in Massachusetts when he signed the documents related

22  to the patent application in 1997.

23    If he had filed that patent application in 1992 or

24  1993, to take us back 12 years, it wouldn't change the

25  analysis.  The analysis is still what is the dispute and

1    what are the person's contacts with the forum at the time

2    the dispute arose.  He was working here, he was living here,

3    he signed the application here.  He signed the contract to

4    assign his rights and obligate him to future things, and,

5    clearly, he has by those actions reasonably anticipated that

6    as to that conduct, he could be required to answer for it in

7    the courts in Massachusetts.  We're not trying to take him

8    someplace where he wasn't at that time.  We're trying to

9    take him back to where he was.

10              And as to the issue of conflating the standard for

11    state jurisdiction, even if there's no state jurisdiction

12    because you were to find that his contacts with this

13    particular forum were insufficient, his contacts according

14    to, you know, his counsel are insufficient in California,

15    which is the only other place that there have been contacts,

16    and there will be no place where he can be called to account

17    for this.

18              Under Federal Rule 4K2, it is intended to close

19    that loophole, and that is exactly the language that goes

20    with that provision, to close the loophole that allows

21    people outside the United States to wreak havock in the

22    United States but then say there is no place where I have

23    sufficient contacts with one state to be held accountable.

24              Here, there are lots of contacts over a long

25    period of time, and the continuous and systematic standard

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

1  is member.  The things that show that it was continuous and

2  systematic, 36 applications, 36 issued.  Since he moved to

3  Italy, he has signed at least three assignments related to

4  inventions.  He's filed six applications for new patents,

5  since he moved to Italy, and those applications are filed

6  here in the United States.  He has continuous and systematic

7  contact with the United States, and he has all these

8  agreements with all kinds of different companies to support

9  their assignment rights, including assignments to leave

10  attached, where he is obligating specifically to participate

11  in the litigation.

12       So, he has systematic and continuous contacts with

13  the United States, even after leaving to go to Italy.  He

14  didn't sever those relationships, nor did he amend the

15  assignments that he gave that require him to come and

16  participate in litigation.  It's just in this case where CPT

17  doesn't want him to be a party to the litigation and subject

18  to the obligations of parties and he doesn't want to be

19  present here where he chooses not to come.

20       Now, we're not trying to make him come if he has

21  reasons not to come.  That we did not do, back in July, when

22  he was deposed, and we didn't know anything about his wife

23  at that point, but we went to Italy to take his deposition

24  because that's where he was, but the concern we have is

25  highlighted by the documents that Mr. Bovio has provided to

Page 59

1    his counsel.

2           He provided notebooks that we have had tested, and

3    they show that there were alterations to the critical pages

4    in 1996.  The ink used to say side-mounting is always

5    different in those March, '96 pages than the ink on the rest

6    of the pages.  We need to get, among other things, to see,

7    you know, what's the support for this claim that he invented

8    it?  We want to see the later notebooks and see what's going

9    on with the ink in those.  We've asked them to provide that,

10   and they've said, no, we gave you, you know, what Mr. Bovio

11   gave us, we have no rights to get any more materials from

12   Mr. Bovio.  Mr. Bovio is not a party to this litigation, and

13   they hide behind that screen.

14          If he's a party --

15          THE COURT:  Did you go to Judge Marshall in

16   California and ask that she compel that?

17          MR. ROTH:  He's not a party in California.

18          THE COURT:  But he's prepared a declaration in

19   California, and he's been deposed, he's a witness, and you

20   say this is relevant to an issue in California.  Can you

21   require that they, the lawfirm that represents him, ask her

22   to compel him to produce that as part of the information

23   that a witness in the case is going to be relying on?

24          MR. ROTH:  A witness's obligation, a nonparty

25   witness's obligation to produce materials is dependent on

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

1    the subpoena in the United States.  If you want to force a

2    nonparty witness to give you things, you have to hit him

3    with a subpoena.

4          THE COURT:  I understand that.  I understand

5    exactly how that works.

6          MR. ROTH:  We can't do that in Italy.

7          THE COURT:  I understand that, but you could move

8    before Judge Marshall to exclude his testimony if you don't

9    get it, you can do that, can't you?

10          MR. ROTH:  We did file that kind of motion last

11    summer, and that's why he sat for a deposition, your Honor,

12    because the magistrate judge --

13          THE COURT:  What I'm saying, you're not without

14    remedy in California about these notebooks, you can say I

15    get the notebooks or I move that he be excluded because the

16    notebooks are critical, he relies on the notebooks to make

17    the claim?

18          MR. ROTH:  He doesn't rely on the later notebooks.

19    The later notebooks are where we're going to find out when

20    he stopped using this particular kind of ink.  They don't

21    rely on those later notebooks.  They don't rely on that.

22    That's evidence that helps us, and, therefore, it's not

23    forthcoming, and it's not the kind of thing that they have

24    agreed to produce.  In response to our discovery requests

25    for that very thing, they have put up a stone wall and said,

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

Page 61

1  you know, we in this litigation in California do not

2  represent Mr. Bovio, we have no control over him, we can't

3  get those things, blah, blah, blah, because it's not in

4  their interests to get those things.

5        THE COURT:  What do you mean, they've said they

6  don't represent Mr. Bovio?

7        MR. ROTH:  In the California action.  They

8  represent him in connection with this case.

9        THE COURT:  Is that right?

10        MR. RESCH:  Your Honor, let me just point out one

11  thing.  We are now seeing the evil that will come, which is

12  you are now getting involved into a discovery dispute in the

13  California action, which is, as you point out, properly

14  before Judge Marshall, if she wants handle it or how she's

15  going to decide it.  I promise you that there have been

16  numerous motions by both sides on discovery issues.

17        THE COURT:  That really isn't what I just asked

18  you.  Let me see if I can restate the question so you can

19  answer the one I asked you, which is, do you take the

20  position that you represent Bovio here but not in

21  California; is that your position?

22        MR. RESCH:  Your Honor, for the purposes of this

23  hearing, I represent and my lawfirm represents Mr. Bovio.

24  I, honestly, it would be a misrepresentation for me to

25  answer that question because I don't know the outlying

Page 62

1  representations that have been made.

2          THE COURT:  What about Frame?  Do you represent

3  him?

4          MR. RESCH:  Just to finish, your Honor, I myself,

5  personally, Michael Resch, I don't know the representations

6  that were made in the underlying California action on this

7  issue.

8          THE COURT:  Do you represent Frame in California?

9          MR. RESCH:  I and the lawfirm represent him here.

10  I thought that we represented him, thought at the

11  deposition, but if Mr. Roth is representing to the Court

12  that we did not represent him at the deposition.  I don't

13  believe that's true.  Let me just say this, your Honor --

14          THE COURT:  Let me speak because the reporter

15  can't take both of us, and I think you should stop if I

16  start.  That's my view.

17          MR. RESCH:  Yes, your Honor, I apologize.

18          THE COURT:  I thought I read in the papers in this

19  case that Mr. Bovio asserted attorney-client privilege and

20  that your firm was his attorney in California?

21          MR. RESCH:  That's what I recall reading as well,

22  your Honor.  I'm just suggesting -- I believe that's true.

23  I'm suggesting it would be careless of me making the

24  representation not having the familiarity.  My understanding

25  is how I asserted attorney-client privilege with respect to

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

Page 63

1    that case.  I don't understand the basis for Mr. Roth's

2    statement, but I don't want to mislead the Court in any

3    way.

4            THE COURT:  What is the basis?

5            MR. ROTH:  They did ask for the deposition.  We

6    asked for the later notebooks and they do not represent,

7    that, you know, we cannot get those materials in California

8    because he is not a party and those documents are not in the

9    possession, custody or control of CPT and they are not in

10   the possession or control of CPT's counsel.

11           THE COURT:  Let's just say if you were to take

12   this agreement that you wave in front of me about this

13   assignment, about how he has to cooperate, collaborate,

14   don't you think Judge Marshall would say to you you're

15   entitled to either of those documents or to have that

16   witness excluded?

17           MR. ROTH:  I don't know, your Honor.

18           THE COURT:  I guess what I am asking you, why am I

19   doing all this because it strikes me she has all this in her

20   care out there?

21           MR. ROTH:  Your Honor, she does not have Bovio and

22   Frame under her umbrella.

23           THE COURT:  I understand that.  Why don't you

24   finish your discussion about personal jurisdiction.

