## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DR. ANTHONY CZARNIK,          )
                                          )
               Plaintiff,        )
                                          )   C.A. No. 05-400 (JJF)
      v.                     )
                                          )   **JURY TRIAL DEMANDED**
ILLUMINA, INC.,                 )
                                          )
              Defendant.     )

## SECOND AMENDED COMPLAINT FOR CORRECTION OF
## INVENTORSHIP,  NEGLIGENCE, AND FRAUD

Plaintiff, Dr. Anthony W. Czarnik, by his undersigned attorneys, demands a trial by jury

of all claims and issues so triable, and, as and for his Second Amended Complaint for Correction

of Inventorship, Negligence, and Fraud against Defendant, Illumina, Inc., hereby alleges the

following:

### NATURE OF THE ACTION

1.      This is a civil action for correction of inventorship of a U.S. patent under 35

U.S.C. § 256, negligence, and fraud.

2.      These claims by Plaintiff Dr. Anthony W. Czarnik ("Dr. Czarnik") are based on

Defendant Illumina, Inc.'s ("Illumina") intentional deception of, and fraudulent

misrepresentation to, Dr. Czarnik, the U.S. Patent and Trademark Office ("PTO"), foreign patent

offices, current and prospective shareholders and investors of Defendant Illumina and the

consuming public that John R. Stuelpnagel ("Stuelpnagel") and Mark S. Chee ("Chee") were the

inventors of unique and valuable microarray technology jointly developed by Dr. Czarnik.

3.      Stuelpnagel and Chee recruited Dr. Czarnik to join them in the founding of

Illumina and to serve as the company's Chief Scientific Officer with primary responsibility for

the overall research and development activities of the company. After Dr. Czarnik devoted a tremendous amount of time and effort to advance the business and technological goals of Illumina, including creating and being recognized as a joint inventor with Stuelpnagel and Chee of microarray technology that Defendant Illumina, Stuelpnagel and Chee have filed for and obtained utility patents on, Defendant Illumina, Stuelpnagel and Chee conspired, agreed and engaged in a concerted action to obtain further utility patents on the jointly developed microarray technology without informing Dr. Czarnik, without identifying Dr. Czarnik as an inventor and crediting him for his contributions, and on the basis that the claimed technology was created by Stuelpnagel and Chee which, at all relevant times hereto, Defendant Illumina, Stuelpnagel and Chee knew was false.

4.    Dr. Czarnik brings this civil action under 35 U.S.C. § 256, the Declaratory Judgment Act, and the common law seeking: (i) a judgment that Dr. Czarnik is a joint inventor of the identified patents, and issuance of an order requiring Defendant Illumina and the PTO to correct the inventorship by adding Dr. Czarnik as an inventor; (ii) a judgment declaring that Illumina has committed negligence or fraud, or both; (iii) compensatory damages; (iv) punitive damages; and (v) reasonable attorneys' fees and costs.

## THE PARTIES

5.    Plaintiff Dr. Anthony W. Czarnik is a resident of the State of Nevada, and was one of the founders of Defendant Illumina. In 1998, Dr. Czarnik was hired by Illumina to serve as the Chief Scientific Officer ("CSO"). As CSO, Dr. Czarnik was charged with primary responsibility for the overall research and development activities of the company, including: (i) identifying and acquiring with the other founders, Stuelpnagel and Chee, the core enabling

technologies necessary to launch Illumina, (ii) identifying the initial principal application areas for the technology, (iii) working with the other founders in recruiting the core scientific and management team, (iv) collaborating with Illumina's Scientific Advisory Board in setting the overall scientific vision of Illumina, (v) managing and recruiting the research and scientific team, (vi) providing technical leadership to the research group to establish the preeminent group focused on fiber optic array sensors in the life sciences, (vii) participating in the creation of a sound intellectual property portfolio, (viii) collaborating with other leaders of Illumina to establish preeminent research strategy, and (ix) participating in strategic corporate planning. During the course of his service as CSO, and then later as a Research Fellow for Defendant Illumina, Dr. Czarnik developed, and contributed to the development of, many of the technological advances which are now, on information and belief, incorporated in the products and services marketed by Defendant Illumina, including Illumina's microarray analysis products, referred to by Illumina as its "BeadArray Technology."

      6.     Dr. Czarnik is currently a Visiting Professor in the Department of Chemistry at the University of Nevada in Reno and serves as Founder and Manager of a Nevada-based startup company, Protia, LLC. He is currently serving as the Editor of both the American Chemical Society's Journal of Combinatorial Chemistry and of the Wiley book series Solid-Phase Organic Syntheses

      7.     Dr. Czarnik was awarded a Bachelor of Science degree in Biochemistry in 1977 from the University of Wisconsin. Dr. Czarnik continued his studies at the University of Illinois and, in 1980, was awarded a Masters of Science degree in Biochemistry. He received a Ph.D. in Chemistry from the University of Illinois in 1981. Dr. Czarnik conducted postdoctoral work at

Columbia University in New York from 1981-83 as a National Institute of Health Postdoctoral Fellow.

8.      From 1983 to 1993, Dr. Czarnik taught at The Ohio State University ("Ohio State") and, during that time, became tenured as a professor of Chemistry. While working for Ohio State, Dr. Czarnik received a number of awards for his work in organic synthesis and wrote approximately 40 grant applications for research projects with which he was involved.

9.      In 1993, Dr. Czarnik left his position at Ohio State to work in the private sector on bio-organic chemistry and combinatorial chemistry. From 1993-96, Dr. Czarnik held the position of Director, BioOrganic Chemistry for Parke-Davis Pharmaceutical Research in Ann Arbor, Michigan. Dr. Czarnik was Vice-President of Chemistry for a company called IRORI in La Jolla, California from 1996-98, which Dr. Czarnik left to co-found Defendant Illumina.

10.     Dr. Czarnik is recognized as a pioneer in the fields of combinatorial chemistry and fluorescent chemosensors. He has published and lectured extensively on combinatorial chemistry as a tool for drug discovery, and has received numerous grants to conduct research on drug discovery technologies. He is author of over 100 scientific publications and an editor of seven books. He served as co-organizer of the Bioorganic Gordon Research Conference (1997) and founding co-organizer of the Combinatorial Chemistry GRC (1999). Dr. Czarnik has received both DuPont and Merck awards for new faculty, and, in 1986, was presented with an American Cyanamid award in recognition of excellence in the advancement of science and the art of chemical synthesis. He was named an Eli Lilly awardee in 1988, a Fellow of the Alfred P. Sloan Foundation in 1989, and a Teacher-Scholar Fellow of the Camille and Henry Dreyfus Foundation in 1990. Dr. Czarnik has served as Chairman of the American Chemical Society's Committee on Ethical Standards for Publication.

4

11.    On information and belief, Defendant Illumina is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 9885 Towne Centre Drive, San Diego, CA 92121. Defendant Illumina markets and sells microarray analysis products and services, referred to by Illumina as "Beadarray Technology" for SNP genotyping and RNA profiling. These products and services utilize, *inter alia*, the IBL/DBL Invention (invented by Dr. Czarnik) and the Embedded/Encapsulated Nanocrystal Invention (co-invented by Dr. Czarnik) and for which Defendant Illumina has obtained utility patents and continues to seek further patent protection, without naming Dr. Czarnik as an inventor and crediting him for his contribution. Defendant Illumina has an economic stake in the enforceability of the identified patents and patent applications, and has derived, and is still deriving, reputational and financial benefits from fraudulently misrepresenting to the PTO, foreign patent offices, current and prospective shareholders and investors, and the consuming public, that Stuelpnagel and Chee were the inventors of the microarray technology jointly developed with Dr. Czarnik.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as a civil action arising under the Constitution, laws, or treatises of the United States. This Court has subject matter jurisdiction under 35 U.S.C. § 1338, because this action arises under an Act of Congress relating to patents (35 U.S.C. §§ 1, *et seq.*). This Court also has supplemental jurisdiction over Counts II and III included herein pursuant to 28 U.S.C. § 1367, because such claims are so related to the claim over which this Court has original jurisdiction that they form part of the same case or controversy.

