# EXHIBIT A

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT B

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT C

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | **612.371.5208**
**tzeuli@merchantgould.com**

September 27, 2007

Marcus E. Sernel, Esq.                     <u>**Sent Via Email**</u>
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

*Re:*    ***Czarnik v. Illumina***
         ***Court File No. 05-400 (JJF)***
         ***M&G No. 15818.1USZA***

Dear Marc:

Per our earlier telephone conversations, I've been thinking about the privilege issues in this case further. It seems to me that there is no attorney-client privilege or work product immunity at least as to Dr. Czarnik concerning communications and documents to and from Illumina and its patent counsel concerning the patents at issue and all applications related thereto. I agree that certain communications and documents are privileged and/or immune from discovery as to third parties, however, there is no such privilege or immunity that would prevent Dr. Czarnik's access to those same materials. Please let me know if you agree.

In addition, I am not aware whether a privilege log has been produced by Illumina for any materials withheld based on privilege, immunity or the like. If such a privilege log exists, please provide a copy to me. If, however, no such log exists but documents and things have been withheld based on privilege, please provide me with a log by the end of this month so that we may determine whether we agree with such designations.

Very truly yours,

Anthony R. Zeuli

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# EXHIBIT D

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | **612.371.5208**
**tzeuli@merchantgould.com**

September 19, 2007

Marcus E. Sernel, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

*Re:*   *Czarnik v. Illumina*
*Court File No. 05-400 (JJF)*
*M&G No. 15818.1USZA*

Dear Marc:

I wanted to advise you that Dr. Czarnik has retained Dr. Walter Hill as an expert witness. I am enclosing a copy of Mr. Hill's CV.

Very truly yours,

Anthony R. Zeuli

ARZ:cmf
Enclosure

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# EXHIBIT E



Analysis
As of: Oct 24, 2007

JUAN E. VELA, et al., Plaintiffs, versus THE CITY OF HOUSTON, Defendant.

CIVIL ACTION H-97-3471

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
TEXAS

*2004 U.S. Dist. LEXIS 14965*

July 15, 2004, Decided

**PRIOR HISTORY:** *Vela v. City of Houston, 276 F.3d
659, 2001 U.S. App. LEXIS 26779 (5th Cir. Tex., 2001)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, employees of a
fire department including paramedics, sued defendant
city for unpaid overtime. The city settled with some but
claimed the others were exempt from the law requiring
payment. The United States Court of Appeals for the
Fifth Circuit disagreed with the city's decision and
ordered the present court to determine the wages the city owed the employees.

**OVERVIEW:** In effect, city was asking the court to
disregard its decision on compensation for paramedics
along with the court of appeals' decision and order on
remand. However, the record wholly contradicted the
city's argument. The employees' appellate briefs made
clear the separate claims that they brought: the telemetry,
dispatch, arson, and fire suppression personnel brought
state law claims based on local ordinances while the
paramedics sued for overtime under federal law. The
court held that the city could not argue that the paramed-
ics should not get overtime under federal law in the pre-
sent court, argue that position on appeal, and then argue
on remand that neither courts' opinions mattered because
the claims had already been settled. Furthermore, the city
hardly acted in good faith by arguing about liability on
remand. Not only were its claims without merit, they also
were outside the scope of remand. Taken together, the
city's acts fell far short of showing that it acted in good
faith or had reasonable grounds for not paying the para-
medics. Thus, the paramedics were paid liquidated dam-
ages equal to the amount of actual damages.

**OUTCOME:** The paramedics were paid their full wages
and liquidated damages for the city's bad faith and the
court determined the actual amount the city owed the
employees.

**COUNSEL:** [*1] For Juan E Vela, et al., PLAINTIFF:
E Troy Blakeney, Jr., Attorney at Law, Houston, TX
USA. Roger Townsend, Alexander Dubose Et Al., Hous-
ton, TX USA.

For Philip E Daley, Tiera Angelle Leger, Richard Wayne
Medeiros, Clint Hendrix, PLAINTIFFS: E Troy
Blakeney, Jr., Attorney at Law, Houston, TX USA.

For Paramedics/EMTs, PLAINTIFF: E Troy Blakeney,
Jr., Attorney at Law, Houston, TX USA. Vincent Lee
Marable, III, Law Offices of Paul Webb, Wharton, TX
USA. Roger Townsend, Alexander Dubose Et Al., Hous-
ton, TX USA.

For Ronald Windham, et al., Carla West, Neferiari Pen-
dleton, Intervenor-PLAINTIFFS: Barbara Jackson Hud-
son, Attorney at Law, Houston, TX USA.

For David Herring, et al., Intervenor-PLAINTIFF: Bar-
bara Jackson Hudson, Attorney at Law, Houston, TX
USA. Gregory S Lindley, E Troy Blakeney PC, Houston,
TX USA.

For Gordon McIlvain, Norman Allen, Louis J Matejek,
Norman Donaldson, Mundoa Olford, John Fleming,
Robert Hunt, Darrell Deckard, Mike Bowen, Earl Hamm,
Clyde Robbins, James Alvin, Jeffrey Polk, Intervenor-

2004 U.S. Dist. LEXIS 14965, *

PLAINTIFFS: Richard R Burroughs, Attorney at Law, Cleveland, TX USA.

For Calvin Thames, Anthony Foster, Kevin Dodge, Mundo Olford, Intervenor-PLAINTIFFS: Gregory [*2] S Lindley, E Troy Blakeney PC, Houston, TX USA.

For Steven J Fish, Intervenor-PLAINTIFF: Delia M Stephens, Attorney at Law, Houston, TX USA.

For Hillary Bell, Ronald Blackmon, Robert Buchman, Donald R Clark, Thomas A McDonald, James Millican, Stanley Phillips, Raymond Richardson, George Rodriguez, Elias Santos, Edward K Ward, Intervenor-PLAINTIFFS: E Troy Blakeney, Jr., Attorney at Law, Houston, TX USA.

For Houston Firefighters Relief and Retirement Fund, Intervenor-PLAINTIFF: J Wiley George, Andrews & Kurth LLP, Houston, TX USA.

For The City of Houston, DEFENDANT: David W Holman, Holman & Keeling, Houston, TX USA. Constance K Acosta, City of Houston, Legal Department, Houston, TX USA. Bertrand L Pourteau, II, City of Houston, Legal Dept., Houston, TX USA.

For The City of Houston, INTERVENOR-DEFENDANT: David W Holman, Holman & Keeling, Houston, TX USA. Bertrand L Pourteau, II, City of Houston, Legal Dept., Houston, TX USA. John E Fisher, City of Houston, Legal Dept., Houston, TX USA.

Richard R Burroughs, MOVANT, Pro se, Cleveland, TX USA.

JUDGES: Lynn N. Hughes, United States District Judge.

