# EXHIBIT I

DECLARATION FOR PATENT APPLICATION

As a below-named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name,

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled <u>DETECTION OF NUCLEIC ACID REACTIONS ON BEAD ARRAYS</u>, the specification of which

                was filed on <u>April 20, 2000</u> as
   <u>X</u>  Application Serial No. <u>09/553,993</u>
                and was amended on _____, (if applicable).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose to the Patent Office all information known to me to be material to patentability as defined in 37 C.F.R. 1.56.

I hereby claim foreign priority benefits under Title 35, United States Code, §119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s)                                    <u>Priority Claimed</u>

| (Number) | (Country) | (Day/Month/Year Filed) | ☐ Yes | ☐ No |
| (Number) | (Country) | (Day/Month/Year Filed) | ☐ Yes | ☐ No |
| (Number) | (Country) | (Day/Month/Year Filed) | ☐ Yes | ☐ No |

I hereby claim the benefit under Title 35, United States Code, §119/§120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, §112, I acknowledge the duty to disclose to the Patent Office all information known to me to be material to patentability as defined in 37 C.F.R. 1.56 which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

<u>09/535,854</u>     <u>March 27, 2000</u>     <u>Pending</u>
(Application Serial No.)    (Filing Date)           (Status)
                               (patented, pending, abandoned)

<u>09/517,945</u>     <u>March 3, 2000</u>     <u>Pending</u>
(Application Serial No.)    (Filing Date)           (Status)
                               (patented, pending, abandoned)

<u>09/513,362</u>     <u>February 25, 2000</u>     <u>Pending</u>
(Application Serial No.)    (Filing Date)           (Status)
                               (patented, pending, abandoned)

| 09/425,633 | October 22, 1999 | ...ding |
|---|---|---|
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |

| 60/161,148 | October 22, 1999 | Abandoned |
|---|---|---|
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |

| 60/160,927 | October 22, 1999 | Abandoned |
|---|---|---|
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |

| 60/160,917 | October 22, 1999 | Abandoned |
|---|---|---|
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |

| 60/135,051 | May 20, 1999 | Abandoned |
|---|---|---|
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |

| 60/135,053 | May 20, 1999 | Abandoned |
|---|---|---|
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |

| 60/135,123 | May 20, 1999 | Abandoned |
|---|---|---|
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |

| 60/130,089 | April 20, 1999 | Abandoned |
|---|---|---|
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |

Direct all telephone calls to ROBIN M. SILVA at (415) 781-1989.

Address all correspondence to:
FLEHR HOHBACH TEST
ALBRITTON & HERBERT LLP
Suite 3400, Four Embarcadero Center
San Francisco, California 94111

File No. A-69235/DJB/RMS/DCF

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Title 18, United States Code, §1001 and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of first
inventor: KEVIN GUNDERSON

Inventor's signature: [signature]

Date: 1/3/2001

Residence: ENCINITAS, CALIFORNIA

Citizenship: UNITED STATES OF AMERICA

DECLARATION FOR PATENT APPLICATION

Post Office Addr   .   1543 JUNIPER HILL DRIVE

ENCINITAS, CALIFORNIA 92024

Full name of second
inventor:    JOHN R. STUELPNAGEL

Inventor's signature: *[signed] John R Stuelpnagel*

Date: 1/3/01

Residence: ENCINITAS, CALIFORNIA

Citizenship: UNITED STATES OF AMERICA

Post Office Address: 38 BRIGGS AVENUE

ENCINITAS, CALIFORNIA 92024

Full name of third
inventor:    MARK S. CHEE

Inventor's signature: *[signed] Mark Chee*

Date: 1/3/01

Residence: DEL MAR, CALIFORNIA

Citizenship: AUSTRALIA

Post Office Address: 155 - 15TH STREET, APT. 24

DEL MAR, CALIFORNIA 92014

1026978

# EXHIBIT J


Analysis
As of: Oct 17, 2007

CIVCO MEDICAL INSTRUMENTS CO., INC., Plaintiff, vs. PROTEK MEDICAL PRODUCTS, INC., Defendant.