25           MR. ROTH:  The issues for purposes of the federal

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

1    rule jurisdiction are that he does have contacts with the

2    United States that are sufficient to make it reasonable and

3    fair for him to appear in this court; No. 1.  He has chosen

4    to participate in some litigation in the United States.  He

5    chose the California litigation where he is not a party.

6           All of the contacts with Massachusetts back in the

7    1990's up to 2000 and the contacts in Texas in 2001 are

8    relevant.  His contacts with the PTO since moving to Italy

9    are particularly relevant.  He has pending applications and

10   pending obligations related to U.S. patents, and he has

11   miscellaneous contacts with the United States like accounts,

12   business investigations and pursuits, and it is not unfair

13   for him to be asked, required to appear in this litigation

14   where the litigation relates directly to assertions that he

15   made in Massachusetts about the very issue here, which is,

16   who is the inventor or who are the inventors.

17           THE COURT:  Is it fair to make him party to a

18   litigation where he has to hire a lawyer, where the issue

19   might be in California; is that fair?

20           MR. ROTH:  I don't think it's unfair to require

21   him to ascertain how he's going to be represented and how he

22   is represented in this case is CPT represents him, and CPT

23   is claiming a common interest with him, so that everything

24   that CPT and Bovio and CPT and Frame discuss is supposedly

25   privileged.  I believe that they are providing the

1    representation and that Bovio is not incurring costs.

2            I believe that he is being reimbursed for his

3    expenses.  I don't know about his time but for his expenses

4    in connection with participating in California.  I don't

5    know whether CPT also is paying for this, but he is being

6    represented by the same counsel who are claiming a privilege

7    that goes beyond communications with him and gets to

8    communications between Bovio and HP or between Bovio and

9    CPT's lawyers before there was a representation of Bovio

10   himself.  So I don't think the cost issue is relevant, your

11   Honor.

12           THE COURT:  Are you representing LPL in

13   California?

14           MR. ROTH:  I am.

15           THE COURT:  I could have a situation where I need

16   you here and Judge Marshall needs you out in California at

17   the same time.

18           MR. ROTH:  I'm not the only person representing

19   LPL.  I'm one member of a team.  As I said, there are

20   hearings going on in California, three of them, and --

21           THE COURT:  I'll take a recess and see if I can

22   come to some conclusions about this.  If I can't, I will

23   take the matter under advisement.

24           MR. RESCH:  May I have five minutes?

25           THE COURT:  Is there going to be anything to say

1   you have not said before?

2       MR. RESCH:  Yes, your Honor, I promise to stay

3   under five minutes.

4       THE COURT:  You have two minutes to tell me

5   everything you need to tell me.  It's quarter of five.  Two

6   minutes you have.

7       MR. RESCH:  First, the Vanguard case does not --

8       THE COURT:  You said that.

9       MR. RESCH:  Second, the reason that you look at

10  the time frame as opposed to back in the '90's, if you

11  perform a simple but for analysis as to why we're cleared

12  but for the time frame now we wouldn't be here, but you

13  could still get rid of all the conduct back in the '90's and

14  we'd still be here as long as CPT is testifying.  The

15  assignments issue, of course, the personal jurisdiction is

16  if we go to subject of jurisdiction.

17      THE COURT:  Why is it moot?

18      MR. RESCH:  Because, your Honor, Mr. Bovio is

19  prepared to make the same representation should your Honor

20  grant the subject matter jurisdiction as Mr. Frame made.

21  And, your Honor, the last thing I'll just say, and it's

22  indicative of a lot of things we talked about today, when

23  you pressed Mr. Roth on the attorney-client issue and

24  whether or not we were truly claiming that we weren't

25  representing, I didn't hear him respond affirmatively to

1    you.

2           What he said, we were making other claims, he's

3    not appeared and things like that.  I didn't hear him come

4    back to your claim we were claiming that we didn't represent

5    him.  I'll leave it at that.  There are numerous things I

6    can point to as well, but the bottom line, Mr. Bovio does

7    not want him to be here.  It's not that CPT doesn't want him

8    to be here.  I thank you.

9           THE COURT:  I'll take a short recess and see if I

10   can come to some conclusions.

11           (A recess was taken.)

12           THE CLERK:  All rise.

13           THE COURT:  I think I'm going to address the

14   motion of Mr. Frame first.  The motion raises the question

15   of whether the Court has jurisdiction.  The Plaintiff in

16   this case, which asserts jurisdiction, bears the burden of

17   establishing if there is jurisdiction.

18           Under the declaratory judgment act, one of the

19   requirements for jurisdiction is that there be an actual

20   controversy, and the Federal Circuit has said that in

21   general the presence of an actual controversy within the

22   meaning of the statute, that is the declaratory judgment

23   act, depends on whether the facts alleged under all the

24   circumstances show that there's a substantial controversy

25   between the parties having adverse legal interests of

1    sufficient immediacy and reality to warrant the issuance of

2    a declaratory judgment action, and in the particular

3    circumstances of this case, the Plaintiff must show that it

4    has a recognized interest in a patent that would be

5    adversely affected by an action brought under 35 U.S.C.,

6    Section 256 and another party with a right to bring an

7    action under that statute has created in the declaratory

8    claim a reasonable apprehension that it will do so.

9            The first prong of that requirement has been met.

10   The Plaintiff has a recognized interest in that it holds the

11   patents at issue in this case, and so the question for me is

12   whether the party being sued has a right to bring an action

13   under Section 256 such that a reasonable apprehension is

14   created and has done something to create a reasonable act of

15   apprehension that he will bring an action.

16           I'm not clear, it's not clear to me that Mr. Frame

17   retains any right to bring an action.  He does not own the

18   technology involved, nor does he presently have a legal

19   interest in that technology having assigned that technology

20   to another person, another party, and the question is

21   whether his participation in the lawsuits in California is

22   of a nature that indicates to a reasonable person in the

23   position of the Plaintiff that Mr. Frame will sue, and I

24   don't think so.

25           I don't think that in light of Mr. Frame's

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

1   unequivocal declaration in the letter and in this court that

2   he will not sue and does not intend to sue under that

3   statute to enforce any right that he has, assuming he has

4   that right, that there's a reasonable apprehension that

5   Mr. Frame will sue.

6          That he is assisting some other party is not

7   dispositive.  It may be relevant if that participation is a

8   sham for a suit by Mr. Frame, but that does not appear from

9   the record in this case.  It appears that he is assisting

10  that litigation.  He may be voluntarily assisting in that

11  litigation.  He may be providing evidence in that

12  litigation, but I've seen no case in which a person who

13  provides evidence in a case creates a reasonable

14  apprehension that that party has a right under Section 256

15  of such force that it would create a probable apprehension

16  that he will sue to enforce that right.

17         Accordingly, the motion to dismiss brought by

18  Mr. Frame, for lack of subject matter, is granted.  Now, I

19  am advised by Mr. Resch that Mr. Bovio is prepared to make

20  that same kind of claim.  Is that right?

21         MR. RESCH:  Yes, your Honor, and, in fact, we have

22  a letter prepared to Mr. Roth which is identical in

23  substance to the letter that Mr. Frame sent to or we on

24  behalf of Mr. Frame sent to Mr. Roth.  I'm prepared to make

25  the same representation.

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

Page 70

1       THE COURT:  Why don't you read it.  I'm delivering

2   it now to counsel.

3       MR. RESCH:  "I write in behalf of my client,

4   Michele B. Bovio, concerning L.G. Philips LCD Company

5   Limited's (LPL) declaratory judgment action against him

6   pending in the District of Massachusetts.

7       Your Honor, if I could give a copy to the court

8   reporter, it might be easier and to you as well.

9       THE COURT:  Why don't you read it and she can have

10  it and correct it.

11      MR. RESCH:  Okay.  "As you know, on September 30,

12  1997, well prior to LPL's lawsuit, Mr. Bovio "assigned,

13  transferred and conveyed" to Digital Equipment Corporation,

14  DEC, his entire right, title and interest together with the

15  benefits and privileges in and to his inventions and

16  discoveries set forth in the Frame/Bovio side-mounted LCD

17  patent application, Serial No. 08/822,438 filed on March 21,

18  1997, including all of his rights, title and interest in the

19  LCD side-mounting feature disclosed therein."

20      "As you also know, Mr. Bovio has submitted a

21  declaration in which he declared under penalty of perjury

22  that he had also assigned to DEC his rights, title and

23  interest in the same inventions as embodied in all other

24  patent applications filed or to be filed worldwide, and that

25  any ownership rights he has in the side-mount patents were

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

Page 71

1   duly assigned to DEC pursuant to the September 30th, 1997

2   assignment."