13.     Venue is proper in this Judicial District pursuant to the provisions of 28 U.S.C. §§ 1391(b) and (c).

14.     On information and belief, Defendant is a corporation organized and existing under the laws of the State of Delaware and is conducting business in this Judicial District.

15.     Defendant Illumina is the assignee of the identified patents and patent applications, and holds the power to request that the inventorship on these patents and pending applications be corrected pursuant to 35 U.S.C. § 256 and § 116.

16.     This Court has personal jurisdiction over Defendant Illumina.

### FACTUAL BACKGROUND

A.     **Stuelpnagel and Chee Recruit Dr. Czarnik**
       **and Together They Found Illumina**

17.     Stuelpnagel presently serves as Illumina's Senior Vice President and Chief Operating Officer, and has been a Director since April 1998. From April 1998 to October 1999, Stuelpnagel served as the Illumina's acting President and Chief Executive Officer and was acting Chief Financial Officer through April 2000.

18.     Chee, along with Stuelpnagel and Dr. Czarnik, co-founded Defendant Illumina. Chee held the position of Vice President of Genomics at Illumina. On information and belief, Chee is no longer employed by Defendant Illumina.

19.     In November 1997, Stuelpnagel began his efforts to recruit Dr. Czarnik to join him in forming the company that would become Defendant Illumina. Several months later, in April 1998, after discussing the proposed employment terms with Dr. Czarnik, Stuelpnagel made a formal written offer to Dr. Czarnik requesting, *inter alia,* that he join Defendant Illumina to serve as the Chief Scientific Officer, "a position of both technical and strategic leadership having

6

primary responsibility for the overall research and development activities of the Company, and involving participation as a founding architect of the Company's technical and business vision."

20.    In May 1998, Dr. Czarnik accepted Stuelpnagel's offer. The formal written agreement was reprinted, signed by all parties, and Dr. Czarnik, along with Stuelpnagel and Chee, began the process of launching the company, developing both the business and technology plans for the company, putting together the research and scientific team, and raising the necessary funds to move forward. As CSO of the company, Dr. Czarnik's principal responsibilities were identified as including: (i) identifying and acquiring with the other founders the core enabling technologies necessary to launch Illumina, (ii) identifying the initial principal application areas for the technology, (iii) working with the other founders in recruiting the core scientific and management team, (iv) collaborating with Illumina's Scientific Advisory Board in setting the overall scientific vision of Illumina, (v) managing and recruiting the research and scientific team, (vi) providing technical leadership to the research group to establish the preeminent group focused on fiber optic array sensors in the life sciences, (vii) participating in the creation of a sound intellectual property portfolio, (viii) collaborating with other leaders of Illumina to establish preeminent research strategy, and (ix) participating in strategic corporate planning.

21.    Through the summer and fall of 1998, Dr. Czarnik continued to carry out his responsibilities as CSO, leading the research and development efforts of Illumina, participating in technical and business development meetings, recruiting scientists and engineers for Illumina, and collaborating with Stuelpnagel, Chee and others at Illumina regarding potential business relationships with other companies.

7

22.     During this same time period, Dr. Czarnik and Stuelpnagel and Chee began
working with Robin M. Silva, a patent attorney engaged by Illumina who, at the time, was with
the Flehr Hohbach firm in San Francisco, California, to prepare and file patent applications
protecting Illumina's microarray technology.

**B.    Dr. Czarnik's Conception of the IBL/DBL Technology**

23.     As CSO, and in connection with Illumina's research and development efforts, Dr.
Czarnik, during the summer and into the fall of 1998, conducted an extensive review of the
issued patents relating to microarray technology and decoding of arrays to, *inter alia*, gain an
understanding of the subset of the field that Illumina might be able to exploit as its own.

24.     A meeting was held at Robin Silva's office in San Francisco between June 24 and
November 1, 1998, involving Robin Silva, Dr. Czarnik, Stuelpnagel and Chee.  On information
and belief, the meeting occurred in October 1998.  During the meeting, Dr. Czarnik provided an
in depth review of the already issued patents in the field that he had reviewed and identified what
he believed were areas that Illumina should explore for further development and to try to obtain
patent protection.  As part of his review, Dr. Czarnik drew a Venn diagram to explain to the
group what areas within Illumina's research targets he believed were not covered by
competitors' patents and might, therefore, be viable for further development by Illumina and for
Illumina to build its intellectual property base.

25.     Dr. Czarnik also described to the group at the meeting an inventive concept which
he had conceived of for use in the decoding systems under development at Illumina that he
coined Identifier Binding Ligand ("IBL") and Decoder Binding Ligand ("DBL") (collectively,
Czarnik's "IBL/DBL Invention").  Dr. Czarnik explained that in the bead-based analytic systems
for the detection of target analytes under development at Illumina, which utilize beads or

8

microspheres on the surface of a substrate in an array composition, his IBL/DBL Invention could be used to identify bioactive agents attached to the beads or microspheres. More particularly, the beads or microspheres can include IBLs that will specifically bind a corresponding DBL to facilitate the elucidation of the identity of the bioactive agent attached to the beads or microspheres. An IBL and corresponding DBL form a binding partner pair that is used to identify the location of each bioactive agent and decode the array.

C.   **Defendant Illumina, Stuelpnagel and Chee File For Patent Protection Covering Dr. Czarnik's IBL/DBL Invention Recognizing Dr. Czarnik's Contribution and Status as a Joint Inventor with Stuelpnagel and Chee**

26.   On June 24, 1998, Defendant Illumina, Stuelpnagel and Chee filed U.S. provisional patent application S.N. 60/090,473 ("'473 application") entitled "Encoding and Decoding of Fiber Optic Sensors with Microspheres." Stuelpnagel and Chee are listed as co-inventors of the invention described in the '473 application, and Robin Silva is listed as the Attorney of Record for the filing.

27.   The '473 application describes an array composition for the detection of target analytes comprising a library of microspheres each comprising a candidate bioactive agent, and a surface that contains wells such that the microspheres are located within the wells. The '473 application does not include any disclosure of Dr. Czarnik's IBL/DBL Invention.

28.   On November 10, 1998, after the meeting discussed above during which Dr. Czarnik explained his IBL/DBL Invention to Stuelpnagel and Chee, and to Robin Silva, Defendant Illumina, Stuelpnagel and Chee filed a second non-provisional patent application, S.N. 09/189,543 ("'543 application") which, on information and belief, claimed priority from the previously filed '473 application and identified Stuelpnagel and Chee, *and* Dr. Czarnik as co-inventors. The '543 application, entitled "Decoding of Array Sensors with Microspheres,"

discloses and claims Dr. Czarnik's IBL/DBL invention.  Claim 1 of the '543 application, as originally filed, reads as follows:

> 1.    An array composition comprising:
>
> a) a substrate with a surface comprising discrete sites; and
>
> b) a population of microspheres comprising at least a first and second subpopulation, wherein each subpopulation comprises:
>
> > i) a bioactive agent; and
> >
> > ii) *an identifier binding ligand that will bind a decoder binding ligand such that the identification of the bioactive agent can be elucidated*;
>
> wherein said microspheres are distributed on said surface.

29.    On information and belief, the preparation, filing, and/or prosecution of both the '473 application and the '543 application was handled by Robin Silva.