OPINION BY: Lynn N. Hughes

OPINION

Opinion on Partial Summary Judgment

1. [*3] *Introduction.*

Employees of a fire department sued the city for unpaid overtime. The city settled with some but claimed the others were exempt from the law requiring payment. The court of appeals disagreed and orders this court to determine the wages the city owes the employees.

2. *Background.*

In October 1995, approximately 2,600 employees of the Houston Fire Department sued the city in state court for unpaid overtime compensation under state and federal law. *See Tex. Loc. Gov't Code § 142.0017* (2002); *29 U.S.C. § 201 et seq. (2002).* The suit was styled *Juan E. Vela, et al. v. City of Houston.* The workers included telemetry and dispatch personnel, arson investigators, firefighters, and paramedics, who are technically called emergency medical technicians.

Almost two years later, the city removed the suit. In 1998, this court entered partial summary judgment for the telemetry and dispatch personnel, arson investigators, and firefighters without awarding damages. The city settled their claims with two payments. The telemetry and dispatch personnel, and arson investigators were paid $ 5,489,590.62 for their [*4] claim. The city then paid the firefighters $ 4,436,819.12. Although some of the firefighters serve as paramedics, their claims as paramedics were not settled. The litigation over those claims continued.

In April 1999, four plaintiffs already in the paramedics suit filed a seperate suit against the city. This suit was styled *Philip Daley, et al. v. City of Houston.* They made the same argument as the other paramedics--they are not exempt "fire suppression" employees under federal law, entitling them overtime. This court consolidated their suit into the senior action and ordered discovery and briefing on the paramedics' claim.

In March 2000, this court held that the paramedics would be paid as fire suppression personnel; that is, they would receive overtime wages only for time worked over 46.7 hours per week, not 40 hours like other city employees. The paramedics appealed, and the city cross-appealed this court's award of the employees' attorneys' fees. The court of appeals upheld the attorneys' fees award, but it agreed with the paramedics that they were covered by the 40-hour rule and remanded the case for a determination of their overtime compensation. *See Vela v. City of Houston, 276 F.3d 659, 679 (2001).*

[*5] 3. *Who's Who.*

On remand, the City of Houston moves to limit the paramedics receiving compensation to the four who filed the second lawsuit. First, it argues that the court of appeals limited overtime compensation to four paramedics. Second, it contends that the court found the paramedics' federal claims to be moot because they were settled. Third, the final judgment entered by this court on July 11, 2000, barred their federal claims. Finally, the city argues that the claims in the *Daley* suit were separate from those in the *Vela* suit, and the consolidated *Vela* suit did not adopt the *Daley* plaintiffs' claims.

(A) *Definitions.*

2004 U.S. Dist. LEXIS 14965, *

In their notice of appeal, approximately 2,700 city employees were individually named. The appellate pleadings separated them into groups: approximately 190 plaintiffs were fire suppression, telemetry, dispatch, and arson investigation personnel and the rest--approximately 2,600--were paramedics. The clerk of the court of appeals styled the case *Philip E. Daley, et al. v. City of Houston*, so the workers used that style in their briefings. Philip Daley was one of the paramedics that brought the second suit. As is the custom, the [*6] plaintiffs used *et al.* to represent multiple paramedics.

The court of appeals divided the plaintiffs by job description. It called "paramedics and emergency medical technicians . . . employed by the City of Houston Fire Department" *Daley* plaintiffs. It accurately classified them as "a subset of a group of approximately 2,600 fire department employees consisting of fire suppression, telemetry, dispatch, and arson investigation personnel." *See Vela, 276 F.3d at 663, 664.* The court of appeals' definition of the paramedics is accurate and clear. It ordered the paramedics--The *Daley* plaintiffs--to get paid. *See Vela, 276 F.3d 659, 683.* There is nothing in its opinion that limits the scope of remand to four paramedics. Calling the paramedics *Daley* plaintiffs was an arbitrary decision made for convenience, not meant to limit the plaintiffs to those in the original *Daley* suit.

Apparently, the city thinks that the court of appeals should have listed each paramedic in its opinion to clarify who should get overtime compensation. The exercise would have been unnecessary and wasteful. By the time it decided, the case had been going on for six years. [*7] Its opinion, except for affirming the award of attorneys' fees, dealt with the paramedics' claims. Further, the parties know how many paramedics there were; they even know their names. It is obvious that this court, the court of appeals, and the parties know that recovery is not limited to four employees.

(B) *Record.*

The record shows that the *Daley* plaintiffs referred to in the court of appeals' decision includes the 2,600 paramedics. This court, in its opinion, could have listed their names individually but did not because it was unnecessary. The opinion dealt with all of the paramedics who brought suit. If this court thought that its decision only dealt with the claims of four paramedics, it would have listed them. Instead, it knew, as did the parties, that there were thousands of paramedics who wanted more money.

Moreover, the city does not have to infer anything from opinions; it only needs to look at its own admissions to know the number of paramedics that must be paid. In its application for an extension of time to file a writ of certiorari to the United States Supreme Court, the city said that the court of appeals decision would impose "tens of millions of dollars [*8] in unanticipated liabilities" on the city. Further, the city attorneys asked the city council for additional funding of its appeal, citing the "potential amount of liability." It knows that it owes millions more to the paramedics and tried to use that expense to persuade the Court.

In addition, this court, in July 2002, ordered the city to calculate the compensation for the paramedics in three weeks. Not only did the city request a 60-day extension because of the amount of records it had to look at--intimating that it was looking at more than four paramedics' schedules--its report estimated the compensation of approximately 2,800 paramedics.

*4. Settlement.*

The City of Houston argues that all the paramedics settled their claims and any additional claims they bring are barred by the final judgment entered in this case. The court of appeals clearly stated that the telemetry, dispatch, and arson investigation personnel settled and were paid approximately $ 5 million. It also said that fire suppression personnel, which includes some firefighters who are also paramedics, settled their state law claims for approximately $ 4 million. However, when the court asked the city if the [*9] second settlement barred the paramedics from compensation under federal law, the city admitted it did not. *See Vela, 276 F.3d at 665.* Just as this argument was waived then, it is waived now.

The settlements and related documents also unambiguously contradict the city's position. The agreed partial summary judgment payment order--the first settlement--and the city council's authorization of the payment expressly state that the money was for telemetry, dispatch, and arson investigation personnel only. The second settlement paid fire suppression employees. There is no mention in either settlement about payment for the paramedics' *federal* wage and hour claim.

*5. Consolidated Claims.*

The city contends that the *Vela* complaint was never amended to include the paramedics' federal overtime claims, absolving it of liability. The federal claim was not added to the complaint because it was already in the complaint.

On August 2, 1999, this court held a hearing on the second suit--the *Daley* suit--filed by four paramedics already listed as plaintiffs in the first suit. This court ruled that the second suit was "wholly duplicative" of the first because it had [*10] the same *parties and claims.* It consolidated the cases into one amended complaint. In fact, the city said that the suits were duplicative in its answer to the second suit.