No. 4:03-cv-40722

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA, CENTRAL DIVISION

*2004 U.S. Dist. LEXIS 10840*

June 4, 2004, Decided

**SUBSEQUENT HISTORY:** Motion granted by, Dismissed by, Motion denied by *Civco Medical Instruments Co. v. Protek Medical Prods.,* 2005 U.S. Dist. LEXIS 1640 (S.D. Iowa, Feb. 4, 2005)

**DISPOSITION:** [*1] Plaintiff's motion to disqualify Simmons Perrine was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued defendant for patent infringement. Plaintiff moved the court to disqualify the law firm representing defendant alleging that one of the lawyer's prior representation of plaintiff was substantially related to the present action. Defendant countered that the lawyer in question never represented plaintiff, rather he represented its former chief executive officer (CEO) in securing patents unrelated to the patents in suit.

**OVERVIEW:** The court found that there was no evidence that plaintiff was the CEO's alter ego. Even if the court assumed that the lawyer represented plaintiff's interests rather than that of the CEO, that representation ceased more than seven years before the patents in suit were filed and 12 years before the litigation began. The assignee of the patents that the lawyer prepared was listed as the CEO, not plaintiff, yet in subsequent patent applications, the CEO listed plaintiff as the assignee. All communications concerning the patents were to be sent to the CEO's home address. Given the limited nature of the lawyer's work for the CEO, the length of time since that work was performed, the public nature of much of the related information, and the limited record evidence connecting the early patents to the patents in suit, the court did not find that the lawyer's prior work for the CEO was substantially related to the current matter as to mandate disqualification.

**OUTCOME:** The court denied the motion to disqualify counsel.

**COUNSEL:** For CIVCO MEDICAL INSTRUMENTS COMPANY INC, plaintiff: Edmund J Sease, Jeffrey D Harty, R Scott Johnson, MCKEE VOORHEES & SEASE P.L.C., DES MOINES, IA.

For CIVCO MEDICAL INSTRUMENTS COMPANY INC, plaintiff: Thomas R Johnson, Jeffer Ali, Rachel Clark Hughey, MERCHANT & GOULD PA, MINNEAPOLIS, MN.

For PROTEK MEDICAL PRODUCTS, INC, defendant: Stephen J Holtman, David A Hacker, Jason M Steffens, SIMMONS PERRINE ALBRIGHT & ELLWOOD, CEDAR RAPIDS, IA.

**JUDGES:** JAMES E. GRITZNER, JUDGE, UNITED STATES DISTRICT COURT.

**OPINION BY:** JAMES E. GRITZNER

**OPINION**

**ORDER ON MOTION TO DISQUALIFY COUNSEL**

Case 1:05-cv-00400-JJF    Document 73-8    Filed 11/06/2007    Page 7 of 12

Page 2
2004 U.S. Dist. LEXIS 10840, *

This matter comes before the Court on motion by Plaintiff Civco Medical Instruments Co., Inc. ("CIVCO") to disqualify the firm of Simmons, Perrine, Albright & Ellwood ("Simmons Perrine"), counsel for Defendant Protek Medical Products, Inc. ("Protek"). The Court heard oral arguments on May 13, 2004. Jeffrey Harty of McKee, Voorhees & Sease and Jeffer Ali of Merchant & Gould appeared for CIVCO. Stephen Holtman of Simmons Perrine appeared for Protek. The motion is now fully submitted.

## I. FACTS

Plaintiff CIVCO Medical Instruments Company Inc. ("CIVCO") [*2] designs and markets specialized medical products and equipment. Victor J. Wedel ("Wedel") founded CIVCO in 1981 and invented, inter alia, needle guides. In the late 1980s, Wedel hired Gregory G. Williams ("Williams") to draft and obtain patents for the needle guides he invented or co-invented. Between 1989 and 1992, Williams filed and prosecuted three applications for Wedel. [1] Wedel was the sole inventor of *U.S. Patent No. 4,898,178* ("'178") and was co-inventor with Rick L. Pruter ("Pruter") of *U.S. Patent Nos. 5,052,396* ("'396") and 5,088,500 ("'500"). The *'178 patent* pertains to a disposable needle guide for ultrasound transducers; the *'396 patent* pertains to a needle guide for ultrasound transducers; and the '500 patent pertains to an ultrasound finger probe.