3          "Thus, Mr. Bovio has no interest in the side-mount

4   patents, and there is no reason to believe that he would sue

5   LPL on those patents or that he would have standing to do

6   so.  More importantly, however, Mr. Bovio has never

7   threatened to sue LPL to correct inventorship on the

8   side-mount patents.  This letter is to advise you that

9   Mr. Bovio will not sue LPL to correct inventorship on the

10  side-mount patents."

11         "Specifically, Mr. Bovio will not assert or

12  threaten to assert a claim under 35 U.S.C., Section 256 for

13  correction of inventorship to name him as an inventor of the

14  side-mount patents.  Although LPL had no reason to believe

15  that Mr. Bovio would sue on the Side-Mount Patent at the

16  time it filed the Massachusetts action, LPL clearly knows

17  now that Mr. Bovio will not sue LPL to correct inventorship

18  on the patents.  Accordingly, there's no basis for LPL to

19  pursue its declaratory judgment claim against Mr. Bovio, and

20  LPL should dismiss that claim as soon as possible."

21         "Nothing contained in this letter shall be deemed

22  as a waiver of Mr. Bovio's right to contest personal

23  jurisdiction in the declaratory judgment action pending in

24  the District of Massachusetts or in any subsequent action."

25         THE COURT:  This is another unequivocal statement

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

Page 72

1    on behalf of Mr. Bovio that he does not intend to sue?

2            MR. RESCH:  Yes, your Honor.

3            THE COURT:  I think that, in fact, resolves this

4    matter because I think the same rule would apply with

5    respect to Mr. Frame would apply to Mr. Bovio.  I will say,

6    although I don't think I have to say, I have some questions

7    about whether jurisdiction, personal jurisdiction, would lie

8    against Mr. Bovio in Massachusetts.

9            The constitutional requirement is of specific

10   jurisdiction, and the Plaintiff must show that the

11   defendant, Mr. Bovio, directed his activities at residents

12   of Massachusetts and that this action arises out of his

13   contacts with Massachusetts, and if those two requirements

14   are met, whether assertion of personal jurisdiction in

15   Massachusetts is reasonable and fair.

16           I think that there's some real question, which I

17   don't have to resolve, about the purpose for availment

18   prong.  The Federal Circuit has defined that purpose for

19   availment prong in this manner:  The circuit has said the

20   purposeful availment prong of the jurisdictional text

21   investigates whether the defendant benefited from his

22   contacts with the form that made jurisdiction foreseeable.

23           And what I see here is that the defendant,

24   Mr. Bovio, assigned what rights he had in the technology in

25   question to DEC.  It's not clear what benefit he got.  I

1   assume the assignment was for some consideration, but it's

2   not clear that he got some benefit from that contact, if

3   that's the contact being sued on, the patent is sufficient.

4          So, I think that's a weak prong.  That makes the

5   second one weak, and it gives strength to the Gestalt

6   factor, the third factor, the fair and reasonable elements,

7   and I take into account all of the considerations that had

8   to do with that what the First Circuit has called the

9   Gestalt factors, the Defendant's burden of appearing, the

10  form states interest in adjudicating the dispute, the

11  Plaintiff's interest in obtaining convenient effective

12  relief, the judicial system's interest in obtaining the most

13  effective resolution of the controversy and the common

14  interests of all sovereigns promoting substantive social

15  policies.

16         The burden on the defendant in this case is

17  substantial in view of his age and the situation of his wife

18  and the fact that he is a resident and apparently a citizen

19  of a foreign country of Italy.  It's not clear what interest

20  Massachusetts has in adjudicating this dispute since no one

21  currently lives here and no particular interest, no interest

22  of a current Massachusetts citizen, not even DEC is at issue

23  in this case.

24         The question of convenient and effective relief is

25  at best unclear since the issue of inventorship is arising

Page 74

1    in the California litigation.  In the California litigation,

2    I expect that some resolution of that issue will be reached.

3    It is true, it may not bind Mr. Bovio, but if a resolution

4    were to take place here, it wouldn't bind the parties, the

5    defendant parties in California.

6          The fourth prong is the judicial system's interest

7    in obtaining a most effective resolution of the controversy

8    strikes me that that, too, is at best a wash, since the most

9    effective resolution is likely to be California, but even if

10   not all the controversy is resolved in California, not all

11   of it will be resolved in Massachusetts, and I think that

12   speaks also to the fifth prong, the common interest of all

13   sovereigns in promoting substantive policies.

14         I don't know that there are any particular

15   policies of Massachusetts or of California that are at

16   stake.  The question of whether there is jurisdiction in the

17   United States under the Rule 4K2 is a separate question

18   which I am not going to venture to speak to this question at

19   this moment because I don't have to.  All I'm saying is I

20   don't think there's jurisdiction in Massachusetts under the

21   Burger King test.

22         So, my resolution of the issues is as follows:

23   The motion of Mr. Frame to dismiss for lack of subject

24   matter jurisdiction was granted, and I'm going to find as

25   moot the motion, the personal jurisdiction motion of

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

Page 75

1    Mr. Bovio in light of the fact that there is not subject

2    matter jurisdiction of Mr. Frame, and Mr. Bovio is in the

3    same position.  Thank you.

4              MR. RESCH:  Thank you, your Honor.

5              (Whereupon, the hearing was adjourned at

6    5:20 p.m.)

7                   C E R T I F I C A T E

8    UNITED STATES DISTRICT COURT )

9    DISTRICT OF MASSACHUSETTS      )

10   CITY OF BOSTON                 )

11             I, Valerie A. O'Hara, Registered Professional

12   Reporter, do hereby certify that the foregoing transcript

13   was recorded by me stenographically at the time and place

14   aforesaid in No. 11076-RCL, In Re:  L.G. PHILIPS LCD., CO.

15   LTD vs. MICHELE B. BOVIO and ROBERT C. FRAME and thereafter

16   by me reduced to typewriting and is a true and accurate

17   record of the proceedings.

18             In witness whereof, I have hereunto set my hand

19   this 14th day of January, 2005.

20

21

22                    _____

23                    VALERIE A. O'HARA

24                    REGISTERED PROFESSIONAL REPORTER

25

ea0cb9e9-bc77-4e24-94f0-b1b9003ba6c4

# EXHIBIT   B

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 293896
**(Cite as: Not Reported in F.Supp.)**

Not Reported in F.Supp., 1993 WL 293896
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Sonya BARRISTER, Plaintiff,
v.
WENDY'S INTERNATIONAL, INC., Bea
Kiersznowski, Isabella Harrison, and Trooper Craig
Thomas, Defendants.
**No. CIV. A. 92-7262.**

July 30, 1993.

*MEMORANDUM*

REED.

## I. INTRODUCTION

**\*1** This case stems from the investigation and criminal prosecution of plaintiff Sonya Barrister ("Barrister") for her purported theft of deposit slips and rolled change from the store safe of the New Castle, Delaware location of defendant Wendy's International, Inc. ("Wendy's"). Plaintiff asserts a claim of malicious prosecution against all defendants under 42 U.S.C. § § 1983 and 1988 and also charges them with violations of applicable state law.

Defendant Trooper Craig Thomas ("Thomas") has filed a motion to dismiss for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1) , and for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6) (Document No. 7). Jurisdiction is predicated upon the existence of a federal question under 42 U.S.C. § § 1983 and 1988 , for violations of the plaintiff's civil rights, and 28 U.S.C. § 1343. Upon consideration of the motion and plaintiff's response thereto, and for the reasons which follow, the motion of defendant Thomas shall be denied.

## II. FACTUAL BACKGROUND

Plaintiff makes the following factual allegations in her complaint.

Plaintiff resides at 702 Trevino Road, Falls Church,

Virginia, but was a Pennsylvania resident for the period she was employed by defendant Wendy's. Wendy's is a fast-food chain with store locations and substantial business contacts throughout the Delaware Valley. Defendants Bea Kiersznowski ("Kiersznowski") and Isabella Harrison ("Harrison") were at all times material to this action managerial employees of Wendy's. At all relevant times, defendant Thomas was a Delaware State Trooper acting under color of state law and authority.

Plaintiff was hired as an Assistant Manager for Wendy's in October 1989, working at various locations throughout the Delaware Valley and earning approximately $23,000 per year. She frequently worked at the store in Broomall, Pennsylvania.