30.    Defendant Illumina, Stuelpnagel and Chee filed additional U.S. and foreign patent applications based on, and claiming priority directly or indirectly from, the '543 application, including: (i) U.S. Patent Application S.N. 09/344,526, filed June 24, 1999; (ii) PCT International Application No. PCT/US99/14387, filed June 24, 1999; (iii)  U.S. Patent Application S.N. 09/748,706, filed December 22, 2000; (iv) U.S. Patent Application S.N. 60/302,213, filed June 28, 2001; (v) PCT International Application No. PCT/US02/22095, filed June 28, 2002; (vi) U.S. Patent Application S.N. 10/187,321, filed June 28, 2002; and (vii) foreign patent applications corresponding to these applications filed in, at least, Australia, Canada, Europe, and Japan.  Each of these applications discloses and claims Dr. Czarnik's IBL/DBL Invention and identifies Stuelpnagel and Chee, *and* Dr. Czarnik as co-inventors.

31.    On information and belief, the preparation, filing, and/or prosecution of each of these applications was handled by Robin Silva.

**D.      Dr. Czarnik Discloses His Medical Condition to Defendant Illumina, Stuelpnagel and Chee**

32.     In November 1998, Stuelpnagel raised concerns with Dr. Czarnik that the research efforts were not progressing rapidly enough.  During this same period, Dr. Czarnik began to experience depressive symptoms resulting from an earlier change in one of his anti-depressant medications that was causing certain undesirable side effects.

33.     In April 1999, Dr. Czarnik was working on an application to the National Institute of Standards and Technology for a $ 2 million grant.  At that time, Dr. Czarnik was experiencing deep depression that interfered with his ability to write the grant.  Dr. Czarnik concluded that he was not going to be able to complete the grant application by the deadline and decided to explain the situation to Stuelpnagel and Chee so that they could complete and submit the application in a timely fashion.

34.     On April 6, Dr. Czarnik met with Stuelpnagel and Chee, but became emotional as he began his explanation and was only able to say that he was not feeling well and would not be able to write the grant.

35.     Stuelpnagel responded angrily, berating Dr. Czarnik for his inability to meet the application deadline.  Chee attempted to intervene, but Stuelpnagel stopped him and continued to yell at Dr. Czarnik, saying that Dr. Czarnik had let the company down and suggesting that Dr. Czarnik had "flamed out" and should leave the company.

36.     Dr. Czarnik indicated that he wanted to stay with the company, but needed to go home to get better.  Stuelpnagel suspected that Dr. Czarnik was suffering from a nervous breakdown, and told Dr. Czarnik – "you can't help Illumina in this state."  He told Dr. Czarnik to go home and rest.

37.     After Dr. Czarnik left, Stuelpnagel and Chee spoke briefly about the encounter and their surprise at Czarnik's behavior. The next day, Stuelpnagel called to see how Dr. Czarnik was doing and told Dr. Czarnik to take whatever time was necessary to recover.

38.     On April 8, Dr. Czarnik followed the advice of his brother, a physician, by taking an amphetamine to quickly overcome his depressive symptoms and immediately began to feel "good."

39.     Dr. Czarnik went into the office that day and met with Stuelpnagel and Illumina's Vice President of Operations. Dr. Czarnik explained his history of depression and that he had suffered a depressive episode as a result of the change in his medication. Dr. Czarnik told them he was getting treatment and felt that he could finish writing the grant application, which he then did.

40.     On April 11, Stuelpnagel and Chee discussed replacing Dr. Czarnik as the CSO based on their concern about his personal health. They agreed to monitor the situation to see whether the breakdown was an "isolated incident" or "would turn into a pattern . . . ."

**E.     Defendant Illumina, Stuelpnagel and Chee Engage in a Pattern of Conduct Intended to Exclude and Ultimately Remove Dr. Czarnik from any Participation in Defendant Illumina's Activities and from Any Recognition as a Co-Inventor of the Microarray Technology**

41.     Beginning in April 1999, just after Dr. Czarnik disclosed his medical condition to Defendant Illumina's senior management, including Stuelpnagel and Chee, Dr. Czarnik was no longer included in important decision-making about fundraising, financing, company presentations, strategic planning, hiring and whether to take the company public.

42.     On information and belief, after Dr. Czarnik's disclosure to Defendant Illumina, Stuelpnagel and Chee of his medical condition in April 1999, they engaged in a pattern of intentional conduct intended to exclude and ultimately remove Dr. Czarnik from any

participation in Defendant Illumina's activities and from any recognition as a co-inventor of the microarray technology.

43.    On May 20, 1999, approximately one month after Dr. Czarnik's disclosure of his medical condition, Defendant Illumina, Stuelpnagel and Chee filed U.S. Patent Application S.N. 09/315,584 ("'584 application"), which issued as U.S. Patent No. 6,544,732 ("'732 patent") (attached as "Exhibit A") on April 8, 2003. The '584 application, like the '543 application and the U.S. and foreign patent applications based on, and claiming priority directly or indirectly from the '543 application discussed above in § C, discloses and claims Dr. Czarnik's IBL/DBL Invention. Claim 15 of the '732 patent, which the '584 application issued as, reads as follows:

15.    An array composition comprising:

a) a substrate with a surface comprising discrete sites, wherein said discrete sites are wells; and

b) a population of microspheres comprising at least a first and a second subpopulation, wherein each subpopulation comprises:

i) a bioactive agent; and

ii) *an identifier binding ligand bound to a decoder binding ligand comprising a nanocrystal such that the identification of the bioactive agent can be elucidated*;

wherein said microspheres are randomly distributed on said surface.

44.    Unlike the '543 application and the U.S. and foreign patent applications based on, and claiming priority directly or indirectly from, the '543 application discussed above in § C, Dr. Czarnik is *not* named as one of the inventors on the '584 application or on the '732 patent. Chee is named, along with two Illumina scientists that were not involved in the development of the IBL/DBL Invention.

45.    On information and belief, the preparation, filing, and/or prosecution of the '584 application was handled by Robin Silva.

46.    Defendant Illumina and Chee filed U.S. and foreign patent applications based on, and claiming priority directly or indirectly from, the '584 application, including: (i) PCT International Application No. PCT/US00/13940, filed May 22, 2000; (ii) U.S. Patent Application S.N. 10/334,416; and (iii) foreign patent applications corresponding to these applications, filed in, at least, Australia, Canada, and Europe. Each of these applications discloses and claims Dr. Czarnik's IBL/DBL Invention, but does not name Dr. Czarnik as one of the inventors. Chee is named, along with two Illumina scientists that were not involved in the development of the IBL/DBL Invention.

47.    On information and belief, the preparation, filing, and/or prosecution of each of these applications was handled by Robin Silva.

48.    On information and belief, Defendant Illumina, Stuelpnagel and Chee naming Chee as a joint inventor and omitting Dr. Czarnik on the '584 application/'732 patent, filed approximately one month after Dr. Czarnik's disclosure to Defendants of his medical condition, and on the other U.S. and foreign patent applications based on, and claiming priority directly or indirectly from, the '584 application, was a deliberate act intended to deceive the PTO, foreign patent offices, current and prospective shareholders and investors, and the consuming public that Chee, not Dr. Czarnik, is a joint inventor with Chanfeng Zhao and Steven M. Barnard of the IBL/DBL Invention jointly developed by Dr. Czarnik.

49.    On December 28, 1998, Defendant Illumina, Stuelpnagel and Chee filed U.S. Provisional Patent Application S.N. 60/113,968 ("'968 application") entitled "Composite Arrays Utilizing Microspheres." Stuelpnagel and Chee, and an Illumina scientist named Steven R.

Auger, are listed as co-inventors of the invention described in the '968 application. The '968 application includes disclosure of Dr. Czarnik's IBL/DBL Invention, but does not name Dr. Czarnik as one of the inventors.