2004 U.S. Dist. LEXIS 14965, *

A pragmatic analysis tenders the same result. If this court really did get rid of the paramedics' federal claims at that hearing, it did not need to issue an opinion on their claim seven months later. Assuming this argument was ever reasonable, it should have been made when the suits were consolidated.

### 6. Precedent.

For the first time in almost six years of litigation, the City of Houston makes a constitutional argument to limit its liability. Under the current law, local governments are bound by the federal wage and hour law. *See Garcia v. San Antonio Metro Trans. Auth., 469 U.S. 528, 83 L. Ed. 2d 1016, 105 S. Ct. 1005 (1985).* The city claims that the law violates the *Tenth Amendment.* It says that some courts have agreed with their position. *See New York v. United States, 505 U.S. 144, 120 L. Ed. 2d 120, 112 S. Ct. 2408 (1992); United States v. Lopez, 514 U.S. 549, 131 L. Ed. 2d 626, 115 S. Ct. 1624 (1995); see also Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 104 L. Ed. 2d 526, 109 S. Ct. 1917 (1989).*

This argument fails. Even if applying the federal wage [*11] and hour law to municipalities is unconstitutional--and it may be--to do it on the current record would be imprudent. This case has dragged on for many years, mostly because of the city's failure to keep adequate records. Further, the city did not raise this argument on its first motion for summary judgment or appeal, so it is too late.

In addition, the court of appeals remanded this case to determine the amount owed to the paramedics, nothing more. The order does not include entertaining new arguments on the constitutionality of applying a federal law to local government. This court follows the "rule of the case doctrine" and does not consider issues outside of the scope of the court of appeals' mandate. *See Rachal v. Allen, et al., 376 F.2d 999, 1002 (5th Cir. 1967); Fontainebleau Hotel Corp. v. Crossman, 286 F.2d 926 (5th Cir. 1961);* Wright, Miller & Cooper, Federal Practice and Procedure: *Jurisdiction* 2d § 4478.3 (2002).

### 7. Defenses.

Along with its *Tenth-Amendment* argument, the City of Houston also raises several defenses to its obligation to pay the paramedics overtime wages. Not only are the claims outside of the scope of remand, [*12] but they are also baseless in law or fact.

#### (A) Judicial Estoppel, Waiver, and Res Judicata.

The city contends that because the *Vela* plaintiffs successfully argued on appeal that they settled their claims, they cannot now recover on a new overtime compensation claim under federal law. The city also argues that the *Vela* plaintiffs waived their right to be in the paramedics group on appeal. It points to the plaintiffs' appellate briefs along with the opinion of the court of appeals for support.

In effect, the city asks this court to disregard its decision on compensation for paramedics along with the court of appeals' decision and order on remand. The record wholly contradicts the city's argument. The plaintiffs' appellate briefs made clear the separate claims that they brought: the telemetry, dispatch, arson, and fire suppression personnel brought state law claims based on local ordinances while the paramedics sued for overtime under federal law. *See* Daley Corrected Brief, p. 5. The brief discusses and separates the claims several times. In fact, the only reason the state law claims were mentioned on appeal was because the city illogically objected to some of the figures [*13] used to determine the money owed to the telemetry, dispatch, arson, and fire suppression personnel, even though it had already settled their state law claims. Based on their pleadings, it is obvious that the paramedics have a completely distinct claim from the other plaintiffs.

The court of appeals decision also clarifies the paramedics' claim. At oral argument, the court asked the city if its settlements with the Vela plaintiffs barred the paramedics' claim. In response, the city said it did not. The only reason the court asked that question was to determine whether it had to entertain the paramedics' claim. If they had settled their claim, as the city argues, the court of appeals did not need to decide the issue.

The city cannot argue that the paramedics should not get overtime under federal law in this court, argue that position on appeal, and then argue on remand that neither courts' opinions matter because the claims had already been settled.

#### (B) Payment and Satisfaction.

The City of Houston also argues that it does not have to pay the paramedics because it tendered, and the plaintiffs cashed, two checks that settled the claims. Because the city admitted that neither settlement [*14] satisfied the paramedics' claim, this argument fails.

#### (C) Offset.

The city complains that its liabilities should be offset by the amounts it paid in two similar state court cases. *See Michael D. Akeroyd, et al. v. City of Houston,* Cause 85-66400, 234th Judicial District of Harris County, Texas; *Donald Aldridge, et al. v. City of Houston,* Cause 86-13617, 234th Judicial District of Harris County, Texas. The parties stipulate that the city's liabilities will be reduced by $ 4,436,819.12, representing the combined amount paid in the earlier cases. *See* Stipulation, Docket No. 235.

(D) *Limitations.*

The city argues that 24 new plaintiffs were added on remand, and that their claims are untimely. The parties have agreed that 15 of the plaintiffs will be dismissed and that the remaining nine were not newly added. *See* Stipulation, Docket No. 235.

8. *Ethics.*

Having failed in its defense of its compensation structure, the city turns its attacks on the workers' lawyer. Over five years since this case started, the city moves to disqualify the paramedics' counsel, E. Troy Blakeney, and his law firm because it hired a former assistant fire chief who had worked [*15] on this case's issues.

In 1995, Richard Mumey was the assistant fire chief in charge of finance and administration. Mumey was also the client representative for the department, assisting the city's attorneys from 1995 to mid-1997. The city contends that Mumey acquired privileged information about this case, including defense strategies, confidential documents, and damage calculations, and drafted memoranda to the mayor.

In June 2002, Mumey retired from the department. The Blakeney law firm hired him to work as an attorney. On July 3, 2002, Blakeney sent a letter to Carole Synder, an assistant city attorney, explaining that Mumey would be the attorney representing the paramedics in an upcoming document review project. The city did not object to his participation. Mumey went on to appear--without objection--at three pretrial conferences in this case: August 5, August 19, and September 23. The city moved to disqualify Blakeney and his firm on September 30. On October 7, this court ordered Mumey to be sequestered from participating directly or indirectly in this case.

The city argues that Mumey's side-switching violates the model rules of professional responsibility and disqualifies both [*16] Mumey and the Blakeney firm. *See* Model Rules of Prof'l Conduct R. 1.11; 5.3. The city asserts a presumption that Mumey used the confidential information he got at the city to help the paramedics' claims, prejudicing the city's defense.

In deciding if a law firm should be disqualified from a case, this court looks at both the Texas and American Bar Association code of responsibility, along with common sense assisted by a deep understanding of a lawyer's role in our society. *See In re American Airlines, Inc., 972 F.2d 605, 610 (5th Cir. 1992).* Both codes allow a lawyer to represent a client in a matter he substantially participated in as a public officer if the appropriate government agency gives its written consent. *See* Tx. St. Rules of Prof'l Conduct R. 1.10; Model Rules of Prof'l Conduct R. 1.11. Obviously, the city has not consented in writing to

Mumey's involvement in the suit and says he is "disloyal."