> 1 The record is unclear on a possible fourth patent application prepared by Williams for Wedel. Williams recalls a fourth application, while Wedel recalls having abandoned the fourth project without the filing of an application.

At the time he drafted [*3] those patents, Williams was an in-house counsel for Rockwell International ("Rockwell"). Rockwell's policy permitted its patent attorneys to perform outside work for third parties, filing and prosecuting patent applications. However, Rockwell's policy did not permit its attorneys to provide intellectual property legal services to third parties beyond the preparation and prosecution of patent applications.

During the prosecution of the Wedel patents, Williams met in person with Wedel on two occasions: once at Wedel's home and once at CIVCO for Wedel to sign the patent documents for submission to the United States Patent and Trademark Office ("USPTO"). All other communication between Williams and Wedel was done via telephone or mail. During the prosecution of the patents, Williams never met Pruter. Williams may have spoken on the phone with Pruter at the time of these initial patents regarding the paperwork involved in Pruter's assignment of his rights to the *'396* and the '500 patents to Wedel.

Williams understood CIVCO would produce and market any product line associated with the *'178*, the *'396*, and the '500 patents. He recognized that Wedel was the chief officer of CIVCO, a small [*4] company. It is also undisputed that Williams was paid by CIVCO. However, the patents were in Wedel's name with no obligation to assign the patents to CIVCO. At Wedel's request, Williams directed all future correspondence regarding the three patents be sent to Wedel's home address, rather than the CIVCO office.

The record is unsettled regarding the detailed nature of any discussions between Williams and Wedel during the prosecution of these early patents. Wedel recalls discussing competitor products and prior art. Williams recalls there would have been discussions about needle guide technology, prior art, and best mode with regard to patent applications. Williams denies discussions of any substance that did not become a part of the public patent application process. No specific disclosure, subject of discussion, or confidence has been identified in this record that provides a strategic advantage over CIVCO in this action, though the potential for such communication may be assumed by the attorney/client relationship.

The professional relationship between Williams and Wedel essentially ended in 1992. There is an indication of some small activity in December of 1993, for which Williams [*5] was paid by CIVCO, which the parties can only project may have been in connection with a maintenance fee due on a patent.

The next contact Williams had with CIVCO occurred in the mid 1990s when Wedel and CIVCO's current president, Charles Klasson approached Williams about the prospect of Williams serving in some connection with CIVCO. The only record evidence suggests this would have been as a member of CIVCO's board of advisors. However, that offer was not extended; Williams left Rockwell in 1997 and joined Simmons Perrine.

Rick Pruter was employed with CIVCO from 1990 to 1996, starting as vice president of engineering and later promoted to vice president and general manager. Pruter left CIVCO in 1996 and is now president of Protek. [2] Pruter recalls no time when strategy discussions regarding intellectual property were pursued in the presence of Williams.

> 2 The disqualification analysis focuses on the lawyer's prior access to confidential information, and it is not resolved by the existence of another person with like or superior knowledge of the confidential subject matter, who is unrestrained by ethical standards of the legal profession. However, Mr. Pruter obviously had extraordinary ac-

Case 1:05-cv-00400-JJF    Document 73-8    Filed 11/06/2007    Page 8 of 12

Page 3
2004 U.S. Dist. LEXIS 10840, *

cess to technology and strategies of his former employer and current adversary.

[*6] In 1999, Wedel retired from and sold his interest in CIVCO and assigned the '178, the '396, and the '500 patents to CIVCO. In August 1999, CIVCO secured *U.S. Patent No. 5,941,889* ("'889") on a multiple angle needle guide system. The listed inventor is Craig Cermak and the assignee is CIVCO. In March 2002, CIVCO secured *U.S. Patent No. 6,361,499* ("'499") on a multiple angel needle guide. The listed inventors are Cermak, John Bates, David Best, Brett Severence and David Schultz and the assignee is CIVCO.