Around April 22, 1990, she began working as a temporary fill-in Assistant Manager at the store on Dupont Highway in New Castle, Delaware. On the evening of April 27, 1990, plaintiff collected the daily receipts, filled out various paperwork, and, as was normal and customary, placed the locked cash bag and cashiers's drawers in the safe at the end of the night.

Early in the morning on April 28, 1990, plaintiff was awakened by a phone call from an unidentified male who told her not to come to work the next day because she had been fired from her job at Wendy's. Unbeknownst to plaintiff, Andy Lamonica ("Lamonica"), a fellow Wendy's employee, opened the New Castle store on the morning of April 28, 1990 and discovered that the cash bag, containing some rolled change and deposit slips, was missing from the safe. Neither the store nor the safe appeared to have been broken into. Lamonica reported the incident to his supervisor, defendant Kiersznowski, who in turn notified her supervisor, defendant Harrison. Kiersznowski instructed Lamonica to contact the police.

**\*2** The police arrived at the Dupont Highway store and defendant Thomas discussed the incident with Kiersznowski. Kiersznowski told Thomas that she, rather than Lamonica, had opened the store that morning and discovered that money was missing from the safe. She also told Thomas that plaintiff was due in to work that morning but failed to report in or call. Furthermore, plaintiff claims Kiersznowski

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 293896
(Cite as: Not Reported in F.Supp.)

falsely reported that plaintiff had been transferred to the New Castle store from the Broomall store because plaintiff was under investigation in Broomall for theft.

In addition, plaintiff asserts that Kiersznowski did not inform Thomas that numerous other people besides plaintiff had keys and thus access to the store and to the safe. Plaintiff also alleges that Thomas did not investigate who had access to the store and the safe, nor did he speak with Lamonica, plaintiff, or anyone else to find out their version of the events surrounding the theft.

Plaintiff claims a warrant was issued for her arrest based solely on the foregoing inaccurate information from Kiersznowski and Thomas. Plaintiff was unaware that such a warrant had been issued because, due to her new job working for Greyhound, she was rarely home. At that time, plaintiff continued to occupy the same residence as when she worked for Wendy's.

A few weeks later, plaintiff went into Wendy's main office and spoke with Harrison and Tom Funderbird ("Funderbird"), a Human Resources officer, concerning her final paycheck, which she never received. She told them that she was working for Greyhound and she confirmed her correct address for them. They told her that the paycheck was not mailed to her because it did not list her correct address. At that time, plaintiff also informed them of the phone call she received on the morning of April 29, 1990 FN1 telling her not to come back to work. Neither Harrison nor Funderbird mentioned anything to her about the theft or the outstanding warrant for her arrest. Plaintiff subsequently mailed her keys and uniforms to Harrison along with a letter.

Still unaware of the outstanding warrant for her arrest, plaintiff returned to Wendy's headquarters in King of Prussia, Pennsylvania in April 1991 to inquire about her year-end tax information, which she had not received. She was told that the information had not been sent because headquarters did not have her correct social security number listed on the forms and that headquarters wanted proof of her actual number. Plaintiff provided the requested proof.

Plaintiff first became aware of the warrant for her arrest in June 1991, and, immediately upon learning of it, she turned herself in to the Wilmington, Delaware police.

Plaintiff was tried and acquitted of the theft charges

in May 1992. Neither Kiersznowski nor Thomas testified at the trial. Plaintiff claims Harrison incorrectly testified at the trial that Lamonica had tried to call plaintiff on the morning after the theft but received no response. Plaintiff also asserts Harrison incorrectly testified that she never attempted to confirm plaintiff's correct address or phone number after the day of the incident, despite the fact that she knew where plaintiff was living and was also aware that she and Kiersznowski specifically implied to Thomas that plaintiff had moved away with no forwarding address because of plaintiff's guilt in the theft. Lastly, plaintiff contends that Harrison incorrectly testified that plaintiff had stolen keys to the Broomall store even though Harrison knew or should have known that this had not happened.

*3 Plaintiff claims she was injured as a direct and proximate result of the knowingly false and incomplete information given by defendants Kiersznowski and Harrison to the police, and the lack of adequate police investigation by defendant Thomas. She was prosecuted for felony theft, which caused her to pay significant attorney's fees and to lose income from work. She also claims to have suffered damage to her reputation and self-esteem, as well as emotional distress and loss of life's pleasures.

Plaintiff alleges that defendants Kiersznowski and Harrison maliciously instituted, promoted, and participated in her prosecution by providing knowingly false and incomplete information about plaintiff and the theft to police and prosecutors. Plaintiff additionally asserts that defendant Thomas acted maliciously and without sufficient probable cause in initiating criminal proceedings against her, because he failed to adequately investigate the theft but nevertheless arrested and prosecuted her based on the information provided by defendants Kiersznowski and Harrison, which he knew or should have known was false. Plaintiff contends that the defendants acted maliciously with the intent to deprive her of equal protection of the law and her constitutional rights by arresting and charging her in this fashion. Plaintiff requests damages in excess of $15,000.

III. DISCUSSION

A. The Standards of Review

*under Rules 12(b)(1) and 12(b)(6)*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 293896
(Cite as: Not Reported in F.Supp.)

Defendant Thomas has mounted a two-pronged attack upon plaintiff's complaint in his motion to dismiss, arguing that he is entitled to dismissal of plaintiff's action against him under Rule 12(b)(1) or, alternatively, Rule 12(b)(6).

Thomas initially attacks this Court's subject matter jurisdiction under Rule 12(b)(1). The leading Third Circuit case explaining the standard of review for 12(b)(1) attacks on a court's jurisdiction is *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884 (3d Cir.1977). In *Mortensen*, the court of appeals noted that a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction can take two (2) forms: it can attack a complaint on its face, known as a "facial attack," or it can attack the existence of subject matter jurisdiction in fact, commonly referred to as a "factual attack." *Id.* at 891.

The court of appeals in *Mortensen* explained further that the distinction between a facial attack and a factual attack is significant. In reviewing a facial attack, a court must consider the allegations of the complaint as true, making all reasonable inferences in plaintiff's favor. *Mortensen*, 549 F.2d at 891. In a factual attack, however, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating for itself the merits of jurisdictional claims." *Id.*

The burden of proving the existence of the court's subject matter jurisdiction rests with the plaintiff. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.), cert. denied, 111 S.Ct. 2839 (1991) ; *Donio v. United States*, 746 F.Supp. 500, 504 (D.N.J.1990) (citing *Gibbs v. Buick*, 307 U.S. 66, 72 (1939) ; *Mortensen*, 549 F.2d at 891). "Trial judges enjoy substantial procedural flexibility in handling Rule 12(b)(1) motions." *Berardi v. Swanson Memorial Lodge*, 920 F.2d 198, 200 (3d Cir.1990) (citing *Land v. Dollar*, 330 U.S. 731, 735 n. 4 (1947)).

**\*4** Decisions of the Court of Appeals for the Third Circuit and other courts of appeals following *Mortensen* have repeatedly cautioned against allowing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction to be turned into an attack on the merits under 12(b)(6). This occurs when the arguments raised in connection with the jurisdictional motion involve questions on the merits, such as the truth of the facts alleged in the complaint and their legal sufficiency. *See Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277 (3d Cir.1993) ;

*Kehr Packages, Inc.*, 926 F.2d at 1408-09; *Boyle v. Governor's Veterans Outreach and Assistance Ctr.*, 925 F.2d 71, 74 (3d Cir.1991) ; *Holland/Blue Streak v. Barthelemy*, 849 F.2d 987, 988-89 (5th Cir.1988) ; *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 897-99 (3d Cir.1987) ; *Malak v. Associated Physicians, Inc.* 784 F.2d 277, 279-80 (7th Cir.1986).

The standards of review under Rule 12(b)(1) and Rule 12(b)(6) are quite different. A federal question may be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) only if it is " 'made solely for the purpose of obtaining jurisdiction,' " or is " 'wholly insubstantial and frivolous.' " *Kulick*, 816 F.2d at 898 (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)). FN2 This test does not permit a court "to prejudge the facts alleged in the complaint, however, for a court may dismiss for lack of jurisdiction only if the claims are 'insubstantial on their face.' " *Id.* (quoting *Hagans v. Lavine*, 415 U.S. 528, 542 n. 10 (1974)). Dismissal for lack of subject matter jurisdiction is not warranted simply because the legal theory alleged is probably false; it is appropriate only where the federal claim is " 'so insubstantial, implausible, foreclosed by prior [court] decisions ..., or otherwise completely devoid of merit as not to involve a federal controversy.' " *Id.* at 899 (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666 (1974)).