50.　　On February 24, 1999, Defendant Illumina, Stuelpnagel and Chee filed a non-provisional patent application, S.N. 09/256,943 ("'943 application"), which claimed priority from the previously filed '968 application and identified Stuelpnagel and Chee, and Steven R. Auger as co-inventors. The '943 application, which issued as U.S. Patent No. 6,429,027 ("'027 patent") (attached as "Exhibit B") on August 6, 2002, discloses and claims Dr. Czarnik's IBL/DBL invention. Claim 6 of the '027 patent, which the '943 application issued as, reads as follows:

> 1.　　A composite array composition comprising:
>
> a) a substrate with a surface comprising a plurality of assay locations, each assay location comprising an array location, said array location comprising a plurality of discrete sites; and
>
> b) a population of microspheres comprising at least a first and a second subpopulation, wherein said first subpopulation comprises a first bioactive agent and wherein said second subpopulation comprises a second bioactive agent;
>
> wherein said microspheres are distributed in said discrete sites in said array location.
>
> 6.　　A composition according to claim 1 wherein each of said subpopulations further comprise *an identifier binding ligand that will bind a decoder binding ligand for identification of said bioactive agent.*

51.　　Dr. Czarnik is not named as one of the inventors on the '943 application or on the '027 patent. Stuelpnagel and Chee are named, along with an Illumina scientist that was not involved in the development of the IBL/DBL Invention.

52. On information and belief, the preparation, filing, and/or prosecution of the '943 application, now '027 patent, was handled by Robin Silva.

53. On December 28, 1999, Defendant Illumina, Stuelpnagel and Chee filed a second non-provisional patent application, S.N. 09/473,904 ("'904 application"), which claimed priority from the previously filed '943 application and '968 application, and identified Stuelpnagel and Chee, and Steven R. Auger as co-inventors. The '904 application, which issued as U.S. Patent No. 6,858,394 ("'394 patent") (attached hereto as "Exhibit C") on February 22, 2005, discloses and claims Dr. Czarnik's IBL/DBL invention. Claim 6 of the '904 application, as originally filed, reads as follows:

> 1. A composite array composition comprising:
>
> a) a substrate with a surface comprising a plurality of assay locations, each assay location comprising a plurality of discrete sites; and
>
> b) a population of microspheres comprising at least a first and a second subpopulation, wherein each subpopulation comprises a bioactive agent;
>
> wherein said microspheres are distributed on each of said assay locations.
>
> 6. A composition according to claim 1 wherein each of said subpopulations further comprise *an identifier binding ligand that will bind a decoder binding ligand such that the identification of the bioactive agent can be elucidated.*

54. Dr. Czarnik is not named as one of the inventors on the '904 application or on the '394 patent. Stuelpnagel and Chee are named, along with an Illumina scientist that was not involved in the development of the IBL/DBL Invention.

55. On information and belief, the preparation, filing, and/or prosecution of the '904 application, now '394 patent, was handled by Robin Silva.

56. Defendant Illumina, Stuelpnagel and Chee filed U.S. and foreign patent applications based on, and claiming priority directly or indirectly from, the '943 application,

including: (i) U.S. Patent Application S.N. 09/606,369, filed June 28, 2000; (ii) U.S. Patent Application S.N. 10/194,912, filed July 12, 2002; (iii) U.S. Patent Application S.N. 10/767,249, filed January 28,2004; (iv) U.S. Patent Application S.N. 10/767,476, filed January 28, 2004; and, (v) foreign patent applications corresponding to these applications filed in, at least, Australia, Canada, Europe, and Japan. Each of these applications discloses and claims Dr. Czarnik's IBL/DBL Invention, but does not name Dr. Czarnik as one of the inventors. Stuelpnagel and Chee are named, along with one or more Illumina scientists that were not involved in the development of the IBL/DBL Invention.

57.     On information and belief, the preparation, filing, and/or prosecution of each of these applications was handled by Robin Silva.

58.     On information and belief, Defendant Illumina, Stuelpnagel and Chee naming Stuelpnagel and Chee as joint inventors and omitting Dr. Czarnik on the '943 application/'027 patent and '904 application/'394 patent, filed after Dr. Czarnik's disclosure to Defendant Illumina, Stuelpnagel and Chee of his medical condition, and on the additional U.S. and foreign patent applications based on, and claiming priority directly or indirectly from, the '943 application, was a deliberate act intended to deceive the PTO, foreign patent offices, current and prospective shareholders and investors, and the consuming public that Stuelpnagel and Chee, not Dr. Czarnik, are joint inventors of the IBL/DBL Invention jointly developed by Dr. Czarnik.

59.     The foregoing pattern of systematically omitting Dr. Czarnik, after Dr. Czarnik's disclosure to Defendant Illumina, Stuelpnagel and Chee of his medical condition in April 1999, as a named co-inventor on U.S. and foreign issued patents and pending applications disclosing and claiming the IBL/DBL Invention was part of a deliberate scheme by Defendant Illumina, Stuelpnagel and Chee intended to exclude and ultimately remove Dr. Czarnik from any

participation in Defendant Illumina's activities and from any recognition as a co-inventor of the microarray technology.

**F.     Dr. Czarnik's Conception of the Embedded/Encapsulated
        Nanocrystal Invention**

  60. Prior to Dr. Czarnik's disclosure to Defendants of his medical condition in April 1999, during the fall of 1998 into the spring of 1999, Dr. Czarnik continued to be heavily involved in Illumina's research and development efforts. As part of that involvement, he, along with two Illumina scientists, Chanfeng Zhao and Steven M. Barnard, conceived of encapsulating and/or embedding encoding quantum dots, which are also referred to as nanocrystals, into beads (*e.g.*, porous silica beads) for use in the bead-based analytic systems for the detection of target analytes under development at Illumina (Czarnik's "Embedded/Encapsulated Nanocrystal Invention").

  61. Dr. Czarnik's inventive contribution to the Embedded/Encapsulated Nanocrystal Invention is described in an April 1999 Illumina Invention Disclosure document, which names Dr. Czarnik, Chanfeng Zhao, and Steven M. Barnard.

**G.     Defendant Illumina and Chee File For Patent Protection Covering
        Dr. Czarnik's Embedded/Encapsulated Nanocrystal Invention,
        Naming Chee as a Joint Inventor and Omitting Dr. Czarnik**

  62. As discussed above, on May 20, 1999, Defendant Illumina and Chee filed the '584 application, which issued as the '732 patent. In addition to disclosing and claiming Dr. Czarnik's IBL/DBL Invention, the '584 application/'732 patent disclosed and claimed Dr. Czarnik's Embedded/Encapsulated Nanocrystal Invention. Claim 1 of the '732 patent, which the '584 application issued as, reads as follows:

1.    A composition comprising:

a) a substrate with a surface comprising discrete sites, wherein said discrete sites are wells; and

b) a population of microspheres randomly distributed on said discrete sites, wherein at least one of said microspheres comprises a *nanocrystal*.

63.    As described above in connection with Defendant Illumina, Stuelpnagel and Chee omitting Dr. Czarnik as a named inventor on the basis of the IBL/DBL Invention, after Dr. Czarnik's disclosure to them of his medical condition in April 1999, Defendant Illumina, Stuelpnagel and Chee engaged in a pattern of conduct intended to exclude and ultimately remove Dr. Czarnik from any participation in Defendant Illumina's activities and from any recognition as a co-inventor of the microarray technology.

64.    On information and belief, Defendant Illumina, Stuelpnagel and Chee naming Chee as a joint inventor and omitting Dr. Czarnik on the '584 application, filed approximately one month after Dr. Czarnik's disclosure to them of his medical condition, was a deliberate act intended to deceive the PTO, foreign patent office, current and prospective shareholders and investors, and the consuming public that Chee, not Dr. Czarnik, is a joint inventor with Chanfeng Zhao and Steven M. Barnard of the Embedded/Encapsulated Nanocrystal Invention jointly developed by Dr. Czarnik.