(a) *Waiver.*

The City of Houston calls its delay in moving to disqualify the firm "unfortunate;" this court calls it a waiver.

The city contends that it first discovered Mumey's involvement at the August 5 pretrial conference, but the evidence shows [*17] otherwise. In his July letter, Blakeney clearly said that Mumey represented the paramedics. The city also says that it waited to file the motion because it had to take time--at least a month apparently--to gather evidence about Mumey's conflict. This excuse is unbelievable because the city failed to object to Mumey's appearance at the next two pretrial conferences. Even if the city was not sure if it had a basis for moving to disqualify him at that point, it could have questioned the appropriateness of Mumey's participation as early as July.

The City of Houston's failure to move for disqualification for three months constitutes a waiver of its objection. *See Turner v. Turner, 385 S.W.2d 230, 236, 8 Tex. Sup. Ct. J. 112 (Tex. 1964).* It should have either recognized the conflict sooner or acted quicker when it finally figured it out. It implicitly consented to his involvement by allowing Mumey to review documents and attend conferences.

(b) *Prejudice.*

The city also has not shown how Mumey's activities prejudiced its defense. He switched sides in July 2002, almost six months after the court of appeals found the city liable. It is uncertain how Mumey has tainted the parties' attempt to [*18] determine damages. It is also unknown what confidential information Mumey has divulged to the paramedics. The city cites letters, conversations, and strategies but offers none. Blakeney rebuts this assertion, swearing that Mumey has not communicated confidential information to him. *See Phoenix Founders, Inc. v. Marshall, 887 S.W.2d 831, 835, 38 Tex. Sup. Ct. J. 12 (Tex. 1994).* Moreover, the city may have waived its privilege in its meetings with its client representatives, who are also clients of Blakeney in this case. Also, pursuant to this court's order, Mumey was removed from the offices of the Blakeney law firm and no longer is involved in this case. The Blakeney law firm will not be disqualified from representing the paramedics in this case.

9. *Leave.*

The paramedics argue that their paid vacation or sick time should count toward the overtime calculation. For example, a paramedic works eight hours a day from Monday through Wednesday. He does not work Thurs-

day, electing to take a paid vacation day. He works eight hours on Friday and another six on Saturday. The paramedic only worked--making runs and attending to patients--for 38 hours that week. However, if you count the eight [*19] hours "worked" on Thursday, he would be entitled to six hours of overtime pay, assuming a 40-hour work week.

The paramedics contend that federal law only establishes minimum protections; if a state law or local ordinance provides greater safeguards, it must be followed. *See 29 U.S.C. § 218(a) (2002).* They believe the applicable law is a City of Houston ordinance that counts compensatory time off toward overtime calculations. *See* Houston, Tex., Ordinance 86-489, § 1(a)(6) (1986).

The city argues that federal law excludes paid leave from compensation because the paramedics do not actually work while they are on leave and they have control over how they spend that time. *See 29 C.F.R. § 785.16(a).* It also argues that the local ordinance requires the paramedics to be "on call" for the time to count toward overtime. *See Tex. Loc. Gov't Code § 142.0017(e).*

The paramedics' argument fails because federal law does not support the inclusion of paid leave in overtime compensation. *See York v. City of Wichita Falls, Tex., 763 F. Supp. 876 (N.D. Tex. 1990); Joseph G. Moretti, Inc. v. Boogers, 376 F.2d 27 (5th Cir. 1967).* [*20] An employee must actually work--be at the station house, assist patients, or be on call--for it to count toward overtime. The paramedics will not get paid for compensated personal time.

Excluding paid leave time for the calculations makes common sense. An employee is not guaranteed paid time off. In some employment relationships, an employee gets leave time based on his tenure or status. This is indirect compensation. If an employee takes time off, he is not working. Allowing an employee to spend a day at the beach with pay does not mean the employer must pay him time-and-one-half for that time. It is unfair and contrary to the intent of the wage and hour law.

In addition, the portion of the federal law that the paramedics rely on only sets *quantitative,* not qualitative, standards for laborers. Congress was very exact in the provision's scope--only minimum wages and maximum hours could be affected by local law. *See Cranford v. City of Slidell, 25 F. Supp. 2d 727 (E.D. La. 1998).* It says nothing about what is considered work. Further, there is no evidence that the specific language extends to local laws about paid leave. Congress could have included that in the [*21] provision, but it did not. In fact, corresponding regulations say that hours off duty are not hours worked. *See 29 C.F.R. § 785.16(a).* Congress intended for paramedics to be paid only for hours spent at the firehouse or riding in ambulances.

10. *Interest and Liquidated Damages.*

The paramedics ask to be made whole; that is, receive compensation for the city's delay in paying them money they rightly earned. They ask for both prejudgment interest and liquidated damages. The city argues that federal law does not allow them to recover prejudgment interest, and that the city should not have to pay liquidated damages because its decision not to pay its employees fully was based on a good faith interpretation of the law.

The paramedics' claim for full compensation is reasonable and makes economic sense. It is well known that actually having money is worth more than receiving the same amount in the future because the money can earn interest or be invested, creating more wealth for the possessor. This is referred to as the time value of money.

The most efficient way to accurately pay the paramedics would be to award prejudgment interest on the amount [*22] of actual damages, excluding leave time. However, the court of appeals has consistently held that prejudgment interest is not available to employees suing under *§ 216 of the FLSA,* even if liquidated damages are not awarded. *See Reich v. Tiller Helicopter Services, Inc., 8 F.3d 1018, 1031 (5th Cir. 1993).*

Although interest is unavailable, liquidated damages can make up for the delayed payment. If an employer violates the federal law, it is presumed that the employees are entitled to additional damages equal to the amount of actual damages. *See 29 U.S.C. § 216(b); Reich, 8 F.3d at 1030.* A court can reduce or deny those damages if the employer shows that it acted in good faith and had reasonable grounds not to pay its employees. *See 29 U.S.C. § 260; Barcellona v. Tiffany English Pub, Inc., 597 F.2d 464, 468 (5th Cir. 1979).*

The city contends that its decision not to pay overtime was made in good faith for several reasons. It argues that neither the city nor its paramedics thought it was supposed to pay overtime until the paramedics filed suit in 1997. The city also points out that [*23] in 1996, two other groups of paramedics settled their state law wage and hour claims without mentioning violations of federal law, inferring that their attorney did not think they had a federal claim. It offers local and state legislation that it thought excluded paramedics from payment under federal law. The city believes that it and the paramedics agreed to a 46.7 hour work week. It cites other cities' decisions to pay paramedics like fire fighters, not as 40-hour per week employees. Further, the city argues that this court's earlier decision denying the paramedics compensation is evidence that its decision was reasonable.