The needle guide technology is central to the business of CIVCO. However, the intellectual property involved in this case is broader than the two companies in this action. In addition to CIVCO and Protek, two or three other companies are in the business of designing, manufacturing and marketing similar needle guide technology and products.

On December 17, 2003, CIVCO filed this patent infringement lawsuit alleging Protek was making and selling products which were infringing on the '889 and the '499 patents. On February 11, 2004, CIVCO filed the present motion to disqualify Simmons Perrine from representing Protek in this lawsuit alleging Williams' prior representation of CIVCO on [*7] matters was substantially related to the present lawsuit. Protek resists the motion arguing Williams never represented CIVCO, rather he represented Wedel in the limited matter of securing patents unrelated to the patents in suit.

## II. STANDARD FOR DISQUALIFICATION

The grant or denial of a motion to disqualify counsel rests in the discretion of the trial court. *Harker v. C.I.R., 82 F.3d 806, 808 (8th Cir. 1996)* (citing *A.J. by L.B. v. Kierst, 56 F.3d 849, 859 (8th Cir. 1995)*); see also *Cent. Milk Producers Co-op. v. Sentry Food Stores, Inc., 573 F.2d 988, 991 (8th Cir. 1978)*. Due to the potential for abuse, motions to disqualify "'should be 'subjected to particularly strict scrutiny.'" *Id.* (quoting *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd., 760 F.2d 1045, 1050 (9th Cir.1985)* (quoting *Rice v. Baron, 456 F. Supp. 1361, 1370 (S.D.N.Y. 1978))*).

"The party seeking disqualification of his former counsel must bear the burden of proving that the present and prior representations are substantially related." *Kierst, 56 F.3d at 859* (citing *Duncan v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 646 F.2d 1020, 1028 (5th Cir. 1981)* [*8] overruled on other grounds by *Gibbs v. Paluk, 742 F.2d 181, 185 (5th Cir. 1984))*. "In determining whether the past and present representations are 'substantially related,' the focus of the district court's inquiry should be on the precise nature of the relationship between the two representations." *Id.* (citing *Duncan, 646 F.2d at 1029*).

United States District Court for Southern District of Iowa Local Rule 83.2(g)(1) states that "the rules of conduct applicable to attorneys admitted to practice before the state courts of Iowa govern all members of the bar of this court ...." Accordingly, the Iowa Code of Professional Responsibility governs motions to disqualify counsel. See *Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1154 (8th Cir. 1999)* (stating that the reviewing court applies the same rule the district court adopted in ruling on the motion to disqualify counsel).

Under Iowa law, "an attorney must be disqualified from representing a party against a former client if the two representations bear a 'substantial relationship' to each other." *Doe v. Perry Cmty. Sch. Dist., 650 N.W.2d 594, 597 (Iowa 2002)* (citing *Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Walters, 603 N.W.2d 772, 777 (Iowa 1999))*. [*9] "In determining whether a substantial relationship exists, we consider: (1) the nature and scope of the prior representation; (2) the nature of the present lawsuit; and (3) whether the client might have disclosed a confidence to her attorney in the prior representation which could be relevant to the present action." *Id. at 598* (citing *Hoffmann v. Internal Med., P.C. of Ottumwa, 533 N.W.2d 834, 837 (Iowa Ct. App. 1995))*. "The former client must be given the presumption confidences were disclosed." *Id.* Due to the strong appearance of impropriety, once it has been concluded that a substantial relationship exists between the two representations, disqualification of the attorney and the law firm cannot be avoided. Id. However, the mere assertion that there is a conflict is insufficient to support a claim for disqualification. *Hoffmann, 533 N.W.2d at 836* (citing *Telectronics Proprietary, Ltd. v. Medtronic, Inc., 836 F.2d 1332, 1336 (Fed. Cir. 1988))*.