By contrast, the standard governing a Rule 12(b)(6) motion to dismiss for failure to state a claim is not as constrained as the Rule 12(b)(1) standard of review just described. A federal claim being reviewed under Rule 12(b)(6) does not have to be "wholly insubstantial" to be dismissed. *Kehr Packages, Inc.*, 926 F.2d at 1409. " 'The threshold to withstand a motion to dismiss under [Rule] 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion.' " *Id.* (quoting *Lunderstadt v. Colafella*, 885 F.2d 66, 70 (3d Cir.1989)). As the court of appeals recently stated,

"[w]hether the complaint states a cause of action on which relief could be granted is a question of law and ... it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction."

**\*5** *Growth Horizons, Inc.*, 983 F.2d at 1280 (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)). Therefore, it is proper for the court to initially rule on the motion to dismiss under Rule 12(b)(1) and then, if the court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 293896
**(Cite as: Not Reported in F.Supp.)**

determines that it has subject matter jurisdiction over the case, it should review a jointly filed motion to dismiss under Rule 12(b)(6).

In reviewing a motion under Rule 12(b)(6), the court must accept " 'as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them.' " *Unger v. Nat'l Residents Matching Program,* 928 F.2d 1392, 1394-95 (3d Cir.1991) (quoting *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990)). Dismissal is allowed for failure to state a claim only in those instances where it is clear that no relief could be granted under any set of facts that could be proved. *Id.* at 1395.

### B. Thomas's Motion to Dismiss under Rule

### *12(b)(1) for Lack of Subject Matter Jurisdiction*

As noted above, defendant Thomas initially attacks this Court's subject matter jurisdiction over the instant action. Although he failed to label his motion as either a factual attack or a facial attack, it is clear that he chose the latter approach, because he concentrates on challenging the federal cause of action alleged in the complaint and argues that this claim is, as a matter of law, simply not cognizable under the Constitution, laws, or treaties of the United States. Relying upon the broad procedural flexibility I am accorded in reviewing a motion made pursuant to Rule 12(b)(1), I shall focus on the allegations contained in plaintiff's complaint, making all reasonable inferences in her favor, and determine whether her claim is " 'so insubstantial, implausible, foreclosed by prior decisions ..., or otherwise completely devoid of merit as not to involve a federal controversy.' " *Kulick,* 816 F.2d at 899 (citation omitted).

Plaintiff alleges that this Court has subject matter jurisdiction over her claim because her complaint presents a federal question, specifically, whether Thomas violated her constitutional rights pursuant to 42 U.S.C. § 1983 when he failed to properly investigate the theft and proceeded to arrest and prosecute plaintiff for the theft based on false information. Thomas challenges plaintiff's jurisdictional allegation with two distinct arguments. First, he charges that plaintiff is suing him in his official capacity and, therefore, that the State of Delaware is the real party in interest to her claim. Second, Thomas asserts that he is entitled to qualified

immunity from suit because he performed the actions in question in his official capacity as a Delaware state trooper and under color of state law. He maintains that plaintiff's allegations are insufficient to nullify such immunity and, therefore, that this immunity voids any jurisdiction which this Court may try to exercise over him.

### 1. Thomas's Capacity

In support of his argument that this Court does not have subject matter jurisdiction over plaintiff's claim, Thomas first claims that plaintiff is suing him in his official capacity and, therefore, that the State of Delaware is the real party in interest to plaintiff's suit. This argument is unavailing. Nowhere in plaintiff's complaint does she allege that she is suing Thomas in his official capacity as a Delaware state trooper. Even though Thomas was acting in his official capacity when he performed the acts which plaintiff claims violated her constitutional rights, I cannot assume that plaintiff is suing him in that official capacity. It is a settled rule of law that the capacity in which a state official is sued does not necessarily refer to the capacity in which his act was performed. *Hafer v. Melo,* 112 S.Ct. 358, 362 (1991). Rather, a plaintiff is free to choose the capacity in which she sues a state officer and may select either a personal-capacity suit, brought against the individual officer, or an official-capacity suit, brought against the state itself. *Id.*

*\*6* In plaintiff's response to Thomas's motion to dismiss, she suggests that she is suing Thomas in his personal capacity. Plaintiff's Response to Defendant Trooper Thomas's Motion to Dismiss ("Response") at 1-2. She declares that her complaint does not state that Thomas is being sued in his official capacity. *Id.* at 1. In addition, she is seeking monetary relief, which is generally not available in an official-capacity suit. *Hadi v. Horn,* 830 F.2d 779, 783 (7th Cir.1987). These factors lead me to infer that plaintiff intended to sue Thomas in his personal capacity.

Additionally, plaintiff's allegations are insufficient to support an official-capacity action against Thomas. In *Kentucky v. Graham,* 473 U.S. 159 (1985), the Supreme Court compared the requirements for establishing liability in personal-capacity and official-capacity suits. *Graham,* 473 U.S. at 165-168. Personal liability may be established merely by showing that "the official, acting under color of state law, caused the deprivation of a federal right." *Id.* at 166. More is required, however, to establish liability in an official-capacity action, as a plaintiff must also

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 293896
(Cite as: Not Reported in F.Supp.)

show that the employing government entity was a " 'moving force' " behind the action causing the deprivation. *Id.*

Plaintiff easily meets the criteria established in *Graham* for a personal-capacity suit against Thomas. She alleges that at all times material to this action, Thomas was acting "under color of state law and authority." Complaint at ¶ 2. Plaintiff also contends that Thomas deprived her of equal protection under the law and violated her constitutional rights by failing to adequately investigate the theft and subsequently arresting and charging her with the theft. *Id.* at ¶¶ 30-31.

Plaintiff's allegations, however, do not meet the criteria for official-capacity liability. Nowhere, either in her complaint or in her response to Thomas's motion, does plaintiff allege or intimate that the State of Delaware was a moving force behind the alleged deprivation of her constitutional rights. The absence of such an assertion supports plaintiff's contention that she did not intend to sue Thomas in his official capacity and thus bring suit against the State of Delaware. Although Thomas correctly notes that the Eleventh Amendment will bar a suit against a named official in an official-capacity suit, because, in such a suit, the state is the real party in interest, the Eleventh Amendment will not shield Thomas in this action, because plaintiff Barrister elected to sue him in his personal capacity.

Contrary to Thomas's argument that plaintiff is suing him in his official capacity, making the State of Delaware the real party in interest to her claim, I find that as a matter of right plaintiff elected to sue Thomas in his personal capacity. Accordingly, I hold that this Court does not lack subject matter jurisdiction over the instant action.

### 2. Thomas's Qualified Immunity

**\*7** As an alternative argument to dismiss plaintiff's claim under Rule 12(b)(1), Thomas contends that he is entitled to qualified immunity from liability under the Eleventh Amendment as a state official vested with discretionary authority. He maintains that plaintiff's allegations fail to nullify this defense.

Government officials performing discretionary functions do enjoy qualified immunity from liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald,* 457 U.S. 800, 818 (1982). Thomas claims that he is entitled to such immunity because he acted in response to both Lamonica's request for police assistance to investigate the theft and Kierszknowski's report about it. He maintains that his investigation and subsequent arrest and prosecution of plaintiff were official responsibilities which he had discretionary authority to execute. However, his subjective belief about the lawfulness of his actions is of no moment. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). The pertinent analysis concerns whether Thomas could have reasonably believed his investigation and subsequent arrest and prosecution of plaintiff was lawful in light of the information he possessed when he acted. *Id.; see also Lee v. Mihalich,* 847 F.2d 66, 69 (3d Cir.1988) (standard for qualified immunity involves examination of the "objective legal reasonableness" under clearly established law of conduct at issue) (citing *Harlow,* 457 U.S. at 818-19).

As discussed above, in reviewing Thomas's facial attack on the subject matter jurisdiction of this Court over plaintiff's claim, I must consider the allegations in her complaint to be true and make all reasonable inferences in her favor. *Mortensen,* 549 F.2d at 891. Plaintiff alleges that Thomas failed to adequately investigate the theft, that he obtained a warrant based on information from Kiersznowski he knew or should have known was false, and that he arrested and maliciously prosecuted plaintiff based on this false information, despite a lack of probable cause. In short, she maintains that his actions constituted malicious prosecution, a tort actionable under 42 U.S.C. § 1983.