65.    In addition to the '584 application, which issued as the '732 patent, Defendant Illumina, Stuelpnagel and Chee filed U.S. Patent Application S.N. 10/334,416 ("'416 application") on December 31, 2002, which issued as United States Patent No. 6,890,764 (the "'764 patent") (attached hereto as "Exhibit D") on May 10, 2005. The '416 application also discloses and claims the use of the Embedded/Encapsulated Nanocrystal Invention jointly developed by Dr. Czarnik. Claim 25 of the '416 application, as originally filed, reads as follows:

19

1.    A method of decoding an array composition comprising:

a) providing an array composition comprising:

i) a substrate with a surface comprising discrete sites; and

ii) a population of microspheres comprising at least a first and a second subpopulation, wherein each subpopulation comprises a bioactive agent;

wherein said microspheres are distributed on said surface;

b) adding a plurality of decoding binding ligands comprising optical signatures to said array composition to identify the location of at least a plurality of the bioactive agents, wherein at least one of said optical signatures comprises a *nanocrystal*.

66.    As with the '584 application/'732 patent, which the '416 application claims priority from, Chee is named as an inventor along with Chanfeng Zhao and Steven Barnard. Zhao and Barnard were the individuals named with Dr. Czarnik on the April 1999 Invention Disclosure document, written one month before the priority date for the '416 application, which issued as the '764 patent.  Chee was not identified as a contributor to the invention in the April 1999 document, but Defendant Illumina, Stuelpnagel and Chee identified Chee, and not Dr. Czarnik, as an inventor of the '416 application.

67.    On information and belief, the preparation, filing, and/or prosecution of the '416 application, which issued as the '764 patent, was handled by Robin Silva.

68.    On information and belief, Defendant Illumina, Stuelpnagel and Chee naming Chee as a joint inventor and omitting Dr. Czarnik on the '416 application, now issued as the '764 patent, based on technology disclosed within the April 1999 Invention Disclosure document, was a deliberate act intended to deceive the PTO, foreign patent offices, current and prospective shareholders and investors, and the consuming public that Chee, not Dr. Czarnik, is a joint

20

inventor with Chanfeng Zhao and Steven M. Barnard of the Embedded/Encapsulated Nanocrystal Invention jointly developed by Dr. Czarnik.

69.    The foregoing pattern of systematically omitting Dr. Czarnik, after Dr. Czarnik's disclosure to Defendant Illumina, Stuelpnagel and Chee of his medical condition in April 1999, the very same month in which he jointly developed the Embedded/Encapsulated Nanocrystal Invention, as a named co-inventor on U.S. and foreign issued patents and pending applications disclosing and claiming the Embedded/Encapsulated Nanocrystal Invention was part of a deliberate scheme by them intended to exclude and ultimately remove Dr. Czarnik from any participation in Defendant Illumina's activities and from any recognition as an inventor of the microarray technology.

**H.    Flatley Joins Illumina and Dr. Czarnik is Terminated**

70.    In October 1999, Jay T. Flatley succeeded Stuelpnagel as Illumina's Chief Executive Officer.  Dr. Czarnik had hoped that Flatley would give him a fresh start with company management, but Flatley showed no interest in getting to know Dr. Czarnik, understanding his function at the company or including him in projects that specifically fell within his expertise and work responsibilities.  Dr. Czarnik never told Flatley about his illness, although Flatley was apparently aware of it.

71.    By January 2000, Flatley felt that Dr. Czarnik was a "potential serious problem" for Illumina and concluded that he needed to replace Dr. Czarnik as the CSO.  At that point, Flatley stopped relying on Dr. Czarnik to carry out his responsibilities as Illumina's CSO. During this same time period, Dr. Czarnik approached Flatley and indicated his willingness to step down from the CSO position to the Vice President of Chemistry if Flatley wanted to bring someone else in to his current position.

72.    In February 2000, Flatley and Dr. Czarnik met for dinner and Flatley inquired whether Dr. Czarnik was still willing to step down as the CSO and become a Research Fellow for Illumina, which was a non-managerial role. At that time, Flatley told Dr. Czarnik he would involve him in the search for a new CSO, but Flatley failed to mention that Illumina's search efforts were already on-going and that he had identified David Barker as a potential candidate for the position.

73.    On March 1, 2000, Flatley removed Dr. Czarnik from the CSO position and told him Illumina would be reducing his salary and repurchasing a large portion of his Illumina stock. Very shortly thereafter, Illumina hired David Barker to replace Dr. Czarnik as the CSO, and in mid-March Flatley asked Dr. Czarnik to sign a new employment contract that included a $ 20,000 reduction in Dr. Czarnik's salary and a repurchase of 167,000 in Illumina shares.

74.    Knowing that Illumina could not repurchase Dr. Czarnik's stock without his consent, Flatley told Czarnik "you better take this because I'm doing you a big favor, and if you don't take this, life is going to be tough for you in the future." Dr. Czarnik refused to sign the proposed contract.

75.    In late March, Dr. Czarnik told Flatley that he was willing to resign from the company if Illumina would agree to pay him one year of salary and to allow him to keep all of his Illumina stock. Flatley rejected Dr. Czarnik's proposal, but was willing to negotiate with Czarnik about his possible severance from the company.

76.    While Dr. Czarnik and Flatley were in the midst of negotiations, Dr. Czarnik discovered that Illumina's S-1 filing with the Securities and Exchange Commission in connection with the planned initial public offering (IPO) of the company's stock omitted any discussion of his role in the development of its technology.

77.     On April 5, 2000, Dr. Czarnik sent Flatley an e-mail in which he asserted that Flatley's attempts to reduce his salary, take away his stock options and omit him from the company history were "discriminatory and punitive," based on his illness, and that if he resigned it would not be voluntary.

78.     On May 4, 2000, Flatley told Dr. Czarnik that he planned to change Dr. Czarnik's performance goals and that henceforth Dr. Czarnik would be reporting to him rather than to Barker. Flatley also gave Czarnik a counseling memo regarding problems with his performance. On May 18, Dr. Czarnik filed a complaint with the California Department of Fair Employment and Housing (DFEH), alleging that Illumina had discriminated against him because of his disability and had punished him for complaining about the discriminatory treatment. Dr. Czarnik informed Flatley that he was going to the DFEH on that day, and therefore might be late for their regularly scheduled weekly meeting. At approximately the same time, Flatley began to consider whether to terminate Dr. Czarnik's employment.

79.     The next day (May 19), Flatley gave Dr. Czarnik a new set of 90-day performance goals which were, Flatley admitted, "aggressive." In fact, these performance goals were unattainable because they required Dr. Czarnik to accomplish more than Illumina's staff had achieved since the inception of the company, and because Illumina lacked certain technology that would have facilitated the accomplishment of those goals until shortly before Dr. Czarnik's termination.

80.     Although Illumina received a formal notification from the DFEH about Dr. Czarnik's claim and prepared a formal response to the claim, it did nothing to investigate Dr. Czarnik's allegations, in contravention of Illumina's personnel policies.

81.    In July 2000, Defendants Flatley and Stuelpnagel, and other company representatives, made presentations to potential investors in cities across the country to promote the IPO of Illumina's stock. While the "road show" was on-going, Dr. Czarnik found out that there had been a possible mislabeling of the dyes Illumina used in its "768" decoding experiment and he told Chee, who was in charge of the office while the other managers were away. Dr. Czarnik told Chee that he was concerned about the integrity of the results of the experiment, the "success" of which was a significant part of the IPO promotions, and that using the results to promote the IPO could constitute a fraud on investors. Dr. Czarnik continued to question the propriety of relying on the 768 decoding results to promote the company, but his objections fell on deaf ears.

82.    On September 5, 2000, Flatley terminated Dr. Czarnik for not meeting performance goals and indicated that if Dr. Czarnik "[told] anyone outside of the company about the reagent [dye] problem, the company will go after you with everything it has." Illumina's human resources manager immediately escorted Dr. Czarnik out of the building.