The city's analysis is untethered to reality. It argues retrospectively--revising history to fit its thesis--instead of explaining the intent behind its decisions. In addition, it relies on inferences and the decisions *of others* to prove that *it* acted in good faith. The city does not cite one affirmative act that shows it thought it was following the law.

For example, it is illogical to think that because the paramedics did not sue until 1997, they thought the city was following the law. It is the duty of the city, not its employees, to make sure that [*24] they properly and adequately pay its employees. Ignorance of the law is no excuse.

Further, the settlements of the state law claims do not show good faith. First, the strategic decision of the *Ackeroyd* and *Albridge* plaintiffs not to pursue a federal claim bears no significance to this case. Second, there is a simple explanation for their decision; the city was not liable when those suits were filed because the federal wage and hour law did not apply to local governments at that time. It was not bound by the law until April 1986. See Public Law 99-150, 99 Stat. 788 (Nov. 13, 1985).

The city's reliance on this court's earlier opinion is also misguided. It argues that the decision proves that it acted in good faith. In effect, the city aligns good faith with liability; if a party is not liable, it did not act with malice and vice-versa. While it is obvious that if a party is not liable it does not have to pay liquidated damages, the two findings are not always related.

The good faith defense allows a defendant to mitigate his damages even though he is liable. In sum, an employer can violate the law without acting in bad faith. Under the city's reasoning, this option is foreclosed. [*25] The city must show more than a favorable trial court ruling to lessen its liability.

Its other contentions are no more persuasive. It relies on inferences from statutes and ordinances, agreements between the city and its paramedics, and the payment plans of several other cities. All of the arguments fail to show a significant, affirmative act by a city employee to notice, much less analyze, its potential liability under federal law. There is no memorandum, letter, note, or brief that explains the state of the law or the city's decision not to pay the paramedics correctly. It adopts the acts of others, such as this court, the paramedics, and the state legislature, as its own to prove it acted in good faith and had a reasonable ground to believe it did not have to pay overtime. If the other parties acted differently, its argument would crumble. While the city may rely on customs and advice, it does not abrogate its duty to investigate its compliance with laws. *See Barcellona, 597 F.2d at 469.* Because it did nothing to deal with the issue, the city did not act in good faith.

In addition, the city's defense of this suit shows anything but good faith. Its recalcitrance [*26] during discovery has frustrated both this court and the paramedics. After the court of appeals decided that the paramedics should be paid, the paramedics' counsel asked for their timesheets to determine their accumulated overtime. Despite its duty to maintain and keep the records, the city did not have them. *See 29 C.F.R. § 553.50.* As a result, the paramedics' counsel had to reconstruct the timesheets of over 2,600 paramedics from 1986 to 1999, using transfer records, patient care records, and ambulance runs.

The calculations took months, and the paramedics' counsel created an extensive database to offer a final amount. Even though the city forced the paramedics to recreate records that it was supposed to have, it complained that the calculations had a 2% error rate. Considering the volume of paper and sheer magnitude of the project, a 2% error rate is more than reasonable; in fact, it is highly unlikely that the city could have done better, especially in light of its obvious inability to deal with paperwork.

The paramedics also claim that the city destroyed some material records needed to calculate damages. When asked, the city admitted that it destroyed [*27] records from 1993 through 1995 in accordance with its document retention procedures.

The city offers two excuses. It says that it did not think they were relevant because they dealt with patient care, not employees' payrolls. It also claims that the destroyed documents were duplicates, and the other copies were available for discovery. It also pointed out that all of the information since 1988 is electronically stored.

Although the documents' destruction did not affect the calculations, other than to slow down the process, it raises some concerns. Even though the city has been involved in this litigation for over five years and knew the information the paramedics were using to calculate damages, it apparently did not realize the importance of the destroyed records. This is especially curious because the agent who signed off on the destruction is working on this case. Further, it is never wise to destroy documents during litigation, even if they appear irrelevant to the issue.

More importantly, almost two years into discovery, the city said it had a majority of the information electronically stored. It is inconceivable to think that the city did not remember this when the paramedics' [*28] counsel began reconstructing 13 years of timesheets. It is just another example of the city's stalling and failure to take responsibility for its actions.

2004 U.S. Dist. LEXIS 14965, *

The city hardly acted in good faith by arguing about liability on remand. Not only are its claims without merit, they also are outside the scope of remand. Taken together, the city's acts fall far short of showing that it acted in good faith or had reasonable grounds for not paying the paramedics. The paramedics will be paid liquidated damages equal to the amount of actual damages.

### 9. *Conclusion.*

The paramedics who filed a claim against the city will be paid their full wages and liquidated damages for the city's bad faith. The city's defenses and arguments to limit its liability fail. We will now determine the actual amount of money the city owes the employees.

Order

1. By August 2, 2004, Vela will calculate the amount of damages that the city owes the employees.

2. The city has through August 16 to respond. It will not raise defenses -- legal or factual. It only will critique Vela's calculations.

Signed July 15, 2004, at Houston, Texas.

Lynn N. Hughes

United States District Judge

# EXHIBIT F

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Marcus E. Sernel
To Call Writer Directly:
312 861-2389
msernel@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: 312 861-2200

October 5, 2007

**Via E-Mail**

Anthony R. Zeuli, Esq.
Merchant & Gould
3200 IDS Center
80 S. 8th Street
Minneapolis, MN 55402-2215

Re:    Illumina v. Czarnik

Dear Tony:

I write to follow up on our conversation of earlier this week. As we discussed, Illumina believes that Merchant & Gould's prior work on behalf of Illumina creates a conflict for Merchant & Gould's representation of Dr. Czarnik in the instant litigation. To this end, we have filed this afternoon a motion to disqualify Merchant & Gould from its representation of Dr. Czarnik in this case.

You have recently raised a handful of discovery issues, and there remain several serious issues that I had previously raised, that will need to be addressed. At this point, however, I think it prudent to wait for the resolution of the disqualification issue before we move forward. Once this issue is resolved, we look forward to moving the case forward and can discuss any necessary adjustments to the schedule at that time.

Sincerely,

Marcus E. Sernel

MES/crw

Hong Kong      London      Los Angeles      Munich      New York      San Francisco      Washington, D.C.