To prevent the use of a motion to disqualify counsel as a strategic device, the Court must also consider the timing of the motion. *Cent. Milk Producers Co-op., 573 F.2d at 992.* [*10]

> A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion. This court will not allow a litigant to delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of a case has been completed.

*Id.* In determining whether the movant has waived its right to object to the opposing party's choice of counsel,

Case 1:05-cv-00400-JJF   Document 73-8   Filed 11/06/2007   Page 9 of 12

Page 4
2004 U.S. Dist. LEXIS 10840, *

the court must consider: "'(1) the length of the delay in bringing the motion to disqualify; (2) when the movant learned of the conflict; (3) whether the movant was represented by counsel during the delay; (4) why the delay occurred; and (5) whether disqualification would result in prejudice to the non-moving party.'" *Geissal v. Moore Med. Corp.*, 92 F. Supp. 2d 945, 946 (E.D. Mo. 2000) (quoting *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1115 (D.N.J. 1993)).

## III DISCUSSION

CIVCO argues that the three factors of the substantially related inquiry are present and therefore, Simmons Perrine should be disqualified: 1) Williams represented CIVCO not only Wedel; [*11] 2) the prior representation and the current matter are substantially related which creates a conflict of interest; and 3) Protek will not be prejudiced by the disqualification of Simmons Perrine.

### A. Party Represented.

CIVCO argues that it is irrelevant that Williams represented Wedel rather than CIVCO in the patent application because a natural person must necessarily apply for the patent. *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1247-48 (Fed. Cir. 1993) ("[Defendant] could never have been declared an 'inventor,' as [defendant] was merely a corporate assignee and only natural persons can be 'inventors.'") (citing 35 U.S.C. §§ 115-118). CIVCO asserts, for purposes of establishing attorney-client privilege, an inventor who is the principle shareholder and president of a company is the company's alter ego. *Hooper v. Steelplank Corp.*, 215 U.S.P.Q. 829, 831(E.D. Mich. 1981) (reasoning for purposes of the attorney-client privilege, the corporation was nothing more than the alter ego of the president and principal shareholder of the corporation). Applying that principle here, CIVCO argues that at the time Williams [*12] drafted the patents, CIVCO had few employees and Wedel was the sole owner; therefore, it is axiomatic that Wedel was CIVCO's alter ego. CIVCO also points out that CIVCO, not Wedel, paid Williams for the patent work he performed.

In resistance, Protek argues that the work Williams did on the three patents was done for Wedel and Williams did not represent CIVCO. Furthermore, Williams' work concluded more than twelve years ago and was on different patents than the patents in suit. In addition, Protek argues Wedel was not obligated to assign his patent rights to CIVCO; moreover, when he did transfer his rights, it did not transfer the attorney-client relationship. *Telectronics Prop., Ltd.*, 836 F.2d at 1336. Protek also points out that while an inventor must be an individual, *Beech Aircraft Corp.*, 990 F.2d at 1247, an inventor may assign his rights to the invention, at any time, even in the patent application, *35 U.S.C. § 261*. In fact, the patents in suit were assigned to CIVCO on the face of those patents, whereas, the Williams' patents were not assigned to CIVCO until Wedel left CIVCO, long after Williams' patent work was completed. [*13] Protek also argues that by asserting that Wedel was its alter ego, CIVCO attempts to pierce its own corporate veil, a proposition for which it has not cited any authority.

CIVCO relies on *Hooper v. Steelplank Corp.*, 215 U.S.P.Q. 829, 831 (E.D.Mich. 1981) for the premise that lawyers who handle patent prosecution for small, closely-held companies, represent those companies as well as the principals. Because these matters turn on unique facts, some review of that case is in order. In that case, the inventor of a railroad crossing, Thomas Hooper ("T. Hooper"), was president and principal shareholder of Hogart Corporation ("Hogart"). *Id. at 830*. T. Hooper assigned his rights to the crossing to Hogart and hired the law firm of Barnes, Kisselle, Raisch & Choate ("B, K, R & C") to apply for a patent.*Id.* All work on the patent was performed while Hogart held the rights to the patent, however, before it was issued, Hogart reassigned rights to the patent to T. Hooper. Id. T. Hooper severed his relationship with Hogart, which ultimately filed for bankruptcy and was dissolved. Id.