Thomas's actions were clearly unreasonable if he proceeded to prosecute plaintiff in the absence of probable cause and with malice. *See Kulwicki v. Dawson,* 969 F.2d 1454, 1468 (3d Cir.1992) (citing *Losch v. Parksburg,* 736 F.2d 903, 907 (3d Cir.1984)). Plaintiff contends in the complaint that throughout Thomas's investigation of the theft, he knew that he was relying on false information provided to him by Kierszknowski. According plaintiff's allegations the presumption of truth to which they are entitled, I cannot find at the present time that defendant Thomas's actions conformed to the standard of "objective legal reasonableness" used to evaluate the legality of the discretionary tasks he executed in this case, *i.e.,* that this defendant is entitled to the defense of qualified immunity. Consequently, I will deny Thomas's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 293896
**(Cite as: Not Reported in F.Supp.)**

C. Thomas's Motion to Dismiss under Rule

12(b)(6) for Failure to State a Claim

**\*8** Having concluded that this Court has subject matter jurisdiction over plaintiff's complaint, I shall consider Thomas's alternative motion to dismiss under Rule 12(b)(6) for failure to present a claim upon which relief could be granted. Because the standard of review on this latter motion requires me to accept all of plaintiff's allegations as true, plaintiff will prevail so long as her complaint contains allegations that satisfy all of the elements of malicious prosecution, a tort actionable under 42 U.S.C. § 1983.

An action for malicious prosecution brought under section 1983 must include the elements of the common law tort as it has developed. *Lee,* 847 F.2d at 70. Specifically, this action requires that: (1) the defendant has initiated a criminal proceeding; (2) which ended in plaintiff's favor; (3) which was initiated without probable cause; and (4) the defendant acted maliciously or for a purpose other than bringing the defendant to justice. *Id.* (citing *Bell v. Brennan,* 570 F.Supp. 1116, 1118 (E.D.Pa.1983)). Either Pennsylvania or Delaware provide the substantive law governing this tort in this case. Both forums require an additional fifth element for the tort of malicious prosecution, namely, actual malice. *Id.* (citing *Simpson v. Montgomery Ward & Co.,* 46 A.2d 674, 681 (Pa.1946) ); *Stidham v. Diamond State Brewery, Inc.,* 21 A.2d 283, 285 (Del.Super.1941); *see also Homlish v. Diamond Motor Sports, Inc.,* No. 81C-OC-19, slip op. at 3 (Del.Super. Feb. 8, 1984). In the context of a suit for malicious prosecution, actual malice is defined as the prosecuting actor's ill will toward the plaintiff, or as the prosecuting actor's belief that he inappropriately prosecuted plaintiff. *Lee,* 847 F.2d at 70; *Stidham,* 21 A.2d at 285 (defendant acting with actual malice displays "wanton disregard of the rights of that person against whom the act is directed"). I have carefully reviewed plaintiff's complaint and find that she has alleged each of these five elements.

In his motion to dismiss under Rule 12(b)(6), Thomas challenges plaintiff's allegations, arguing that she is unable to establish the existence of two (2) key elements of the action for malicious prosecution: want of probable cause and actual malice.

1. Probable Cause

Thomas initially argues that plaintiff is wholly unable to produce evidence establishing that he arrested and prosecuted her for the theft without probable cause. He maintains that at the time he instituted the criminal proceedings against plaintiff, he had no reason to doubt the veracity of Kiersznowski's statements, which plaintiff claims were falsely made. All parties agree that these statements formed the basis for Thomas to prosecute plaintiff and for the grand jury to indict her. Thomas asserts that holding a person to answer to criminal charges is prima facie evidence of probable cause for institution of those charges and, therefore, that the grand jury indictment handed down in this case established that Thomas had probable cause to arrest and prosecute plaintiff. *See* Defendant Trooper Craig Thomas' Opening Memorandum of Law in Support of his Motion to Dismiss at p. 9 (citing *Stidham,* 21 A.2d at 285). Thomas thus claims that plaintiff cannot establish that he acted without probable cause when he instituted criminal proceedings against her.

**\*9** Though Thomas's argument is legally sound, evidence of probable cause provided by the indictment is not irrefutable. Rather, the indictment only offers prima facie evidence of probable cause which plaintiff may counter with evidence to the contrary. *Stidham,* 21 A.2d at 285; *see also Kelley,* 544 A.2d at 943. To that end, in her complaint plaintiff alleges that Thomas did not have probable cause to arrest and prosecute her. Accepting as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them, I find that this allegation suffices to satisfy the probable cause element of the tort of malicious prosecution.

2. Actual Malice

I must now consider Thomas's final argument for his motion to dismiss for failure to state a claim, specifically, that his actions in prosecuting plaintiff did not amount to actual malice. Though the term of art "actual malice" does not appear in plaintiff's complaint, she repeatedly uses the word "maliciously" to characterize Thomas's actions, claiming that he intentionally deprived her of constitutional rights to which she was entitled. *See* Complaint at ¶ ¶ 30-31. Furthermore, plaintiff alleges that Thomas prosecuted her based on information he knew or should have known was false. *Id.* at ¶ 31. Accepting as true the facts alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                     Page 7
Not Reported in F.Supp., 1993 WL 293896
**(Cite as: Not Reported in F.Supp.)**

in the complaint and making all reasonable inferences that can be drawn from them, I find that plaintiff meets the actual malice element of the tort of malicious prosecution.

In sum, because I have found that plaintiff has adequately alleged all of the elements of the constitutional tort of malicious prosecution brought under 42 U.S.C. § 1983 , I will deny the motion to dismiss under Rule 12(b)(6).

### IV. CONCLUSION

For the foregoing reasons, the motion of defendant Thomas to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) shall be denied.

An appropriate order follows.

> FN1. Although there is a discrepancy in plaintiff's complaint as to the exact date of the phone call (whether it was made on April 28 or April 29), it does not materially affect my decision regarding the merits of defendant's motion to dismiss.

> FN2. The court of appeals recently summarized this standard and distinguished it from the standard under Rule 12(b)(6):
> A district court has federal question jurisdiction in any case where a plaintiff with standing makes a non-frivolous allegation that he or she is entitled to relief because the defendant's conduct violated a federal statute. Here, the plaintiff makes a non-frivolous claim that the County's refusal to assume the leases violated the [Fair Housing Act]. Whether or not Growth's claim is one on which relief can be granted, if it has standing, the district court has subject matter jurisdiction.
> *Growth Horizons, Inc.*, 983 F.2d at 1281.

E.D.Pa. 1993
Barrister v. Wendy's Intern., Inc.
Not Reported in F.Supp., 1993 WL 293896

Briefs and Other Related Documents (Back to top)

• 2:92cv07262 (Docket) (Dec. 18, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   C



Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22455387
(Cite as: Not Reported in F.Supp.2d)

Not Reported in F.Supp.2d, 2003 WL 22455387
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. Texas, Dallas
Division.
James Ellis COLE Plaintiff,
v.
Stephen A. GUMMOW Defendant.
No. 3-02-CV-0705-BD(P).

Oct. 22, 2003.

Robert G Oake , Jr, Law Office of Robert G Oake Jr,
Allen, TX, for Plaintiff.
David W Carstens , Casey L Griffith , Carstens Yee
& Cahoon , Dallas, TX, Donald D Mondul , Law
Office of Donald D Mondul , Dallas, TX, Mark M
Grossman , Grossman Patti & Brill , Chicago, IL,
Scott L Harper , Carstens Yee & Cahoon, Dallas, TX,
for Defendant.

*MEMORANDUM OPINION AND ORDER*

KAPLAN , Magistrate J.
*1 Defendant Stephen A. Gummow has filed a
motion to dismiss Plaintiff's Second Amended
Complaint for lack of subject matter jurisdiction. For
the reasons stated herein, the motion is granted.


                        I.

This is a declaratory judgment action involving two
patents for an indexable head ratchet wrench. FN1 At
issue is whether Plaintiff James Ellis Cole is the sole
and true inventor of U.S. Patent No. 5,419,221 (the "
'221 Patent") , issued May 30, 1995, and U.S. Patent
No. 5,775,184 (the " '184 Patent"), issued July 7,
1998. (See Plf. Sec. Am. Compl. at 1, ¶ 1 & Plf.
Resp.App. at 5-8, 9-15).

          FN1. An indexable head ratchet wrench is a
          "wrench[ ] to which other tools, such as
          sockets, crowfoot-type wrenches, and the
          like, are connected for use in tightening and
          loosening nuts and bolts." (Plf. Resp.App. at
          13).