83.    A week later, Dr. Czarnik received a $4,516.67 check from Illumina for the repurchase of his unvested shares of company stock, which at the time had a fair market value of $ 10 million. Dr. Czarnik never cashed the check.

84.    In March 2001, Dr. Czarnik filed an action in the Superior Court of San Diego County contending that Defendant Illumina had wrongfully terminated him from his Research Fellow position. After a five week trial, the jury returned a verdict in Dr. Czarnik's favor on all of his claims, finding: (1) Illumina terminated his employment and took other adverse employment actions against him in whole or part because of his disability; (2) the company terminated Dr. Czarnik and took other adverse employment actions against him in whole or part

because he complained about discrimination; (3) Dr. Czarnik had a reasonable belief that Illumina used or was planning to use the results of the 768 decoding experiment in a misleading manner in its presentations to potential investors and had raised his concerns to appropriate individuals at Illumina; (4) the decision-makers involved in Dr. Czarnik's termination were aware that Czarnik had raised concerns about the company's use of the 768 decoding experiment results and the termination was based in whole or part on that fact; (5) Illumina terminated Dr. Czarnik in whole or part because he raised concerns regarding the 768 experiment; and (6) Dr. Czarnik had suffered $ 2,196,935 in damages as a result of Defendant Illumina's misconduct.

85.    The jury also found that Illumina was motivated by malice, fraud and oppression and awarded Dr. Czarnik $5 million in punitive damages. After Illumina unsuccessfully sought judgment notwithstanding the verdict and a new trial, the parties stipulated that Dr. Czarnik was entitled to recover $325,000 in attorney fees.

86.    Defendant Illumina appealed the judgment to the Court of Appeal of California, and on December 3, 2004, the Appeals Court issued its opinion rejecting Illumina's arguments, affirming the judgment, and reducing only the $5 million punitive damage award to $2,196,935.

## I.    Dr. Czarnik Discovers Defendant Illumina's, Stuelpnagel's and Chee's Misrepresentations Regarding Inventorship

87.    On August 14, 2001, almost one year after Dr. Czarnik was terminated from Illumina, Robin Silva sent Dr. Czarnik a letter advising him that Illumina had "recently filed a continuation-in-part case, which included some additional material added after [Dr. Czarnik] left Illumina." Ms. Silva indicated to Dr. Czarnik in the letter that "[w]e believe you are a co-inventor on this new application" and requested that Dr. Czarnik execute a Nondisclosure

Agreement ("NDA") so that the application and formal documents could be provided to Dr. Czarnik.

88.    Dr. Czarnik promptly signed the NDA, as Illumina requested, and per Ms. Silva's instructions, reviewed, executed and returned the formal papers to Ms. Silva for filing with the PTO.

89.    Dr. Czarnik justifiably believed, based on the deliberate actions of Defendant Illumina, that he was receiving the proper credit and recognition as the inventor of the claimed IBL/DBL Invention, and that his interests as an inventor for those inventions he made while at Illumina were being protected.

90.    Just over a year later, in October 2002, Dr. Czarnik received another letter requesting that Dr. Czarnik, as a joint inventor of the claimed invention, execute a Declaration and Power of Attorney for the patent application, indicating that he is "an original, first and joint inventor of the subject matter that is claimed and for which a patent is sought," and an Assignment of the patent application, invention, and all rights therein to Defendant Illumina. The letter, which was sent by a colleague of Robin Silva, was carbon copied to her.

91.    Just as with the prior letter he had received, Dr. Czarnik signed the papers, as requested and in accordance with the instructions, and returned them to Ms. Silva's office for filing with the PTO.

92.    Dr. Czarnik's belief that he was receiving the proper credit and recognition as the inventor of the claimed IBL/DBL Invention, and that his interests as an inventor for those inventions he made while at Illumina were being protected, was further confirmed by these intentional actions of Defendant Illumina.

93.    In December 2004, Dr. Czarnik discovered that he had been seriously misled by Defendant Illumina. After being terminated, Dr. Czarnik was provided with little, if any, information on Illumina. As part of Dr. Czarnik's efforts to try and keep tabs on what was going on at Illumina after his termination, Dr. Czarnik routinely checked the Yahoo Message Boards. During a check of the Yahoo Message Board for Illumina in December 2004, Dr. Czarnik discovered a December 5, 2004 posting that included a link to the PTO's website, referring to the PTO's database for patents and Illumina. Dr. Czarnik clicked on the link and was surprised to learn that, in addition to patents issued and assigned to Illumina, several of Illumina's published patent applications were also listed.

94.    Dr. Czarnik went through the list of identified Illumina issued patents and published patent applications, and reviewed each one. During this review in December 2004, Dr. Czarnik learned for the first time, and to his surprise, that the Defendant Illumina, Stuelpnagel, Chee and Silva had prepared, filed, and prosecuted to issuance, patents disclosing and claiming his IBL/DBL Invention and his Embedded/Encapsulated Nanocrystal Invention without informing him, without identifying him as an inventor, and without giving him the credit and recognition he was, and is, entitled to.

95.    Defendant Illumina, Stuelpnagel and Chee concealed these filings with the PTO disclosing and claiming Dr. Czarnik's IBL/DBL Invention and Embedded/Encapsulated Nanocrystal Invention from him, knowing that the inventorship on these filings was false, while, at the same time, sending letters and formal papers to Dr. Czarnik advising him that he was a joint inventor on the selected two filings they decided to inform him about. Defendant Illumina's, Stuelpnagel's and Chee's actions in sending these letters and formal papers to Dr. Czarnik on two of the patent applications they filed, and not the many others, were, on

information and belief, intentionally designed to mislead Dr. Czarnik into believing that he was

receiving the proper credit and recognition for those inventions he made at Illumina, and that his

interests as an inventor were being protected. On information and belief, Defendant Illumina,

Stuelpnagel and Chee knew this was false.

96.     Dr. Czarnik justifiably relied on Defendant Illumina's, Stuelpnagel's and Chee's

misleading actions and nondisclosure to his detriment. Stuelpnagel and Chee, and not Dr.

Czarnik, were credited with creating the inventions jointly developed by Dr. Czarnik. On

information and belief, Defendant Illumina, Stuelpnagel and Chee knew Dr. Czarnik was a joint

inventor of the claimed inventions, and that they were not entitled to be named as joint inventors

without Dr. Czarnik.

97.     Defendant Illumina, Stuelpnagel and Chee conspired, agreed and engaged in a

concerted action to obtain further utility patents on the IBL/DBL Invention and

Embedded/Encapsulated Nanocrystal Invention jointly developed by Dr. Czarnik without

informing Dr. Czarnik, without identifying Dr. Czarnik as a co-inventor and crediting him for his

contributions, and on the basis that the claimed technology was created by Stuelpnagel and Chee

which, at all relevant times hereto, they knew was false.

## J.     Dr. Czarnik's Filings with the U.S. Patent and Trademark Office Addressing the Inventorship Issue

98.     During the course of the next few months, Dr. Czarnik worked with a registered

patent attorney, Dr. David H. Vance, investigating the inventorship issues further. On March 16,

2005, Dr. Czarnik filed multiple Protests with the PTO pursuant to 37 C.F.R. § 1.291 regarding

the most recently filed and/or granted, but not yet issued, applications claiming the IBL/DBL

Invention and/or Embedded/Encapsulated Nanocrystal Invention. Specifically, the Protests were

filed in connection with: (i) U.S. Patent Application S.N. 10/194,912, filed July 12, 2002; (ii) the

'416 application, filed December 31, 2002; (iii) U.S. Patent Application S.N. 10/767,249, filed January 28,2004; and (iv) U.S. Patent Application S.N. 10/767,476, filed January 28, 2004.