# EXHIBIT G

10-07-0

PTO/SB/05 (03-01)
Approved for use through 10/31/2002. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **UTILITY PATENT APPLICATION TRANSMITTAL** | Attorney Docket No. | 031229.0012.CON2 |
|---|---|---|
| | First Inventor | Kevin GUNDERSON |
| | Title | DETECTION OF NUCLEIC ACID REACTIONS ON BEAD ARRAYS |
| *(Only for new nonprovisional applications under 37 CFR 1.53(b))* | Express Mail Label No. | EL573390773US |

| APPLICATION ELEMENTS | ADDRESS TO: | Assistant Commissioner for Patents Box Patent Application Washington, DC 20231 |
|---|---|---|

*See MPEP chapter 600 concerning utility patent application contents.*

1. [✓] Fee Transmittal Form (e.g., PTO/SB/17)
   *(Submit an original and a duplicate for fee processing)*
2. [✓] Applicant claims small entity status. See 37 CFR 1.27.
3. [✓] Specification    [Total Pages   171   ]
   *(preferred arrangement set forth below)*
   - Descriptive title of the invention
   - Cross Reference to Related Applications
   - Statement Regarding Fed sponsored R & D
   - Reference to sequence listing, a table, or a computer program listing appendix
   - Background of the Invention
   - Brief Summary of the Invention
   - Brief Description of the Drawings (if filed)
   - Detailed Description
   - Claim(s)
   - Abstract of the Disclosure

4. [✓] Drawing(s) (35 U.S.C. 113)    [Total Sheets   26   ]

5. Oath or Declaration    [Total Pages   3   ]
   a. [ ] Newly executed (original or copy)
   b. [✓] Copy from a prior application (37 CFR 1.63 (d))
      *(for continuation/divisional with Box 18 completed)*
      i. [ ] DELETION OF INVENTOR(S)
         Signed statement attached deleting inventor(s) named in the prior application, see 37 CFR 1.63(d)(2) and 1.33(b).

6. [ ] Application Data Sheet. See 37 CFR 1.76

7. [ ] CD-ROM or CD-R in duplicate, large table or Computer Program (Appendix)
8. Nucleotide and/or Amino Acid Sequence Submission (if applicable, all necessary)
   a. [ ] Computer Readable Form (CRF)
   b. Specification Sequence Listing on:
      i. [ ] CD-ROM or CD-R (2 copies); or
      ii. [ ] paper
   c. [ ] Statements verifying identity of above copies

**ACCOMPANYING APPLICATION PARTS**

9. [ ] Assignment Papers (cover sheet & document(s))
10. [ ] 37 CFR 3.73(b) Statement (when there is an assignee)    [✓] Power of Attorney from Parent App.
11. [ ] English Translation Document (if applicable)
12. [ ] Information Disclosure Statement (IDS)/PTO-1449    [ ] Copies of IDS Citations
13. [✓] Preliminary Amendment
14. [ ] Return Receipt Postcard (MPEP 503) (Should be specifically itemized)
15. [ ] Certified Copy of Priority Document(s) (if foreign priority is claimed)
16. [ ] Nonpublication Request under 35 U.S.C. 122 (b)(2)(B)(i). Applicant must attach form PTO/SB/35 or its equivalent.
17. [ ] Other:  Check in the amount of $472.00; Return Postcard

18. If a CONTINUING APPLICATION, check appropriate box, and supply the requisite information below and in a preliminary amendment, or in an Application Data Sheet under 37 CFR 1.76:

[✓] Continuation    [ ] Divisional    [ ] Continuation-in-part (CIP)    of prior application No.:   09 / 553,993

Prior application information:    Examiner   Betty J. FORMAN    Group Art Unit   1634

For CONTINUATION OR DIVISIONAL APPS only: The entire disclosure of the prior application, from which an oath or declaration is supplied under Box 5b, is considered a part of the disclosure of the accompanying continuation or divisional application and is hereby incorporated by reference. The incorporation can only be relied upon when a portion has been inadvertently omitted from the submitted application parts.

**19. CORRESPONDENCE ADDRESS**

[ ] Customer Number or Bar Code Label    (Insert Customer No. or Attach bar code label here)    or [✓] Correspondence address below

| Name | Vicki G. Norton, Esq. | | |
|---|---|---|---|
| | BROBECK, PHLEGER & HARRISON LLP | | |
| Address | 12390 El Camino Real | | |
| City | San Diego | State | CA | Zip Code | 92130 |
| Country | UNITED STATES | Telephone | (858) 720-2500 | Fax | (858) 720-2555 |

| Name (Print/Type) | Vicki G. Norton, Esq. | Registration No. (Attorney/Agent) | 40,745 |
|---|---|---|---|
| Signature | Vicki G. Norton | Date | 10/04/2002 |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Box Patent Application, Washington, DC 20231.



PTO/SB/17 (10-01)
Approved for use through 10/31/2002. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# FEE TRANSMITTAL
## for FY 2002

*Patent fees are subject to annual revision.*

| Complete if Known | |
|---|---|
| Application Number | NOT YET ASSIGNED |
| Filing Date | 10/02/2002 |
| First Named Inventor | Kevin GUNDERSON |
| Examiner Name | UNKNOWN |
| Group Art Unit | UNKNOWN |
| Attorney Docket No. | 031229.0012.CON2 |

**TOTAL AMOUNT OF PAYMENT** ($) 472.00

## METHOD OF PAYMENT

1. ☑ The Commissioner is hereby authorized to charge indicated fees and credit any overpayments to:

Deposit Account Number: 50-1273

Deposit Account Name: BROBECK, PHLEGER & HARRISON LLP

☐ Charge Any Additional Fee Required Under 37 CFR 1.16 and 1.17

☑ Applicant claims small entity status. See 37 CFR 1.27

2. ☑ **Payment Enclosed:**
☑ Check   ☐ Credit card   ☐ Money Order   ☐ Other

## FEE CALCULATION

### 1. BASIC FILING FEE

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | Fee Paid |
| 101 | 740 | 201 | 370 | Utility filing fee | 370.00 |
| 106 | 330 | 206 | 165 | Design filing fee | |
| 107 | 510 | 207 | 255 | Plant filing fee | |
| 108 | 740 | 208 | 370 | Reissue filing fee | |
| 114 | 160 | 214 | 80 | Provisional filing fee | |

**SUBTOTAL (1)** ($) 370.00

### 2. EXTRA CLAIM FEES

| | | Extra Claims | Fee from below | Fee Paid |
|---|---|---|---|---|
| Total Claims | 22 | -20** = 2 | x 9 | = 18.00 |
| Independent Claims | 5 | - 3** = 2 | x 42.00 | = 84.00 |
| Multiple Dependent | | | | |

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | |
| 103 | 18 | 203 | 9 | Claims in excess of 20 | |
| 102 | 84 | 202 | 42 | Independent claims in excess of 3 | |
| 104 | 280 | 204 | 140 | Multiple dependent claim, if not paid | |
| 109 | 84 | 209 | 42 | ** Reissue independent claims over original patent | |
| 110 | 18 | 210 | 9 | ** Reissue claims in excess of 20 and over original patent | |