That same year, T. Hooper entered into an agreement with his cousin [*14] David Hooper ("D. Hooper") to establish Steelplank Corporation ("Steelplank") which T. Hooper granted the exclusive right to manufacture and sell the crossing. *Id.* In exchange, T. Hooper was paid a licensing fee, and when he died the payments were made to his widow, and then to his daughter. Id. Several years later, Steelplank designed a new crossing and was advised by B, K, R & C that it did not infringe on T. Hooper's patent. Id. Steelplank stopped paying the licensing fee to T. Hooper's estate which in turn brought an infringement action against Steelplank. Id. Steelplank defended against the claim asserting patent invalidity; that is, B, K, R & C was asserting that the very same patent it had obtained for Hogart was invalid. Id. T. Hooper's estate moved to disqualify B, K, R & C from representing Steelplank in the infringement action due to the prior representation. Id.

In resistance, B, K, R & C argued its attorney-client relationship was with Hogart not T. Hooper, therefore, it was not taking a position adverse to a client in a substantially related matter. *Id. at 831*. The court disagreed reasoning Hogart was never anything more than [*15] T. Hooper's alter ego and that any work done for Hogart could only be done at T. Hooper's direction. Id.

CIVCO's reliance on*Hooper* is misplaced. First, that court never made an alter ego analysis. Rather, it simply

*concluded* that Hogart was nothing more than T. Hooper's alter ego. Second, that court did not base its decision to disqualify counsel on T. Hooper's status as alter ego. In fact, the court suggested it might not have to disqualify B, K, R & C if it had agreed to drop its patent invalidity defense. Id. That is, B, K, R & C was arguing for the invalidity of the very patent it had drafted for T. Hooper. *Id. at 831*. The court concluded, "we do not believe that it is within the bounds of propriety to permit a law firm to assist one client in obtaining a patent and then to assist another client in proving that the patent was not validly issued." *Id. at 832*.

*Hooper* is distinguishable from the present case. Here, the patents in suit are different than those Williams drafted for Wedel. CIVCO, unlike Bogart, is still a viable corporation and aside from CIVCO's own unsubstantiated claims, there is no evidence that CIVCO was Wedel's [*16] alter ego. In Hooper, the law firm at issue had represented both parties before their interests became adverse. In the present case, even if the Court were to assume Williams represented CIVCO's interests rather than Wedel's, that representation ceased more than seven years before the patents in suit were filed and twelve years before this litigation began. When he drafted patents for Wedel, Williams was working as a counsel at Rockwell International and doing outside work preparing and prosecuting patent applications. The assignee of the patents Williams prepared was listed as Wedel, not CIVCO. Yet, in subsequent patent applications, Wedel listed CIVCO as the assignee. In addition, Wedel did not assign the *'178*, the *'396* or the '500 patents to CIVCO until he retired in 1999. Wedel and Williams met in person on only two occasions during the preparation and prosecution of the three patents; only one of those occasions was at CIVCO. Wedel requested that Williams have all future communication concerning those patents sent to Wedel's home address, not to CIVCO. Wedel appears to have taken deliberate and careful steps to separate his role as inventor from his role as CEO of CIVCO.

[*17] CIVCO's alter ego argument is incompatible with its declaration that CIVCO, not Wedel, is a world-renown innovator in the design, manufacture, and marketing of specialized medical products and equipment. Also incompatible with the alter ego argument is the fact that in 1996, Pruter assigned his patent rights to Wedel, not CIVCO. In addition, in 1987 and 1989, Wedel signed declarations of small entity status to reduce his USPTO fee liability. Therein, Wedel declared that he had not assigned, nor was he obliged to assign his rights in the invention. That declaration further required Wedel to report any status change to USPTO.