On February 22, 2002, defendant sued plaintiff in
Illinois federal district court claiming that he, not
plaintiff, was the true inventor of the '221 Patent.
(Plf. Sec. Am. Compl. at 2, ¶ 8). In that case,
defendant, who holds patents on other types of
ratchet wrenches, alleged that he conceived and
designed an indexable improvement to his patented
device which was disclosed in confidential
communications to plaintiff and his brother, Charles
Austin Cole, in the early 1990s. According to
defendant, plaintiff used this confidential information
to apply for and obtain the '221 Patent. The Illinois
lawsuit was dismissed for lack of personal
jurisdiction over plaintiff. See Gummow v. Cole,
2002 WL 959836 (N.D.Ill. May 9, 2002).

While the Illinois case was still pending, plaintiff
filed a declaratory judgment action in this court
seeking to clarify his inventorship status. Defendant
answered and counterclaimed for a declaratory
judgment that he is the true inventor of the subject
claims of the '221 and '184 Patents. FN2 In a separate
pleading, defendant moves to dismiss this case for
lack of subject matter jurisdiction. The motion has
been fully briefed by the parties and is ripe for
determination.


          FN2. On May 20, 2003, four months after
          the pleading deadline expired, defendant
          filed an amended counterclaim asserting
          claims against plaintiff and four new parties
          for infringement, correction of inventorship,
          civil conspiracy, breach of contract, fraud,
          unjust enrichment, breach of fiduciary duty,
          and breach of the duty of good faith and fair
          dealing. By order dated June 10, 2003, the
          court struck this amended counterclaim as
          untimely. Thereafter, defendant filed a
          separate lawsuit against plaintiff, Teresa M.
          Cole, Charles Austin Cole, James G. Jones,
          and Splined Tools Corporation. That case is
          currently pending before another judge in
          this district. Gummow v. Splined Tools
          Corp., et al., No. 3-03-CV-1428-L.

                        II.

A party seeking to invoke the jurisdiction of a federal
court must prove that jurisdiction is proper. See
Boudreau v. United States, 53 F.3d 81, 82 (5th

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22455387
(Cite as: Not Reported in F.Supp.2d)

Cir.1995), *cert. denied,* 516 U.S. 1071, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996) ; *Lowe v. Ingalls Shipbuilding, A Division of Litton Systems, Inc.,* 723 F.2d 1173, 1177 (5th Cir.1984). In this case, the burden falls on plaintiff. The allegations of his complaint must be taken as true and all inferences drawn in his favor. *Saraw Partnership v. United States,* 67 F.3d 567, 569 (5th Cir.1995) ; *Garcia v. United States,* 776 F.2d 116, 117 (5th Cir.1985). Dismissal is warranted only if those allegations, together with any undisputed facts and the court's resolution of disputed facts, establish that the district court lacks subject matter jurisdiction. *See Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 424 (5th Cir.2001), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1059, 151 L.Ed.2d 967 (2002) ; *Santerre v. Agip Petroleum Co.,* 45 F.Supp.2d 558, 565 (S.D.Tex.1999). FN3

> FN3. In his reply brief, defendant argues that the court cannot go beyond the pleadings in ruling on a motion to dismiss. (*See* Def. Reply Br. at 4). Such is not the case. In examining the basis for its own jurisdiction, the court may consider: (1) the allegations of the complaint alone; (2) the allegations of the complaint supplemented by undisputed facts in the record; or (3) the allegations of the complaint supplemented by undisputed facts and the court's resolution of disputed facts. *Den Norske,* 241 F.3d at 424; *Santerre,* 45 F.Supp.2d at 565.

### A.

The Declaratory Judgment Act authorizes federal district courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). However, an "actual controversy" between the parties is necessary to establish subject matter jurisdiction under the Act. *Cardinal Chemical Co. v. Morton International, Inc.,* 508 U.S. 83, 95, 113 S.Ct. 1967, 1974, 124 L.Ed.2d 1 (1993) ; *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 633-34 (Fed.Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991). Hypothetical, conjectural, or conditional disputes based on factual situations that may never develop will not support a request for declaratory relief. *Brown & Root, Inc. v. Big Rock Corp.,* 383 F.2d 662, 665 (5th Cir.1967). The question is "whether the facts alleged, under all the circumstances, show that

there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 57-58, 96 S.Ct. 1917, 1933, 48 L.Ed.2d 450 (1976), *quoting Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed. 2 118 (1969).

**\*2** The Federal Circuit has established a two-part test to determine whether an "actual controversy" exists in an inventorship dispute. *Chou v. University of Chicago,* 254 F.3d 1347, 1358 (Fed.Cir.2001), *citing Fina Oil & Chemical Co. v. Ewen,* 123 F.3d 1466, 1471 (Fed.Cir.1997). A party seeking declaratory relief must prove both: (1) that he holds a recognized interest in a patent that could be adversely affected by an action challenging inventorship; and (2) that another party with a right to bring such an action has created an objectively reasonable apprehension on the part of the plaintiff that it will do so. *Ewen,* 123 F.3d at 1471. The court must analyze the operative facts as they existed at the time the complaint was filed. *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988); *see also Spectronics,* 940 F.2d at 634-35 ("[A] party seeking a declaratory judgment must plead facts initially sufficient to establish the existence of an actual controversy ... [L]ater events may not create jurisdiction where none existed at the time of filing.").

### B.

While maintaining his right to contest inventorship of the '221 and '184 Patents, FN4 defendant argues that the court lacks subject matter jurisdiction over this declaratory judgment action because plaintiff no longer holds a recognized interest in the patents sufficient to create an actual controversy. Indeed, plaintiff admits that he assigned his entire interest in the '221 Patent to Splined Tools Corporation, a company formed by his sister-in-law, in 1995. (Plf. Resp.App. at 1, ¶ 3; at 2, ¶¶ 7-8; at 4, ¶ 12). Splined, in turn, licensed the patent to Superior Ratchet and Tool Company, a manufacturing company owned by plaintiff. (*Id.* at 2, ¶ 8). From 1994 to 1995, Superior sold wrenches to various independent dealers, including Snap-On Tools Company. (*Id.* at 1, ¶¶ 4-5 & 2, ¶ 8). On May 7, 1997, Splined licensed the '221 Patent directly to Snap-On in exchange for royalties on the licensed products. (*Id.* at 3, ¶ 11 & 32-50). A short time later, Superior ceased making wrenches. (*Id.* at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22455387
(Cite as: Not Reported in F.Supp.2d)

3, ¶ 11). Plaintiff then entered into an oral consulting agreement with Splined. (*Id.* at 4, ¶ 12). According to plaintiff:

> FN4. Defendant has withdrawn his correction of inventorship claim against plaintiff. However, he continues to pursue such a claim against Splined Tools Corporation, the assignee of the '221 and '184 Patents. (*See* Def. Reply Br. at 6-7).

I consulted with Splined over inventive and marketing activities and assigned to Splined the rights to [the '184 Patent] ... on September 8, 1998. I was able to enter into and continue under the income producing consulting agreement with Splined based on large part on my status as the named and correct inventor of the '224 and '184 patents.(*Id.*). To date, plaintiff has received more than $500,000 under his consulting agreement with Splined. (*Id.* at 4, ¶ 12). However, due to the inventorship dispute with defendant, plaintiff states that Splined "is unable to pay me a consulting fee and is not paying me a consulting fee." (*Id.*).

Although plaintiff no longer has any ownership rights in the '221 and '184 Patents, certain interests other than ownership may be sufficient to confer standing to sue for declaratory relief. *See Chou,* 254 F.3d at 1358 (suggesting that a party who has "a concrete financial interest in the patent, albeit an interest less than ownership," has standing in an inventorship dispute). Plaintiff argues that his oral consulting agreement with Splined gives him the necessary financial interest to maintain this action. However, the only evidence of this consulting arrangement is plaintiff's self-serving, conclusory statement that he is paid for giving advice regarding unspecified "inventive and marketing activities." (*Id.* at 4, ¶ 12). There is no indication what, if any, relationship exists between those activities and the patents in-suit. For all the record shows, plaintiff could have been paid consulting fees for developing new products not related to the '221 and '184 Patents. FN5 Thus, plaintiff has failed to prove that he has a "concrete financial interest in the patent" necessary to confer standing. *See Chou,* 254 F.3d at 1359.

> FN5. Indeed, at the time plaintiff assigned his rights in the '221 Patent, he "had additional ideas for tools" and anticipated entering into a consulting agreement whereby he would assign the right to "future

inventions" to Splined. (Plf. Resp.App. at 3, ¶ 9).