99.    In addition, and on this same date, Dr. Czarnik filed a letter with the Office of the Solicitor of the PTO informing the Solicitor of the incorrect inventorship on three patents issued to Illumina: (i) the '027 patent; (ii) the '732 patent; and, (iii) the '394 patent.

100.    The PTO has taken no action in response to either the Protests or the letter to the Solicitor.

## K.    Injury to Dr. Czarnik as a Direct and Foreseeable Consequence of Defendant Illumina's Actions

101.    As set forth in detail above, Dr. Czarnik has not been given the credit and recognition he was entitled to for his contributions to the patented microarray technology, and was excluded and ultimately removed from any participation in Defendant Illumina's activities and from any recognition as a co-inventor of the microarray technology he co-invented.  Dr. Czarnik justifiably relied on Defendant Illumina's misleading actions and nondisclosure regarding inventorship.

102.    During the time period when Dr. Czarnik was employed by Defendant Illumina, he was earning approximately $200,000.00 in annual salary and receiving 6,700 shares of Illumina stock per month.  Dr. Czarnik's annual salary, valuing the shares he received on a conservative basis, was approximately $1 million per year.

103.    Further, the recognition that Dr. Czarnik initially received while at Illumina, including his being recognized as contributing to the IBL/DBL technology and being credited as a co-inventor, bolstered his reputation and standing within the scientific community.  At that point in time, Dr. Czarnik received the reputational benefits associated with, and gained the prestige within the scientific community resulting from, being named as an inventor, including

numerous offers to participate in invited scientific seminars and many inquiries from recruiters

retained to search for and hire recognized researchers and scientists to fill Chief Technology

Officer and Chief Science Officer positions in a wide range of technology companies.

104.    As a direct and foreseeable consequence of Defendant Illumina's actions,

including Illumina not giving Dr. Czarnik the credit and recognition as a co-inventor that he was

entitled to for his contributions to the patented microarray technology, Dr. Czarnik has suffered

damage to his reputation and standing within the scientific community, has not received the

reputational benefits associated with being named as an inventor, and has suffered a loss of

prestige within the scientific community resulting from his inventions being recognized as

another's.

105.    During his testimony in the prior lawsuit by Dr. Czarnik against Illumina, Flately,

Illumina's CEO, testified that, if Dr. Czarnik had simply resigned from Illumina, "He could join

another start-up and get another few hundred thousand shares of stock at another start-up. That's

not something he was giving up permanently. He would give up Illumina's and get the new

one." Trial Transcript, p. 1457.

106.    As a direct and foreseeable consequence of Defendant Illumina's actions,

including Illumina not giving Dr. Czarnik the credit and recognition as a co-inventor that he was

entitled to for his contributions to the patented microarray technology, Dr. Czarnik has not been

able to "join another start-up and get another few hundred thousand shares of stock" which, as

set forth above, amounted to an annual salary of approximately $1 million. As a direct and

foreseeable consequence of these actions by Defendant Illumina, Dr. Czarnik has been damaged

in an amount to be proven at trial.

## COUNT I

### CORRECTION OF INVENTORSHIP
### PURSUANT TO 35 U.S.C. § 256
### (ISSUED U.S. PATENTS)

107.    Dr. Czarnik incorporates by reference paragraphs 1-106 as if fully set forth herein.

108.    Prior to October 1998, Dr. Czarnik conceived of the IBL/DBL Invention.

109.    Prior to May 1999, Dr. Czarnik, along with two Illumina scientists, Chanfeng Zhao and Steven M. Barnard, conceived of the Embedded/Encapsulated Nanocrystal Invention.

110.    In May 1999, just after Dr. Czarnik's disclosure to Defendant Illumina, Stuelpnagel and Chee of his medical condition, Defendant Illumina, Stuelpnagel and Chee filed a series of patent applications both in the U.S. and abroad disclosing and claiming Dr. Czarnik's IBL/DBL Invention and Embedded/Encapsulated Nanocrystal Invention, and omitting Dr. Czarnik as a named co-inventor.

111.    On information and belief, Defendant Illumina, Stuelpnagel and Chee naming Stuelpnagel and/or Chee as co-inventors and omitting Dr. Czarnik, after Dr. Czarnik's disclosure to them of his medical condition, was a deliberate act intended to deceive the PTO, foreign patent offices, current and prospective shareholders and investors, and the consuming public that Stuelpnagel and/or Chee, not Dr. Czarnik, are joint inventors of the IBL/DBL Invention and Embedded/Encapsulated Nanocrystal Invention jointly developed by Dr. Czarnik.

112.    The error in not naming Dr. Czarnik as a joint inventor on the identified issued U.S. patents for which correction of inventorship is sought arose without any deceptive intention on the part of Dr. Czarnik.

113.    On information and belief, all parties concerned with the inventorship of the issued patents identified herein and for which correction of inventorship is sought are on notice,

and Defendant Illumina, as the assignee of the identified issued patents, holds the power to request that the inventorship on these patents be corrected pursuant to 35 U.S.C. § 256.

114.    Dr. Czarnik is a joint inventor of the identified issued U.S. patents for which correction of inventorship is sought and, pursuant to 35 U.S.C. § 256, inventorship should be corrected by adding Dr. Czarnik as a joint inventor.

115.    As a direct and foreseeable consequence of Defendant Illumina's actions, including Illumina not giving Dr. Czarnik the credit and recognition as a co-inventor that he was entitled to for his contributions to the patented microarray technology, Dr. Czarnik has suffered damage to his reputation and standing within the scientific community, has not received the reputational benefits associated with being named as an inventor, and has suffered a loss of prestige within the scientific community resulting from his inventions being recognized as another's.

116.    As a direct and foreseeable consequence of Defendant Illumina's actions, including Illumina not giving Dr. Czarnik the credit and recognition as a co-inventor that he was entitled to for his contributions to the patented microarray technology, Dr. Czarnik has not been able to "join another start-up and get another few hundred thousand shares of stock" which, as set forth above, amounted to an annual salary of approximately $1 million.

**COUNT II**

**NEGLIGENCE**

117.    Dr. Czarnik incorporates by reference paragraphs 1-116 as if fully set forth herein.

118.    Defendant Illumina had a duty to list the true and correct inventors, each of them, on the issued patents and patent applications listed above.

119.    Defendant Illumina breached that duty by not listing Dr. Czarnik as a co-inventor on the issued patents and patent applications listed above.

120.    Defendant Illumina's breach of its duty proximately caused Dr. Czarnik's injuries including those specified in paragraphs 101-106 above.

121.    As a direct and foreseeable consequence of Defendant Illumina's actions, including Illumina not giving Dr. Czarnik the credit and recognition as a co-inventor that he was entitled to for his contributions to the patented microarray technology, Dr. Czarnik has suffered damage to his reputation and standing within the scientific community, has not received the reputational benefits associated with being named as an inventor, and has suffered a loss of prestige within the scientific community resulting from his inventions being recognized as another's.

As a direct and foreseeable consequence of Defendant Illumina's actions, including Illumina not giving Dr. Czarnik the credit and recognition as a co-inventor that he was entitled to for his contributions to the patented microarray technology, Dr. Czarnik has not been able to "join another start-up and get another few hundred thousand shares of stock" which, as set forth above, amounted to an annual salary of approximately $1 million.

**COUNT III**

**<u>FRAUD COMMITTED BY DEFENDANT ILLUMINA</u>**

122.    Dr. Czarnik incorporates by reference paragraphs 1-123 as if fully set forth herein.

123.    Defendant Illumina, along with Stuelpnagel and Chee, conspired, agreed and engaged in a concerted action to obtain patents on the jointly developed microarray technology without informing Dr. Czarnik, without identifying Dr. Czarnik as a co-inventor and crediting

him for his contributions, and on the basis that the claimed technology was created by
Stuelpnagel and/or Chee which, at all relevant times hereto, Defendant Illumina knew was false.