**SUBTOTAL (2)** ($) 102.00

**"or number previously paid, if greater; For Reissues, see above

## FEE CALCULATION (continued)

### 3. ADDITIONAL FEES

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | Fee Paid |
| 105 | 130 | 205 | 65 | Surcharge - late filing fee or oath | |
| 127 | 50 | 227 | 25 | Surcharge - late provisional filing fee or cover sheet | |
| 139 | 130 | 139 | 130 | Non-English specification | |
| 147 | 2,520 | 147 | 2,520 | For filing a request for *ex parte* reexamination | |
| 112 | 920* | 112 | 920* | Requesting publication of SIR prior to Examiner action | |
| 113 | 1,840* | 113 | 1,840* | Requesting publication of SIR after Examiner action | |
| 115 | 110 | 215 | 55 | Extension for reply within first month | |
| 116 | 400 | 216 | 200 | Extension for reply within second month | |
| 117 | 920 | 217 | 460 | Extension for reply within third month | |
| 118 | 1,440 | 218 | 720 | Extension for reply within fourth month | |
| 128 | 1,960 | 228 | 980 | Extension for reply within fifth month | |
| 119 | 320 | 219 | 160 | Notice of Appeal | |
| 120 | 320 | 220 | 160 | Filing a brief in support of an appeal | |
| 121 | 280 | 221 | 140 | Request for oral hearing | |
| 138 | 1,510 | 138 | 1,510 | Petition to institute a public use proceeding | |
| 140 | 110 | 240 | 55 | Petition to revive - unavoidable | |
| 141 | 1,280 | 241 | 640 | Petition to revive - unintentional | |
| 142 | 1,280 | 242 | 640 | Utility issue fee (or reissue) | |
| 143 | 460 | 243 | 230 | Design issue fee | |
| 144 | 620 | 244 | 310 | Plant issue fee | |
| 122 | 130 | 122 | 130 | Petitions to the Commissioner | |
| 123 | 50 | 123 | 50 | Processing fee under 37 CFR 1.17(q) | |
| 126 | 180 | 126 | 180 | Submission of Information Disclosure Stmt | |
| 581 | 40 | 581 | 40 | Recording each patent assignment per property (times number of properties) | |
| 146 | 740 | 246 | 370 | Filing a submission after final rejection (37 CFR § 1.129(a)) | |
| 149 | 740 | 249 | 370 | For each additional invention to be examined (37 CFR § 1.129(b)) | |
| 179 | 740 | 279 | 370 | Request for Continued Examination (RCE) | |
| 169 | 900 | 169 | 900 | Request for expedited examination of a design application | |

Other fee (specify) _____

*Reduced by Basic Filing Fee Paid   **SUBTOTAL (3)** ($) 0.00

| SUBMITTED BY | | Complete (if applicable) | |
|---|---|---|---|
| Name (Print/Type) | Vicki G. Norton, Esq. | Registration No. (Attorney/Agent) 40,745 | Telephone (858) 720-2500 |
| Signature | | Date | 10/04/2002 |

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.



Patent
031229.0012.CON2

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Patent Application of: | Group Art Unit: 1634 |
| Applicant:   Kevin Gunderson, et al. | Examiner: Betty J. Forman |
| Serial No.:   09/553,993 | |
| Filed:     April 20, 2000 | |
| Title:  DETECTION OF NUCLEIC ACID REACTIONS ON BEAD ARRAYS | |

### PRELIMINARY AMENDMENT

Commissioner for Patents
Washington, D.C. 20231

Dear Sir or Madam:

Applicants submit the following amendment for a continuation of the above-referenced application. Prior to examination, please amend the above-identified application as follows:

### AMENDMENTS

IN THE SPECIFICATION:

At page 1, immediately after the title, please add the following heading:

--RELATED APPLICATIONS--

---

**CERTIFICATE OF MAILING**
(37 C.F.R. §1.10)

I hereby certify that this document (along with anything referred to as being attached or enclosed) is being deposited with the United States Postal Service on the date shown below with sufficient postage as 'Express Mail Post Office to Addressee' in an envelope addressed to the Commissioner for Patents, Washington, D.C. 20231.

| EL573390773US | Jeanne M. Brush |
|---|---|
| Express Mail Label No. | Name of Person Mailing Document |
| Date of Deposit | Signature of Person Mailing Document |

At page 1, immediately after the heading "Related Applications," please replace the paragraph beginning at line 3 and continuing to 7 with the following paragraph:

--This application is a continuation of U.S. Application Serial No. 09/553,993, filed April 20, 2000, which claims the benefit of U.S. Provisional Application Serial No. 60/135,123, filed May 20, 1999; U.S. Provisional Application Serial No. 60/160,917, filed October 22, 1999; U.S. Provisional Application Serial No. 60/135,051, filed May 20, 1999; U.S. Provisional Application Serial No. 60/161,148, filed October 22, 1999; U.S. Application Serial No. 09/517,945, filed March 3, 2000; U.S. Provisional Application Serial No. 60/130,089, filed April 20, 1999; U.S. Provisional Application Serial No. 60/160,027, filed October 22, 1999; U.S. Application Serial No. 09/513,362, filed February 25, 2000; U.S. Provisional Application Serial No. 60/135,053, filed May 20, 1999; U.S. Application Serial No. 09/425,633, filed October 22, 1999; and U.S. Application Serial No. 09/535,854, filed March 27, 2000, all of which are hereby expressly incorporated by reference herein.--

IN THE CLAIMS:

Please cancel claims 1 to 14 and add new claims 15 through 22 as follows:

15.     (New)   A composition comprising a padlock probe hybridized to a target sequence

wherein said target sequence comprises:

a) a first domain, a second domain, and a detection position;

wherein said padlock probe comprises

a) a first end of said padlock probe that is complementary to said first domain of said target sequence;

b) a second end of said padlock probe that is complementary to said second domain of said target sequence;

c) a cleavage site;

d) an adapter; and

e) a binding site for a primer.

2

16.　　(New)  The composition of claim 15 wherein said padlock probe comprises an internally positioned adapter sequence.

17.　　(New)  The composition of claim 15 wherein said padlock probe comprises an internal primer binding site wherein said primer can be extended by a polymerase, and wherein said primer binding site, said cleavage site and said adapter sequence can be in any order.

18.　　(New)  The composition of claim 15 wherein said detection sequence is comprised within either said first domain of said target sequence or said second domain of said target sequence.

19.　　(New)  The composition of claim 15 wherein said detection sequence is between said first domain of said target sequence and said second domain of said target sequence.

20.　　(New)  A composition comprising a plurality of species of padlock probes hybridized to target sequences,

　　wherein each species of target sequences comprises:

　　a) a first domain;

　　b) a second domain; and

　　c) a detection position;

　　and wherein each species of padlock probes comprises:

　　d) a cleavage site;

　　e) an adapter; and

　　f) a binding site for a primer;

and further wherein each species of hybridized padlock probe and target sequence in said composition comprises:

　　g) a padlock probe with ends complementary to said first domain and said second domain of a species of target sequence; and

3

h) an internal adapter that is distinguishable from internal adapters comprised in other species of padlock probes present in said composition.