During the late 1980s, Wedel had strategic reasons for hiring Williams for the limited purpose of drafting and prosecuting three patents. Wedel was looking to have the applications pursued at minimum cost, so sought the assistance of a "moonlighting" company lawyer. The work was done at a flat fee, and was restricted by Rockwell mandates, diminishing the potential for strategic legal work on behalf of CIVCO. Wedel's requirements led the transactions in the direction of Wedel's personal interests. The fact Williams may have been paid by CIVCO is not independently [*18] controlling under these other circumstances.

### B. Substantial Relationship.

CIVCO argues that the substantial relationship between the *'178*, the *'396*, and the '500 patents ("Wedel patents") and the *'889* and the *'499 patents* ("CIVCO patents in suit") is illustrated by the citation to the Wedel patents as prior art in the prosecution application for the CIVCO patents in suit. Protek counters this argument stating that the fact that the USPTO issued the *'889* and the *'499 patents* despite the existence of the Wedel patents means the USPTO considered the differences between the CIVCO patents in suit and the Wedel patents significant enough to warrant the issuance of new patents.

The Court agrees with Protek. In the prosecution of a patent, an applicant *distinguishes* prior art to persuade the USPTO that the product is distinct and a new patent is warranted. For CIVCO to now change its position and argue that at the time of application in the constantly changing field of medical technology, the newer CIVCO patents in suit were substantially related to the then ten year old Wedel patents, would be contrary to the prosecution of the *'889* and the *'499 patents*. Of further note, on the [*19] face of the *'178*, the *'396*, and the '500 patent applications, there is a reference to the interrelationship of the Wedel patents. Whereas, on the *'889* or the *'499 patent* applications, there is no such reference to the Wedel patents, instead, those applications simply state that the invention relates to a needle guide for a medical imaging instrument.

CIVCO argues that Simmons Perrine should be disqualified in light of *Engineered Products Co. v. Donaldson Co. Inc., 290 F. Supp. 2d 974 (S.D. Iowa 2003)*, a case in which Simmons Perrine argued for disqualification under similar circumstances. In Engineered Products Co., Simmons Perrine representing defendant Donaldson, moved to disqualify the law firm of Carlson, Caspers, Vandenburgh and Lindquist ("CCVL"). *Id. at 976*. One of CCVL's founding partners, Alan Carlson, had previously provided intellectual property legal services for Donaldson while he was with the law firm of Merchant & Gould ("M & G").*Id.* That representation included a broad range of intellectual property work on at least twenty-five different cases, prosecuting patent

Case 1:05-cv-00400-JJF   Document 73-8   Filed 11/06/2007   Page 11 of 12

Page 6
2004 U.S. Dist. LEXIS 10840, *

applications, drafting infringement opinions, and negotiating [*20] with competitors, as well as litigating two patent trials. Id.

During that representation, Carlson was on M & G's board of directors and personally worked on many of Donaldson's intellectual property matters including the two patent cases that went to trial. *Id.* The final matter Carlson worked on for Donaldson was a patent case filed in 1994 which was settled in 1997. *Id. at 977.* After that, Carlson no longer personally performed any legal services for Donaldson, however, Carlson remained on M & G's board of directors until he left the firm in 2003 to establish CCVL. Id. Several M & G attorneys followed Carlson to CCVL. *Id. at 979.*

Engineered Products Co. ("EPC") filed a patent infringement lawsuit against Donaldson in 1998. *Id. at 975.* By September 2003, with its case against Donaldson proceeding to trial, the majority interest owner of EPC became concerned about the trial experience of EPC's litigation team and sought more experienced patent trial lawyers. *Id. at 976.* Carlson was contacted to represent EPC, and after seeking the opinion of an "expert" in legal ethics, Carlson determined that there was [*21] no conflict of interest and agreed to represent EPC. Id.