C.

*3 Plaintiff further argues that he has a "reputational interest" in his status as the inventor of the '221 and '184 Patents. (*See* Plf. Resp.App. at 4, ¶ 14). Although the Federal Circuit has suggested in dicta that "[p]ecuniary consequences may well flow from being designated as an inventor[,]" no federal court has yet to determine whether the mere status of inventor is sufficient to confer standing. *See Chou,* 254 F.3d at 1359.

Whatever the contours of such an interest may be, plaintiff has offered neither evidence nor argument to assist the court in answering this jurisdictional question. Beyond his bald assertion that "I have a reputational interest as inventor of the '221 and '184 Patents," there is nothing in the record to support such a conclusion. Plaintiff's mere say-so is hardly sufficient to carry his burden of proof.

*CONCLUSION*

Plaintiff has failed to prove that he has a recognized interest in the patents in-suit sufficient to create an actual case or controversy. Accordingly, defendant's motion to dismiss for lack of subject matter jurisdiction is granted.

SO ORDERED.

N.D.Tex.,2003.
Cole v. Gummow
Not Reported in F.Supp.2d, 2003 WL 22455387

Briefs and Other Related Documents (Back to top)

• 3:02cv00705 (Docket) (Apr. 05, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   D



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22834499
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Not Reported in F.Supp.2d, 2003 WL 22834499
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
SICOM SYSTEMS LTD., Plaintiff,
v.
AGILENT TECHNOLOGIES, INC., Tektronix, Inc.,
and Lecroy Corporation, Defendants.
**No. Civ.A. 03-040 JJF.**

Nov. 20, 2003.

Steven T. Margolin , and Tiffany L. Geyer , of Ashby & Geddes , Wilmington, Delaware, for Plaintiff Sicom Systems Ltd., Edward W. Goldstein , Christopher M. Faucett , Corby R. Vowell , and Jason W. Deats , of Goldstein & Faucett, L.L.P., of counsel. Josy W. Ingersoll , and Adam W. Poff , of Young, Conaway, Stargatt, & Taylor, LLP , Wilmington Delaware, for Defendant Agilent Technologies, Inc., James Galbraith , Thomas F. Meagher , and John C. Vetter , of Kenyon & Kenyon , New York, New York, Philip J. McCabe , and Susan A. Smith , of Kenyon & Kenyon, San Jose California, of counsel. John T. Meli, Jr. , and Elise Tillinghast , of Fish & Richardson, P . C., Wilmington, Delaware, for Defendant LeCroy Corporation. N. Richard Powers , of Connolly, Bove, Lodge, & Hutz LLP , Wilmington, Delaware, for Defendant Tektronix, Inc., John M. Romary , and Michael R. Kelly , of Finnegan, Henderson, Farabow, Garrett & Dunner, LLP , Washington, District of Columbia, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.
*1 Presently before the Court is Defendants Agilent Technologies, Inc., Tektronix, Inc., and LeCroy Corporation's Motion to Dismiss (D .I. 38-1). For the reasons discussed below, Defendants' Motion to Dismiss will be granted.

BACKGROUND

Plaintiff Sicom Systems Ltd. ("Sicom") is suing for alleged infringement of U.S. Patent 5,33,147 (" '147 patent"). The '147 patent was licensed to Sicom by the Canadian government ("Canada"). Canada retained legal title to the patent and a reversionary interest in the patent. The Licensing Agreement states that Sicom has the right to sue for infringement of the patent.

DISCUSSION

I. Allegations of the Parties

Defendants contend that Sicom is the "sole" but not the "exclusive" licensee of the '147 patent. Defendants assert that Canada has retained the right to use the patented technology and assert that Sicom is merely a licensee. Defendants assert that Sicom's license is not the equivalent of an assignment of the patent and does not give Sicom the capacity to sue for infringement. Thus, Defendants contend that Sicom does not have standing in the present case and that the case must be dismissed.

Sicom contends that it is the exclusive licensee of the '147 patent, and therefore has sufficient interest in the patent to create standing to enforce the patent's claims against alleged infringers. Sicom contends that Canada did not retain the right to make, or to authorize others to make, commercial sales involving the patent that would compete with Sicom and, by electing not to sue in the instant case, Canada relinquished its rights to sue Defendants for infringement of the '147 patent.

II. Legal Standard for a Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows the dismissal of an action when a party "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In reviewing a motion to dismiss for failure to state a claim, "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party." *Strum v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). A court may dismiss a complaint for failure to state a claim only if it is clear that no relief

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22834499
(Cite as: Not Reported in F.Supp.2d)

could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). Stating a claim on which relief can be granted requires stating a legally recognized claim.

### III. Legal Standard for Standing to Sue for Infringement

To survive a motion to dismiss, a party must have standing to sue, i.e. it must have "a sufficient stake in an otherwise justiciable controversy." *Sierra Club v. Morton,* 405 U.S. 727, 731 (1972). Standing must be present at the time the suit is brought. *See Procter & Gamble Co. v. Paragon Trade Brands, Inc.* 917 F.Supp. 305, 309-10 (D.Del.1995).

**\*2** Under the Patent Act, "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. "The word 'patentee' includes not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100. Under 35 U.S.C. § 100, "[t]he owner of a patent or the owner's assignee can commence an action for patent infringement, but a licensee alone cannot." *Calgon Corp. v. Nalco Chemical Co.* 726 F.Supp. 983, 985 (D.Del.1989).

However, an exclusive license is sometimes treated like an assignment, creating a discrete standing to sue for infringement. *See Prima Tek II, L.L.C. v. A-Roo Co.,* 222 F.3d 1372, 1377 (Fed.Cir.2000). For a license to be exclusive enough to create standing, the license must convey all substantial rights. *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA,* 944 F.2d 870, 875 (Fed.Cir.1991). To implement this rule, courts "must ascertain the intention of the parties and examine the substance of what [the licensing agreement] granted." *Prima Tek II, L.L.C. v. A-Roo Co.,* 222 F.3d 1372, 1378 (Fed.Cir.2000).

### IV. Decision and Rationale

Sicom's Licensing Agreement with Canada makes Sicom the "sole" licensee of the '147 patent, while Canada remains the legal title holder of the patent. The Licensing Agreement defines sole as "the right to be the only licensee of the Licensed Intellectual Property." Defendants' Exhibit B, at 7. Canada and Sicom are both given the power to sue under the Agreement. The Agreement allows Sicom to use the patent and grant sub-licenses to use the patent. Under the Agreement, Canada is not allowed to make, or

authorize another to make, commercial sales in competition with Sicom and cannot grant contracts to develop the patent without first offering the contract to Sicom. Sicom must seek approval for any sub-licenses it seeks to grant but approval cannot be unreasonably withheld. Steps taken to defend the patent are to be done jointly by Sicom and Canada. Further, Sicom is not allowed to assign its rights under the Agreement.

After reviewing the provisions of the instant Agreement, the Court concludes that the rights of Sicom are limited. Canada has retained legal title to the patent and, in the Court's view, has not granted Sicom sufficient rights to make Sicom the equivalent of an assignee. Although Canada did not retain the right to compete with Sicom; Canada has retained the right to grant additional licenses and to sue under the patent. FN1 Additionally, the Agreement requires Sicom to obtain approval from Canada prior to granting any sub-licenses and further, Sicom is not permitted to assign its rights under the patent. In sum, after an examination of the provisions of the instant Licensing Agreement, the Court concludes that Canada has retained substantial rights to the patent to a degree sufficient to bar its licensee, Sicom, from alone commencing an action for infringement of the claims of the patent.

> FN1. While Canada may have chosen not to pursue an infringement action against the Defendants here, this choice is not the equivalent of a complete abdication of Canada's right to sue others for infringement of the patent.

### CONCLUSION

**\*3** For the reasons discussed, the Court will grant Defendants' Motion to Dismiss. An order consistent with this Memorandum Opinion will be entered.

### FINAL ORDER

At Wilmington, this 20th day of November 2003, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants Agilent Technologies, Inc., Tektronix, Inc., and LeCroy Corporation's Motion to Dismiss (D.I.38-1) is *GRANTED.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22834499
**(Cite as: Not Reported in F.Supp.2d)**

D.Del.,2003.
Sicom Systems Ltd. v. Agilent Technologies, Inc.
Not Reported in F.Supp.2d, 2003 WL 22834499

Briefs and Other Related Documents (Back to top)

• 1:03cv00040 (Docket) (Jan. 15, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.