124.    Defendant Illumina has an economic stake in the enforceability of the identified
patents and patent applications, and has derived, and is still deriving, reputational and financial
benefits from fraudulently misrepresenting to the PTO, foreign patent offices, current and
prospective shareholders and investors, and the consuming public that Stuelpnagel and Chee
were the sole inventors of the microarray technology developed jointly with Dr. Czarnik.

125.    Defendants Illumina knew that these representations were false when they were
made, or made such representations with reckless disregard as to their truth or falsity.

126.    Moreover, on August 14, 2001, almost one year after Dr. Czarnik was terminated
from Illumina, Robin Silva sent Dr. Czarnik a letter advising him that Illumina had "recently
filed a continuation-in-part case, which included some additional material added after [Dr.
Czarnik] left Illumina." Ms. Silva indicated to Dr. Czarnik in the letter that "[w]e believe you
are a co-inventor on this new application" and requested that Cr. Czarnik execute a
Nondisclosure Agreement ("NDA") so that the application and formal documents could be
provided to Dr. Czarnik.

127.    Dr. Czarnik promptly signed the NDA, as Illumina requested, and per Ms. Silva's
instructions, reviewed, executed and returned the formal papers to Ms. Silva for filing with the
PTO.

128.    Dr. Czarnik justifiably believed, based on the deliberate actions of Defendant
Illumina and Ms. Silva, that he was receiving the proper credit and recognition as the inventor of
the claimed IBL/DBL Invention, and that his interests as a co-inventor for those inventions he
made while at Illumina were being protected.

34

129.    Just over a year later, in October 2002, Dr. Czarnik received another letter requesting that Dr. Czarnik, as a joint inventor of the claimed invention, execute a Declaration and Power of Attorney for the patent application, indicating that he is "an original, first and joint inventor of the subject matter that is claimed and for which a patent is sought," and an Assignment of the patent application, invention, and all rights therein to Defendant Illumina. The letter, which was sent by a colleague of Robin Silva, was carbon copied to her.

130.    Just as with the prior letter he had received, Dr. Czarnik signed the papers, as requested and in accordance with the instructions, and returned them to Ms. Silva's office for filing with the PTO.

131.    Dr. Czarnik's belief that he was receiving the proper credit and recognition as the inventor of the claimed IBL/DBL Invention, and that his interests as an inventor for those inventions he made while at Illumina were being protected, was further confirmed by these intentional actions of Defendant Illumina and Ms. Silva.

132.    In December 2004, Dr. Czarnik discovered that he had been seriously misled by Defendants. After being terminated, Dr. Czarnik was provided with little, if any, information on Illumina. As part of Dr. Czarnik's efforts to try and keep tabs on what was going on at Illumina after his termination, Dr. Czarnik routinely checked the Yahoo Message Boards. During a check of the Yahoo Message Board for Illumina in December 2004, Dr. Czarnik discovered a December 5, 2004 posting that included a link to the PTO's website, referring to the PTO's database for patents and Illumina. Dr. Czarnik clicked on the link and was surprised to learn that, in addition to patents issued and assigned to Illumina, several of Illumina's published patent applications were also listed.

133.    Dr. Czarnik went through the list of identified Illumina issued patents and published patent applications, and reviewed each one. During this review in December 2004, Dr. Czarnik learned for the first time, and to his surprise, that the Defendant Illumina had prepared, filed, and prosecuted to issuance, patents disclosing and claiming his IBL/DBL Invention and his Embedded/Encapsulated Nanocrystal Invention without informing him, without identifying him as a co-inventor, and without giving him the credit and recognition he was, and is, entitled to.

134.    Defendants Illumina concealed these filings with the PTO disclosing and claiming Dr. Czarnik's IBL/DBL Invention and Embedded/Encapsulated Nanocrystal Invention from him, knowing that the inventorship on these filings was false, while, at the same time, sending letters and formal papers to Dr. Czarnik advising him that he was a joint inventor on the selected two filings Defendant Illumina decided to inform him about. Defendant Illumina's actions in sending these letters and formal papers to Dr. Czarnik on two of the patent applications they filed, and not the many others, were, on information and belief, intentionally designed to mislead Dr. Czarnik into believing that he was receiving the proper credit and recognition for those inventions he made at Illumina, and that his interests as a co-inventor were being protected. On information and belief, Defendant Illumina knew this was false and intentionally carried out these actions to induce Dr. Czarnik to refrain from taking action.

135.    Dr. Czarnik justifiably relied on Defendant Illumina's misleading actions and nondisclosure to his detriment. Stuelpnagel and Chee, and not Dr. Czarnik, were credited with creating the inventions jointly developed with by Dr. Czarnik. On information and belief, Defendant Illumina knew Dr. Czarnik was a co-inventor of the claimed inventions, and that Stuelpnagel and Chee were not entitled to be named as joint inventors without Dr. Czarnik.

136.    Dr. Czarnik relied on these representations by Defendant Illumina to his detriment including, inter alia, damage to Dr. Czarnik's reputation and standing within the scientific community, eliminating the reputational benefits associated with being named as an inventor, a loss of prestige within the scientific community resulting from his inventions being recognized as another's, and substantially devaluing Illumina's patent portfolio by rendering unenforceable those U.S. and foreign patents and applications claiming Dr. Czarnik's IBL/DBL Invention and Embedded/Encapsulated Nanocrystal Invention.  As a direct and foreseeable consequence of Defendant Illumina's actions, including Illumina not giving Dr. Czarnik the credit and recognition as a co-inventor that he was entitled to for his contributions to the patented microarray technology, Dr. Czarnik has suffered damage to his reputation and standing within the scientific community, has not received the reputational benefits associated with being named as an inventor, and has suffered a loss of prestige within the scientific community resulting from his inventions being recognized as another's.

137.    As a direct and foreseeable consequence of Defendant Illumina's actions, including Illumina not giving Dr. Czarnik the credit and recognition as a co-inventor that he was entitled to for his contributions to the patented microarray technology, Dr. Czarnik has not been able to "join another start-up and get another few hundred thousand shares of stock" which, as set forth above, amounted to an annual salary of approximately $1 million.

138.    Dr. Czarnik was damaged as a result of his reliance on these representations by Defendant  Illumina in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing allegations and claims, Plaintiff, Dr. Anthony W. Czarnik, prays that the Court award him the following relief:

      A.      a judgment that Dr. Czarnik is a joint inventor of the identified issued U.S.

patents, and issuance of an order, pursuant to 35 U.S.C. § 256, requiring the Director of the U.S.

Patent and Trademark Office, and Defendant Illumina, to correct the inventorship by adding Dr.

Czarnik as an inventor;

      B.      a judgment declaring that Defendant Illumina was negligent;

      D.      a judgment that Defendant Illumina committed fraud;

      E.      an award of compensatory damages in an amount to be determined at trial;

      F.      an award of punitive damages in an amount to be determined at trial;

      G.      a judgment declaring that this case is exceptional under 35 U.S.C. § 285;

      H.      an award of reasonable attorneys' fees and costs pursuant to 35 U.S.C. § 285, or

at common law; and

      I.      such further relief as this Court may deem necessary, just, and proper.

OF COUNSEL:

Anthony R. Zeuli
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 371-5208

Anthony F. Pantoni
ANTHONY F. PANTONI, ESQUIRE
501 West Broadway, Suite 1370
San Diego, CA 92101
Tel: (619) 235-4400

Dated: July 31, 2007
809475 / 32040

POTTER ANDERSON & CORROON LLP

By: */s/ David E. Moore*  _____
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE 19899
     Tel: (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

*Attorneys for Plaintiff*
*Dr. Anthony Czarnik*