21.    (New)  A composition according to Claim 20 wherein each padlock probe in said plurality of species of padlock probes hybridized to said target sequences further comprises a priming site that is identical in all members of said plurality of species of padlock probes hybridized to said target sequences.

22.    (New)  A composition according to Claim 20 wherein each padlock probe comprises a cleavage site that is identical in all members of said plurality of species of padlock probes hybridized to target sequences.

## REMARKS

Attached hereto is a marked-up version of the changes made to the specification and claims by the current amendment. The attached page is captioned **"MARKED UP COPY OF AMENDED SPECIFICATION AND CLAIMS."** Applicant submits this Preliminary Amendment prior to examination of the above-identified application and in compliance with 37C.F.R. § 1.115. These amendments do not constitute an admission regarding the patentability of the amended subject matter and should not be so construed. Applicant reserves the right to pursue the canceled subject matter in this or a related patent application or any other appropriate patent application. Entry of these amendments is respectfully requested.

Claims 1-14 have been cancelled. Claims 15-22 have been added. Support for the new claims may be found throughout the specification and in claims 1-14. Padlock probes, as a variety of Oligonucleotide Ligase Amplification (OLA), are described generally in the specification from page 47, line 22 through page 49, line 26. Additionally, padlock probes are generally depicted in Figure 6 which is described in the section "Brief Description of the Drawings" on page 17, lines 25 through 31, and elsewhere within the specification. The ligation of padlock probes is described both in the portions cited *supra* and at page 92, lines 3 through 16. OLA is described throughout the specification and in particular in the section beginning at page 44, line 25 and ending at page 52, line 26; and at page 91, line 1 through page 92, line 16. OLA

4

is also depicted in Figures 3A, 3B, 6, 7, 10A, 10B, 10C, 10D, 10E, 11A, 11B, and 11C. The description of OLA includes situations where the oligonucleotides, or ends of oligonucleotides, are adjacent following hybridization, and the situation where one of the ends of oligonucleotides must be extended by a polymerase prior to ligation (*see, e.g.*, page 89, lines 13 to 16; page 53, lines 3 to 4; and page 45, lines 10 to 12). Thus, a variety of means of covalently attaching the oligonucleotides used to detect a detection sequence are included within the specification, and include direct ligation of the oligonucleotides and also the situation where one oligonucleotide is first extended, then the two adjacent ends are ligated.

The use of adapter sequences to connect the oligonucleotides following ligation to an array is described at page 12, lines 16 to 21, and elsewhere within the specification.

The variety of substrates that may be used for attachment of an oligonucleotide that can bind the adapter following covalent attachment of the padlock probe is described throughout the specification and in particular at page 126, lines 1-10.

Serial No. 09/553,993
Page 6 of 9

## CONCLUSION

It is believed that all claims are now in condition for allowance. Notification to that effect is respectfully requested. If it is believed that prosecution may be furthered thereby, the Examiner is invited to contact Applicant's undersigned representative to discuss the same. If, however, any fee should become due or credit become payable during the pendency of this application, the Patent Office is authorized to charge or credit the same to Deposit Account 50-1273.

Respectfully Submitted,

Date: _October 4, 2002_

Vicki G. Norton, Ph.D.
Reg. No. 40,745

Brobeck, Phleger & Harrison LLP
12390 El Camino Real
San Diego, CA 92130-2081
Direct Dial: (858) 720-2570
Facsimile: (858) 720-2555

6

Serial No. 09/553,993
Page 7 of 9

## MARKED UP COPY OF AMENDED SPECIFICATION AND CLAIMS

IN THE SPECIFICATION: :

At page 1, immediately after the title, please insert the heading as follows:

RELATED APPLICATIONS

At page 1, immediately after the heading "Related Applications," the paragraph beginning at line 3 and continuing to 7 has been replaced in entirety with the paragraph as follows:

This application is a continuation of U.S. Application Serial No. 09/553,993, filed April 20, 2000, which claims the benefit of U.S. Provisional Application Serial No. 60/135,123, filed May 20, 1999; U.S. Provisional Application Serial No. 60/160,917, filed October 22, 1999; U.S. Provisional Application Serial No. 60/135,051, filed May 20, 1999; U.S. Provisional Application Serial No. 60/161,148, filed October 22, 1999; U.S. Application Serial No. 09/517,945, filed March 3, 2000; U.S. Provisional Application Serial No. 60/130,089, filed April 20, 1999; U.S. Provisional Application Serial No. 60/160,027, filed October 22, 1999; U.S. Application Serial No. 09/513,362, filed February 25, 2000; U.S. Provisional Application Serial No. 60/135,053, filed May 20, 1999; U.S. Application Serial No. 09/425,633, filed October 22, 1999; and U.S. Application Serial No. 09/535,854, filed March 27, 2000, all of which are hereby expressly incorporated by reference herein.

IN THE CLAIMS:

Please cancel claims 1 to 14 and add new claims 15 through 22 as follows:

15.     A composition comprising a padlock probe hybridized to a target sequence wherein said target sequence comprises:

a) a first domain, a second domain, and a detection position;

wherein said padlock probe comprises

Serial No. 09/553,993
Page 8 of 9

a) a first end of said padlock probe that is complementary to said first domain of said target sequence;

b) a second end of said padlock probe that is complementary to said second domain of said target sequence;

c) a cleavage site;

d) an adapter; and

e) a binding site for a primer.

16.     The composition of claim 15 wherein said padlock probe comprises an internally positioned adapter sequence.

17.     The composition of claim 15 wherein said padlock probe comprises an internal primer binding site wherein said primer can be extended by a polymerase, and wherein said primer binding site, said cleavage site and said adapter sequence can be in any order.

18.     The composition of claim 15 wherein said detection sequence is comprised within either said first domain of said target sequence or said second domain of said target sequence.

19.     The composition of claim 15 wherein said detection sequence is between said first domain of said target sequence and said second domain of said target sequence.

20.     A composition comprising a plurality of species of padlock probes hybridized to target sequences,

wherein each species of target sequences comprises:

a) a first domain;

b) a second domain; and

c) a detection position;

and wherein each species of padlock probes comprises:

8

Serial No. 09/553,993
Page 9 of 9

d) a cleavage site;

e) an adapter; and

f) a binding site for a primer;

and further wherein each species of hybridized padlock probe and target sequence in said composition comprises:

g) a padlock probe with ends complementary to said first domain and said second domain of a species of target sequence; and

h) an internal adapter that is distinguishable from internal adapters comprised in other species of padlock probes present in said composition.

21.    A composition according to Claim 20 wherein each padlock probe in said plurality of species of padlock probes hybridized to said target sequences further comprises a priming site that is identical in all members of said plurality of species of padlock probes hybridized to said target sequences.

22.    A composition according to Claim 20 wherein each padlock probe comprises a cleavage site that is identical in all members of said plurality of species of padlock probes hybridized to target sequences.