Donaldson moved to disqualify Carlson and CCVL asserting Carlson and the former M & G attorneys at CCVL had confidential information about Donaldson. *Id. at 978.* Donaldson argued, inter alia, that when EPC commenced the lawsuit in 1998 while Carlson was still at M & G and on its board of directors, various M & G attorneys worked with Donaldson's representatives on the case. *Id.*

After a thorough discussion of the Iowa Code of Professional Responsibility for Lawyers and *State of Arkansas v. Dean Foods Products Co., 605 F.2d 380 (8th Cir. 1979)*, the leading Eighth Circuit case on attorney disqualification, the Engineered Products court reasoned that since Carlson and the other former M & G attorneys were still at M & G while it was representing Donaldson in the current litigation, it was presumed that they possessed knowledge of confidential communications concerning the case. *Id. at 985.* The court went on to reason that under current Eighth Circuit and Iowa law, such a presumption was not rebuttable and therefore Carlson and CCVL must be disqualified. *Id.*

> There is no question [*22] that all of the lawyers employed by M & G while the firm was representing Donaldson in connection with the present case are presumed to have knowledge of confidential communications between Donaldson and M & G concerning the case. Thus, the court must presume Carlson, and the lawyers who followed him from M & G to CCVL, have knowledge of confidential communications concerning this case. Also, if Carlson ever represented Donaldson on any matter 'substantially related' to the present case, the court must presume he has knowledge of confidential communications between Donaldson and M & G regarding the case. The question is whether, under the facts of this case and the applicable law, these presumptions are rebuttable. If they are not, then Carlson and CCVL must be disqualified. If they are rebuttable, then the court must analyze whether, on this record, EPC has rebutted both of these presumptions sufficiently to avoid disqualification from the case.

*Id.*

CIVCO asserts Engineered Products stands for principles the court never addressed in that case. CIVCO asserts that court found prior and current representations were substantially related despite the fact that the same [*23] patents were not at issue. However, that court did not discuss the relationship between previous patents and the patents in suit. Rather, the issue before that court was whether the presumption of confidential knowledge was rebuttable. *Id.* The presumption arose because Carlson, an attorney that previously represented the defendant, was still affiliated with the representing law firm *during* the litigation of the *same* case. Id.

In the present case, the issue is whether Williams' representation drafting and prosecuting the Wedel patents is substantially related to the current litigation of the CIVCO patents in suit. Given the limited nature of Williams' work for Wedel, the length of time since that work was performed, the public nature of much of the related information, and the limited record evidence connecting the early Wedel patents to the patents in suit, the Court does not find Williams' prior work for Wedel is substantially related to the current matter. [3]

---

3  As to the final disqualification factor, CIVCO argues Protek would not be prejudiced if Simmons Perrine were disqualified because it is early in the litigation. However, in the absence of finding a substantial relationship between the prior and current representation, the lack of prejudice to the non-movant is not enough to merit disqualification since the rights of a party to choose

its own attorney must also be protected. *Hoffmann, 533 N.W.2d at 836.*

> The 'substantial relationship' standard, however, does not establish an absolute prohibition against representing a new client against a former client. It addresses an extremely sensitive area of the practice of law, and involves many conflicting rights. These rights include the right of a litigant to choose his or her attorney, and the right of a lawyer to represent new clients without interference from former clients.

*Id.* (citing *Richers v. Marsh & McLennan Group Assoc.,* 459 N.W.2d 478, 481 (Iowa 1990)).

Under the circumstances of this case, the issue of prejudice to the non-movant is moot since the Court finds the relationship between the prior and current representations is not so substantial as to mandate disqualification.

[*24] **IV. CONCLUSION**

On a motion to disqualify, the movant has the burden of showing that prior and current representations are substantially related. *Kierst, 56 F.3d at 859.* CIVCO has not persuaded the Court a substantial relationship exists. For the above stated reasons, CIVCO's motion to disqualify Simmons Perrine must be **denied.**

**IT IS SO ORDERED.**

Dated this 4th day of June, 2004.

JAMES E. GRITZNER, JUDGE

UNITED STATES DISTRICT COURT