# EXHIBIT O

**NOV 2 3 2005**

# Merchant & Gould

### An Intellectual Property Law Firm

901 15th Street, NW
Suite 850
Washington, DC
20005 USA
TEL 202-326-0300
FAX 202-326-0778
www.merchant-gould.com

---

## Fax Transmission  |  November 23, 2005

| | | | |
|---|---|---|---|
| To: | Robert Thomas Crow | From: | Steven B. Kelber |
| Company: | U.S. Patent and Trademark Office | Our Ref.: | 70051.0002USC1 |
| U.S. Appln. No.: | 10/264,574 | Fax No.: | 202-326-0778 |
| Fax No.: | 571-273-8300 | Phone No.: | 202-326-0300 |
| Phone No.: | 571-272-1113 | Total Pages: | 22 |
| State/Country: | | E-Mail: | skelber@merchant-gould.com |
| Confirmation Via Mail: ☐ Yes  ☒ No | | Return Fax To: | |

---

**CERTIFICATE UNDER 37 CFR 1.6(d):**
I hereby certify that the following documents are being transmitted by facsimile to the U.S. Patent and Trademark Office on November 23, 2005.

By: *Catherine Grosshans*
Name: Catherine Grosshans

**Documents Transmitted:**

Response including Annex A and Annex B.

---

This transmission contains information that is confidential and/or legally privileged. It is intended for use only by the person to whom it is directed. If you have received this telecopy in error, please notify us by telephone immediately so that we can arrange for the return of the original documents to us.

If you did NOT receive all of the pages, please call us in the U.S.A. at 202-326-0300 or fax us at 202-326-0778.

SENT BY: M&G;                    2026258381;         NOV-23-05 15:21;        PAGE 2

RECEIVED
CENTRAL FAX CENTER
NOV 2 3 2005

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| RESPONSE | ATTORNEY DOCKET NO.<br>70051.0002USC1 | |
|---|---|---|
| | U.S. APPLICATION SERIAL NO.<br>10/264,574 | CONFIRMATION NO<br>4126 |
| | FILING DATE<br>October 4, 2002 | |
| INVENTOR(S)<br>Kevin Gunderson, et al. | EXAMINER<br>Robert Thomas CROW | GROUP ART UNIT<br>1634 |
| TITLE OF APPLICATION<br>Detection of nucleic acid reactions on bead arrays | | |

### RESPONSE

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:

Applicants wish to express their appreciation and thanks to Examiner Crow, Interference Specialist Tsang and Supervisor Gary Jones, for the extended Interview afforded Applicants and undersigned counsel Monday, November 21, 2005. During that interview, Applicants' suggestion for Declaration of an Interference, and supporting papers, including the Preliminary Amendment, and support for the claims introduced by the Preliminary Amendment, were discussed at length.

Of the various requirements to be satisfied in seeking declaration of an interference as suggested, with US Patent 6,858,412, only one, express written support for the recitation that the cleaved probe is amplified in claims 23 and 24, was discussed. Added support was identified, and the same is discussed at length below. Additionally, Applicants submit herewith revised ANNEX A and ANNEX B to the suggestion for interference, which reflect the additional support discussed.

CERTIFICATE UNDER 37 CFR 1.6(d):
I hereby certify that this paper is being transmitted by facsimile to the U.S. Patent and Trademark Office on November 23, 2005.

By: _Catherine Grossman_
Name: Catherine Grossman

## Response to Office Action

Initially, it is noted that an Office Action was issued in the above-captioned patent application on September 23, 2005. Because that date is a Friday, Applicants' Preliminary Amendment, and Suggestion for Interference, was actually filed in the office on September 26, 2005 <u>prior</u> to receipt of the Office Action, which occurred on September 27, 2005. So that Applicants' suggestion for an interference with the '412 patent may be considered, and the case otherwise properly docketed, it is requested that the rejections in the action of September 23, 2005 be vacated, and the preliminary amendment and suggestions for an interference be considered on the merits. In this respect, it was observed during the interview that if in fact a further action on the merits is required, as opposed to a declaration of interference, the further action would be non-final in nature.

## Express Support

As noted, during the interview, the entire preliminary amendment and suggestion for declaration of an interference was considered. The only copied claim element discussed was the presence in Applicants' involved specification, and continuation parent, for the recitation in Claim 23 and Claim 24 of amplifying the <u>cleaved</u> probe, that is, amplification following cleavage of the probe. In this respect, Applicants note that no issue was raised with respect to Claim 25.

Additional express support for the recitation of amplification of a cleaved probe can be found in the application as originally filed beginning with page 25, lines 2-8. The exact language of this passage is replicated in the substitute Annex A submitted herewith. This Annex A should replace Annex A submitted with Applicants' Suggestion for an

2

SENT BY: M&G;                    2026258381;              NOV-23-05 15:22;        PAGE 4

Interference. Annex A presents the recitation of the claims with the points of the specification lending express support. (Annex B does the same for the continuation parent, which has the same disclosure in a different font). At page 25, the involved specification notes that amplification involves amplification of a **target sequence**. The target sequence is not limited to the initial nucleic acid hybridized by the probe, the probe, or any other "primary target." Specifically, the application teaches that secondary targets, such as products from a reaction as claimed in Claims 23 and 24, are also targets to be amplified and detected. A variety of specific examples are set forth. Thus, the application teaches at page 25, lines 2-8, that the amplified target sequence may be a secondary target that is produced by cleavage. Clearly, amplification occurs after cleavage.

The focus, in this regard, in the specification, is amplification of the target, be it primary or secondary. The application teaches at page 35, lines 17-19, that the target, be it primary or secondary, is amplified so as to be detected, increasing the number of copies of the target sequence. Thus, in the subject matter of Claims 23 and 24, the target sequence is the sequence resulting after cleavage.

Beyond this express support, it is noted that the application specifically teaches combinations of techniques such as OLA and RCA, wherein the probe with detection sequences at either terminus is first ligated into a circle, and then cleaved. At page 98, lines 3-5 of the application, it is specifically noted that genotyping, for example, can be combined with amplification following, for detection of specific sequences. Methods of genotyping are described beginning on page 88 of the Application as filed (Section entitled LIGATION TECHNIQUES FOR GENOTYPING). RCA, or an assay using a

3

padlock probe (where the probe has hybridizing sequences at each terminus of the probe) is described as a method for genotyping at page 92 of the application, lines 3-16.

Immediately following the section on genotyping, the application specifically teaches, page 98, lines 3-5, that "it is also possible to combine two or more of these techniques to do genotyping, quantification, detection of sequences, etc." Thus, the combination of RCA and PCR or other amplification, as recited in the claims, is specifically and expressly embraced by the application.

Applicants further urge the Office to reconsider the support identified in Applicants original submission, including page 104, lines 21-23, which note that OLA and PCR can be combined in any order. RCA is a type of OLA. Clearly the application teaches that amplification can follow RCA, including the cleavage step. See, page 33 for additional support.

In view of the foregoing, it is respectfully submitted that adequate express written support for Claims 23 and 24, as presented, as well as Claim 25, is present in the application as originally filed. This support is replicated in Annex A and Annex B hereto, which are intended to replace original Annex A and original Annex B. They differ from those submitted on September 26, 2005 only in the recitation of additional support for the step of Claim 23 that calls for amplification following cleavage.

Pursuant to discussions Monday, this response is being sent via facsimile to the group, at 571-273-8300 and directly as a courtesy copy, to Cecelia Tsang, at 571-273-0562.

4

SENT BY: M&G;                    2026258381;        NOV-23-05 15:22;        PAGE 6

Consideration and Declaration of an Interference is respectfully requested.

Should there be any questions at all regarding the above-matters, you are invited to

contact undersigned counsel at 202-326-0333.

Respectfully submitted,

MERCHANT & GOULD P.C.

November 23, 2005
Date

Steven B. Kelber
Registration No. 30,073
Attorney of Record

Merchant & Gould
901 Fifteenth Str., N.W.
Suite 850
Washington, D.C. 20005

23552
Patent & Trademark Office

5

SENT BY: M&G;                    2026258381;          NOV-23-05 15:22;          PAGE 7

# ANNEX A

|  | Disclosure in USSN 10/264,574 |
|---|---|
| 23. A method for detecting a target sequence | Abstract, p. 171 (*The invention finds use in the detection and quantification of a nucleic acid target*) |
| comprising a first and second target domain in a sample, said method comprising: | P. 47, ll. 23 - 26). (*That is, each terminus of the oligonucleotide contains sequence complementary to the target nucleic acid...That is, the first end of the RCA probe is substantially complementary to a first target domain and the second end of the RCA probe is substantially complementary to a second target domain*). |
| a) hybridizing said target sequence to a precircle probe to form a first hybridization complex, | P. 47, ll. 28- 29. (*Hybridization of the oligonucleotide to the target nucleic acid results in the formation of a hybridization complex*). |
| said precircle probe comprising: i) a first targeting domain; ii) a second targeting domain; | P. 47, ll. 22 - 25. (*A single oligonucleotide is used for both OLA and as the circular template for RCA (referred to herein as a "padlock probe" or "RCA probe". That is, each terminus of the oligonucleotide contains sequence complementary to the target nucleic acid...*). |
| iii) at least a first universal priming site; and | P. 49, l. 6. (*The padlock probe also contains a priming site for priming the RCA reaction*). |
| iv) a cleavage site; | P. 48, ll. 22 - 23. (*In a preferred embodiment the padlock probe contains a restriction site. The restriction endonuclease site allows for cleavage...*) |
| wherein said first and second targeting domains hybridize to said first and second target domains; | P. 47, ll. 25 - 27. (*That is, each terminus of the oligonucleotide contains sequence complementary to the target nucleic acid...That is, the first end of the* |

|  | *RCA probe is substantially complementary to a first target domain and the second end of the RCA probe is substantially complementary to a second target domain...). P. 47, ll. 28 - 29. (Hybridization of the oligonucleotide to the target nucleic acid results in the formation of a hybridization complex).* |
|---|---|
| b) contacting said first hybridization complex with a ligase to form a closed circular probe; | *P. 48, ll. 1 - 3. (Ligation of the "primers" (which are the discrete ends of a single oligonucleotide) results in the formation of a modified hybridization complex containing a circular probe i.e. an RCA template complex.)* |
| c) cleaving said closed circular probe at said cleavage site to form a cleaved probe; | *P. 48 ll. 25 - 27. (Thus, following RCA, the product nucleic acid is contacted with the appropriate restriction endonuclease. This results in cleavage of the product nucleic acid into smaller fragments.)* |
| d) amplifying said cleaved probe to form a plurality of amplicons; and | *P. 25, ll. 2-8. (As is outlined herein, the* <u>*target sequence*</u> *may be a target sequence from a sample,* <u>*or a secondary target*</u> *such as a product of a reaction such as a detection sequence from an invasive cleavage reaction, a ligated probe from an OLA reaction, an extended probe from a PCR or SBE reaction, etc. Thus, for example, a target sequence from a sample is amplified to produce a secondary target* |

*that is detected; alternatively, an amplification step is done using a signal probe that is amplified, again producing a secondary target that is detected.*)(emphasis supplied).

P. 35, ll. 17-19. (*Target amplification involves the amplification (replication) of the target sequence to be detected, such that the number of copies of the target sequence is increased.*) (emphasis supplied).

p. 98, ll. 3-5. (*Combination Techniques: It is also possible to combine two or more of these techniques to do genotyping, quantification, detection of sequences, etc.*)

P. 104, ll. 21 - 23. (*In a preferred embodiment, OLA and PCR are combined. As will be appreciated by those in the art, the sequential order of the reaction is variable. That is, in some embodiments, it is desired to perform the genotyping or OLA reaction first followed by PCR amplification.*)

P. 33, ll. 26 - p. 27, l.1. (*Suitable amplification methods include both target amplification and signal amplification and include, but are not limited to, polymerase chain reaction (PCR), ligation chain reaction (sometimes referred to as an oligonucleotide ligase amplification OLA), cycling probe technology (CPT), strand displacement assay (SDA), transcription mediated amplification (TMA), nucleic acid sequence based amplification (NASBA), rolling circle based amplification (RCA), and invasive cleavage technology.*)

SENT BY: M&G;                    2026258381;         NOV-23-05 15:23;        PAGE 11

e) detecting said amplicons to detect the
presence of said target sequence in said
sample.

| | |
|---|---|
| Claim 24.  A method for amplifying a target sequence comprising a first and second target domain in a sample, said method comprising: | Abstract, p. 171. (*The invention finds use in the detection and quantification of a nucleic acid target using a variety of amplification techniques... P. 47, ll. 23 - 26. (That is, each terminus of the oligonucleotide contains sequence complementary to the target nucleic acid...That is, the first end of the RCA probe is substantially complementary to a first target domain and the second end of the RCA probe is substantially complementary to a second target domain*). |
| a) hybridizing said target sequence to a precircle probe to form a first hybridization complex, | as above, Claim 23 |
| said precircle probe comprising: i) a first targeting domain; ii) a second targeting domain; iii) at least a first universal priming site; and iv) a cleavage site; wherein said first and second targeting domains hybridize to said first and second target domains; | as above, Claim 23 |
| b) contacting said first hybridization complex with a ligase to form a closed circular probe; | as above, Claim 23 |
| c) cleaving said closed circular probe at said cleavage site to form a cleaved probe; and | as above, Claim 23 |
| d) amplifying said cleaved probe. | as above, Claim 23 |

| | |
|---|---|
| 25. A method of detecting the presence of a target nucleic acid sequence in a sample, comprising: | Abstract, p. 171. (*The invention finds use in the detection and quantification of a nucleic acid target using a variety of amplification techniques.*) |
| contacting said sample with a probe which contains sequence complementary to the target nucleic acid at each terminus of the probe, | P. 47, ll. 22 - 25. (*In an preferred embodiment, a single oligonucleotide is used for both OLA and as the circular template for RCA (referred to herein as a "padlock probe" or a "RCA probe"). That is each terminus of the oligonucleotide contains sequence complementary to the target nucleic acid and functions as an OLA primer as described above.*) |
| hybridizing said probe with any of said target nucleic acid sequence in said sample to form a hybridization complex, | P. 47, ll. 28 - 29 (*Hybridization of the oligonucleotide to the target nucleic acid results in the formation of a hybridization complex...*). |
| ligating said hybridization complex to form a modified hybridization complex which serves as a rolling circle amplification template, | P. 48, ll. 1 - 3 (*Ligation of the "primers" (which are at the discrete ends of a single oligonucleotide) results in the formation of a modified hybridization complex containing a circular probe i. e. an RCA template complex.*) |
| cleaving said rolling circle template to produce a target nucleic acid sequence product, | P. 48, ll. 25 - 27. (*Thus, following RCA, the product nucleic acid is contacted with the appropriate restriction endonuclease. This results in cleavage of the product nucleic acid ...*). |
| adding polymerase to said target nucleic acid sequence product to provide amplified target nucleic acid, and | P. 48, ll. 4 -5. (*Addition of a polymerase to the RCA template complex results in the formation of an amplified product nucleic acid.*) |
| detecting said amplified target nucleic acid sequence. | P. 48, ll. 5 - 6. (*Following RCA, the amplified product nucleic acid is detected.*) |

SENT BY: M&G;                    2026258381;           NOV-23-05 15:24;          PAGE 14

P. 50, ll. 22 - 25. *(Again, these copies are subsequently detected by one of two methods; either hybridizing a labeled oligo complementary to the circular target or via the incorporation of labeled nucleotides in the amplification reaction. The label is detected using conventional label detection methods as described herein...).*

P. 40, l. 26 *(Many sequences can be analyzed directly from genomic DNA).*

P. 27, ll. 24 - 25. *(Detection proceeds via detection of the label as an indication of the presence, absence or amount of the target sequence...).*

SENT BY: M&G;                          2026258381;          NOV-23-05 15:24;          PAGE 15

# ANNEX B

SENT BY: M&G;                    2026258381;        NOV-23-05 15:24;        PAGE 16

| | Disclosure in USSN 09/553,993 |
|---|---|
| 23. A method for detecting a target sequence | Abstract, p. 130 (*The invention finds use in the detection and quantification of a nucleic acid target*) |
| comprising a first and second target domain in a sample, said method comprising: | P. 36, ll. 33 - p. 37, l. 2). (*That is, each terminus of the oligonucleotide contains sequence complementary to the target nucleic acid...That is, the first end of the RCA probe is substantially complementary to a first target domain and the second end of the RCA probe is substantially complementary to a second target domain*). |
| a) hybridizing said target sequence to a precircle probe to form a first hybridization complex, | P. 37, l. 3 - 4. (*Hybridization of the oligonucleotide to the target nucleic acid results in the formation of a hybridization complex*). |
| said precircle probe comprising: i) a first targeting domain; ii) a second targeting domain; | P. 36, l. 33 - 35. (*A single oligonucleotide is used for both OLA and as the circular template for RCA (referred to herein as a "padlock probe" or "RCA probe". That is, each terminus of the oligonucleotide contains sequence complementary to the target nucleic acid...*). |
| iii) at least a first universal priming site; and | P. 37, l. 36. (*The padlock probe also contains a priming site for priming the RCA reaction*). |
| iv) a cleavage site; | P. 37, ll. 21 -25 (*In a preferred embodiment the padlock probe contains a restriction site. The restriction endonuclease site allows for cleavage...*) |
| wherein said first and second targeting domains hybridize to said first and second target domains; | P. 36, l. 33 - p. 37, l. 2. (*That is, each terminus of the oligonucleotide contains sequence complementary to the target nucleic acid...That is, the first end of the*) |

PAGE 16/22 * RCVD AT 11/23/2005 2:09:57 PM [Eastern Standard Time] * SVR:USPTO-EFXRF-6/28 * DNIS:2738300 * CSID:2026258381 * DURATION (mm-ss):04-54

|  | *RCA probe is substantially complementary to a first target domain and the second end of the RCA probe is substantially complementary to a second target domain...). P. 47, ll. 28 - 29. (Hybridization of the oligonucleotide to the target nucleic acid results in the formation of a hybridization complex).* |
|---|---|
| b) contacting said first hybridization complex with a ligase to form a closed circular probe; | P. 37, ll. 4 - 6. *(Ligation of the "primers" (which are the discrete ends of a single oligonucleotide) results in the formation of a modified hybridization complex containing a circular probe i.e. an RCA template complex.)* |
| c) cleaving said closed circular probe at said cleavage site to form a cleaved probe; | P. 37, ll. 22 - 25. *(Thus, following RCA, the product nucleic acid is contacted with the appropriate restriction endonuclease. This results in cleavage of the product nucleic acid into smaller fragments.)* |
| d) amplifying said cleaved probe to form a plurality of amplicons; and | P. 19, ll. 26 - 32. *(As is outlined herein, the target sequence may be a target sequence from a sample, or a secondary target such as a product of a reaction such as a detection sequence from an invasive cleavage reaction, a ligated probe from an OLA reaction, an extended probe from a PCR or SBE reaction, etc. Thus, for example, a target sequence from a sample is amplified to produce a secondary target* |

*that is detected; alternatively, an amplification step is done using a signal probe that is amplified, again producing a secondary target that is detected.*)(emphasis supplied).

P. 28, ll. 27 - 29.  (*Target amplification involves the amplification (replication) of the target sequence to be detected, such that the number of copies of the target sequence is increased.*) (emphasis supplied).

p. 75, ll. 3 - 4. (*Combination Techniques:  It is also possible to combine two or more of these techniques to do geneotyping, quantification, detection of sequences, etc.*)

P. 80, ll. 1 - 5. (*In a preferred embodiment, OLA and PCR are combined. As will be appreciated by those in the art, the sequential order of the reaction is variable. That is, in some embodiments, it is desired to perform the genotyping or OLA reaction first followed by PCR amplification.*)

P. 26, ll. 14 - 19. (*Suitable amplification methods include both target amplification and signal amplification and include, but are not limited to, polymerase chain reaction (PCR), ligation chain reaction (sometimes referred to as an oligonucleotide ligase amplification OLA), cycling probe technology (CPT), strand displacement assay (SDA), transcription mediated amplification (TMA), nucleic acid sequence based amplification (NASBA), rolling circle based amplification (RCA), and invasive cleavage technology.*)

c) detecting said amplicons to detect the
presence of said target sequence in said
sample.

| | |
|---|---|
| Claim 24.  A method for amplifying a target sequence comprising a first and second target domain in a sample, said method comprising: | Abstract, p. 130. (*The invention finds use in the detection and quantification of a nucleic acid target using a variety of amplification techniques... P. 36, l. 33 - p. 37, l. 2. (That is, each terminus of the oligonucleotide contains sequence complementary to the target nucleic acid...That is, the first end of the RCA probe is substantially complementary to a first target domain and the second end of the RCA probe is substantially complementary to a second target domain*). |
| a) hybridizing said target sequence to a precircle probe to form a first hybridization complex, | as above, Claim 23 |
| said precircle probe comprising: i) a first targeting domain; ii) a second targeting domain; iii) at least a first universal priming site; and iv) a cleavage site; wherein said first and second targeting domains hybridize to said first and second target domains; | as above, Claim 23 |
| b) contacting said first hybridization complex with a ligase to form a closed circular probe; | as above, Claim 23 |
| c) cleaving said closed circular probe at said cleavage site to form a cleaved probe; and | as above, Claim 23 |
| d) amplifying said cleaved probe. | as above, Claim 23 |

BEST AVAILABLE COPY

| | |
|---|---|
| 25. A method of detecting the presence of a target nucleic acid sequence in a sample, comprising: | Abstract, p. 130. (*The invention finds use in the detection and quantification of a nucleic acid target using a variety of amplification techniques.*) |
| contacting said sample with a probe which contains sequence complementary to the target nucleic acid at each terminus of the probe, | P. 36, l. 32 - 35. (*In a preferred embodiment, a single oligonucleotide is used for both OLA and as the circular template for RCA (referred to herein as a "padlock probe" or a "RCA probe"). That is each terminus of the oligonucleotide contains sequence complementary to the target nucleic acid and functions as an OLA primer as described above.*) |
| hybridizing said probe with any of said target nucleic acid sequence in said sample to form a hybridization complex, | P. 37, ll. 2 - 3 (*Hybridization of the oligonucleotide to the target nucleic acid results in the formation of a hybridization complex.*). |
| ligating said hybridization complex to form a modified hybridization complex which serves as a rolling circle amplification template, | P. 37, ll. 4 -5 (*Ligation of the "primers" (which are at the discrete ends of a single oligonucleotide) results in the formation of a modified hybridization complex containing a circular probe i. e. an RCA template complex.*) |
| cleaving said rolling circle template to produce a target nucleic acid sequence product, | P. 37, ll. 23 - 25. (*Thus, following RCA, the product nucleic acid is contacted with the appropriate restriction endonuclease. This results in cleavage of the product nucleic acid ...*). |
| adding polymerase to said target nucleic acid sequence product to provide amplified target nucleic acid, and | P. 37, ll. 7 - 8. (*Addition of a polymerase to the RCA template complex results in the formation of an amplified product nucleic acid.*) |
| detecting said amplified target nucleic acid sequence. | P. 37, ll. 8 - 9. (*Following RCA, the amplified product nucleic acid is detected.*) |

BEST AVAILABLE COPY

P. 39, ll. 6 - 9. *(Again, these copies are subsequently detected by one of two methods; either hybridizing a labeled oligo complementary to the circular target or via the incorporation of labeled nucleotides in the amplification reaction. The label is detected using conventional label detection methods as described herein...).*

P. 40, l. 26 *(Many sequences can be analyzed directly from genomic DNA).*

P. 27, ll. 24 - 25. *(Detection proceeds via detection of the label as an indication of the presence, absence or amount of the target sequence...).*

BEST AVAILABLE COPY

# EXHIBIT P

| | | ATTORNEY DOCKET NO. |
| **TRANSMITTAL FORM** | | 70051.0002USC1 | |
| (to be used on all correspondence after initial filing) | U.S. APPLICATION SERIAL NO. | | CONFIRMATION NO. |
| | 10/264,574 | | 4126 |
| | FILING DATE | | |
| | October 4, 2002 | | |

| INVENTOR(S) | EXAMINER | GROUP ART UNIT |
| Kevin GUNDERSON et al. | Robert Thomas CROW | 1634 |

| TITLE OF APPLICATION |
| Detection of nucleic acid reactions on bead arrays |

| ADDRESS TO: | Commissioner for Patents<br>P.O. BOX 1450<br>ALEXANDRIA, VA  22313-1450 |

### ENCLOSURES

☒ **Transmittal Form**
☒ **Request for Withdrawal as Attorney or Agent and Change of Correspondence Address**
☒ **Return Postcard**

☒ Please charge Deposit Account No. 13-2725 in the amount of $0.00 to cover any required fees.  In the event any variance exists between this amount and the Patent Office charges for filing the above-noted documents, including any fees required under 35 CFR 1.136 for any necessary extension of time to make the filing of the attached documents timely, please charge or credit the difference to Deposit Account No. 13-2725.  Further, if these papers are not considered timely filed, then a request is hereby made under 37 CFR 1.136 for the necessary extension of time.

### CORRESPONDENCE ADDRESS

☒ The address associated with Customer Number:  **23552**     OR  ☐ the correspondence address below.

| Name | | |
| Address | | |
| City | State | Zip Code |

| NAME | Steven B. Kelber | | REGISTRATION NO. | 30,073 | |
| SIGNATURE | | DATE | June 9, 2006 | TELEPHONE | 202 326-0300 |
| NAME | | | REGISTRATION NO. | | |

OTP F
JUN 0 9 2006
PATENT & TRADEMARK OFFICE

PTO/SB/83 (01-06)
Approved for use through 12/31/2008. OMB 0651-0035
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| | |
|---|---|
| **REQUEST FOR WITHDRAWAL AS ATTORNEY OR AGENT AND CHANGE OF CORRESPONDENCE ADDRESS** | |

| | |
|---|---|
| Application Number | 10/264,574 |
| Filing Date | October 4, 2002 |
| First Named Inventor | Kevin GUNDERSON |
| Art Unit | 1634 |
| Examiner Name | Robert Thomas CROW |
| Attorney Docket Number | 70051.0002USC1 |

**To: Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

Please withdraw me as attorney or agent for the above identified patent application, and

☐ all the attorneys/agents of record.

☐ the attorneys/agents (with registration numbers) listed on the attached paper(s), or

☑ the attorneys/agents associated with Customer Number    23552

NOTE: This box can only be checked when the power of attorney of record in the application is to all the practitioners associated with a customer number.

The reasons for this request are:   Pursuant to the instructions of Christian G. Cabou, Senior VP & General Counsel of illumina, Inc., an authorized representative of the assignee of the entire right, title and interest in the above-captioned application, the undersigned, counsel of record, hereby withdraws from representation herein. All materials pertinent to the above-captioned matter have been returned to the assignee.

## CORRESPONDENCE ADDRESS

1. ☐ The correspondence address is NOT affected by this withdrawal.

2. ☐ Change the correspondence address and direct all future correspondence to:

☐ The address associated with Customer Number: [ ]

*OR*

| ☑ Firm or Individual Name | Christian G. Cabou, Senior Vice President & General Counsel illumina, Inc. | | | | |
|---|---|---|---|---|---|
| Address | 9885 Towne Centre Dr. | | | | |
| City | San Diego | State | California | Zip | 92121 |
| Country | | | | | |
| Telephone | 858.202.4503 | | | Email | |
| Signature | [signature] | | | | |
| Name | Steven B. Kelber | | | Registration No. | 30,073 |
| Date | June 9, 2006 | | | Telephone No. | 202.326.0300 |

NOTE: Withdrawal is effective when approved rather than when received. Unless there are at least 30 days between approval of withdrawal and the expiration date of a time period for response or possible extension period, the request to withdraw is normally disapproved.

This collection of information is required by 37 CFR 1.36. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# EXHIBIT Q



*PATENT APP. No. 10/264,574*
*ATT'Y DOCKET NO.: 68205.000003*
*12/7/2006*

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Application Number | : | 10/264,574     Confirmation No.:     4126 |
| Applicant | : | Kevin GUNDERSON *et al* |
| Filed | : | October 4, 2002 |
| Title | : | DETECTION OF NUCLEIC ACID REACTIONS ON BEAD ARRAYS |
| TC/Art Unit | : | 1634 |
| Examiner: | : | Robert T. CROW |
| | | |
| Docket No. | : | 68205.000003 |
| Customer No. | : | **21967** |

MAIL STOP AF
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

## REQUEST TO CORRECT INVENTORSHIP
## PURSUANT TO 37 C.F.R. §1.48(b)

Sir:

Applicants respectfully request the change of inventorship for the above-identified patent application by deletion of the following named inventor:

John R. Stuelpnagel

The above-named inventors' invention is no longer being claimed in the present application.

A check in the amount of $130.00 is included herewith to cover the processing fee required for this correction as set forth in 37 C.F.R. §1.17(i).  It is believed that no additional fees are due in connection with this request.  However, the Commissioner is hereby authorized to charge any additional fees, or to credit any overpayment, to the undersigned's Deposit Account No. **50-0206.**

12/08/2006 HVUONG1 00000047 10264574
01 FC:1464                    130.00 OP

*PATENT APP. No. 10/264,574*
*ATT'Y DOCKET NO.: 68205.000003*
*12/7/2006*

Respectfully submitted,

HUNTON & WILLIAMS LLP

Date:  December 7, 2006

By: _____
Robert M. Schulman
Registration No. 31,196

Robert C. Lampe III
Registration No. 51,914

HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C.  20006
Telephone  (202) 955-1500
Fax:  (202) 778-2201

2

# EXHIBIT R

## INTERFERENCE DIGEST

Interference No.    105,547                            Paper No.

Name:  Kevin Gunderson et al.

Serial No.:    10/264,574                      Patent No.

Title:  Detection of nucleic acid reactions on bead arrays

Filed:  10/04/02

Interference with   Willis et al.

## DECISION ON MOTIONS

Administrative Patent Judge,_____Dated,_____

_____

_____

_____


## FINAL DECISION

Board of Patent Appeals and Interferences,_____Dated,_____

_____

Court,_____Dated,_____

## REMARKS

_____

_____

_____

This should be placed in each application or patent involved in interference in addition to the interference letters.

PAPER NO.



UNITED STATES PATENT AND TRADEMARK OFFICE

DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE
BOARD OF PATENT APPEALS AND INTERFERENCES
BOX INTERFERENCE, WASHINGTON, D.C. 20231

Filed by: Judge James T. Moore
Telephone: 571-272-4683
Facsimile: 571-273-0042

**MAILED**

**FEB 2 7 2007**

PAT. & T.M. OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

Applicants: GUNDERSON
Application No.: 10/264,574
Filed: 10/04/02
For: Detection of nucleic acid reactions on
       bead arrays

    The above-identified application or patent has been forwarded to the Board of Patent Appeals and Interferences because it is adjudged to interfere with another application or patent. An interference has been declared. The interference is designated as No. 105,547.

    Notice is hereby given the parties of the requirement of the law for filing in the Patent and Trademark Office a copy of any agreement "in connection with or in contemplation of the termination of the interference." 35 U.S.C. § 135(c).

/James T. Moore/
JAMES T. MOORE
Administrative Patent Judge

Paper 1

Mail Stop Interference
P.O. Box 1450
Alexandria Va 22313-1450
Tel: 571-272-4683
Fax: 571-273-0042

Filed 27 February 2007

## UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE BOARD OF PATENT APPEALS
## AND INTERFERENCES

---

THOMAS D. **WILLIS**, PAUL HARDENBOL,
MANEESH JAIN, VIKTOR STOLC, MOSTAFA RONAGHI,
and
RONALD W. DAVIS

Junior Party
(Patent 6,858,412),

v.

KEVIN **GUNDERSON**
and
MARK S. CHEE

Senior Party
(Application 10/264,574).

---

Patent Interference No. 105,547 (JTM)
(Technology Center 1600)

---

1          **DECLARATION - Bd.R. 203(b)**[1]
2
3          **Part A.  Declaration of interference**

4          An interference is declared (35 U.S.C. §135(a)) between the above-identified

5          parties.  Details of the application, patent, count, and claims designated as

---

[1] "Bd.R. x" may be used as shorthand for "37 C.F.R. ʼ 41.x".  69 Fed. Reg. 49960, 49961 (12 Aug. 2004).

-1-

1   corresponding or as not corresponding to the count appear in Parts E and F of this

2   DECLARATION.

3       **Part B.  Judge managing the interference**

4       Administrative Patent Judge James T. Moore has been designated to manage

5   the interference. Bd. R. 104(a).

6       **Part C.  Standing order**

7       A Trial Section STANDING ORDER "SO" (Paper 2) accompanies this

8   DECLARATION.  The SO applies to this interference.

9       **Part D.  Initial conference call**

10      A telephone conference call to discuss the interference is set for **1:00 p.m. on**

11   **April 27, 2007** (the Board will initiate the call).

12      No later than **four business days** prior to the conference call, each party shall

13   file and serve (SO 10.1 & 105) a list of the motions (Bd. R. 120; Bd. R. 204; SO 104.2.1,

14   120 & 204) the party intends to file.

15      A sample schedule for taking action during the motion phase appears as Form 2

16   in the SO.  Counsel are encouraged to discuss the schedule prior to the conference call

17   and to agree on dates for taking action.  A typical motion period lasts approximately

18   eight (8) months.  Counsel should be prepared to justify any request for a shorter or

19   longer period.

-2-

1    **Part E.  Identification and order of the parties**

2                                    <u>Junior Party</u>

3    Named inventors:    THOMAS D. WILLIS, SAN FRANCISCO, CALIFORNIA
4                                PAUL HARDENBOL, LOS ALTOS, CALIFORNIA
5                                MANEESH JAIN, MENLO PARK, CALIFORNIA
6                                VIKTOR STOLC, CUPERTINO, CALIFORNIA
7                                MOSTAFA RONAGHI, PALO ALTO, CALIFORNIA
8                                RONALD W. DAVIS, PALO ALTO, CALIFORNIA

9    Involved Patent:     6,858,412, granted 22 February 2005, based on
10                                application 09/999,362, filed 24 October 2001
11
12   Title:                       Direct Multiplex Characterization of Genomic DNA

13   Assignee:              BOARD OF TRUSTEES OF THE LELAND STANFORD
14                                   JUNIOR UNIVERSITY,
15                                OFFICE OF TECHNOLOGY LICENSING
16                                STANFORD UNIVERSITY
17                                900 WELCH ROAD, SUITE 350
18                                STANFORD, CALIFORNIA 94304

19                                    <u>Senior Party</u>

20   Named Inventors:    KEVIN GUNDERSON, ENCINITAS, CALIFORNIA
21                                MARK S. CHEE, DEL MAR, CALIFORNIA
22
23   Involved Application: 10/264,574, filed 4 October 2002

24   Title:                       Detection of Nucleic Acid Reactions on Bead Arrays

25   Assignee:              ILLUMIMA, INC.
26                                9390 TOWNE CENTRE DRIVE, SUITE 200
27                                SAN DIEGO, CALIFORNIA 92121

28        The senior party is assigned exhibit numbers 1001-1999.  The junior party is

29   assigned exhibit numbers 2001-2999.  Bd. R. 154(c)(1); SO 154.2.1.  The senior party

30   is responsible for initiating settlement discussions.  SO 126.1.

31

32

                                          -3-

1    **Part F.  Count and claims of the parties**

2                                    Count 1

3           Claim 1 of 6,858,412 or Claim 23 of 10/264,574.

4    The claims of the parties are:

5           Gunderson:  Claims 23-25

6           Willis:        Claims 1-47

7    The claims of the parties which correspond to Count 1 are:

8           Gunderson:  Claims 23-25

9           Willis:        Claims1-47

10   The claims of the parties which do not correspond to Count 1, and therefore are

11   not involved in the interference, are:

12           Gunderson:  None

13           Willis:        None

14   The parties are accorded the following benefit for Count 1:

15           Willis: 09/999,362, filed October 24, 2001

16           Gunderson: 09/553,993, filed April 20, 2000.

17

18

19

20

21

22

23

1

2    **Part G.  Heading to be used on papers**

3    The following heading must be used on all papers filed in this interference, see
4    SO 106.1.1:

6    UNITED STATES PATENT AND TRADEMARK OFFICE

9    BEFORE THE BOARD OF PATENT APPEALS
10    AND INTERFERENCES

13    THOMAS D. **WILLIS**, PAUL HARDENBOL,
14    MANEESH JAIN, VIKTOR STOLC, MOSTAFA RONAGHI,
15    and
16    RONALD W. DAVIS

18    Junior Party
19    (Patent 6,858,412),

21    v.

23    KEVIN **GUNDERSON**
24    and
25    MARK S. CHEE

27    Senior Party
28    (Application 10/264,574).

31    Patent Interference No. 105,547 (JTM)

34    **Part H.  Order form for requesting file copies**

35    When requesting copies of files, use of SO Form 4 will greatly expedite

36    processing of the request.  Please attach a copy of Parts E and F of this

37    DECLARATION with a hand-drawn circle around the patents and applications for which

38    a copy of a file wrapper is requested.

-5-

```
1
2                                        /James T. Moore/
3                                        Administrative Patent Judge
4
5
6    Encl:
7          Copy of STANDING ORDER
8          Copy U.S. Patent 6,858,412
9          Copy of claims of 10/264,574
10
11   Revised 3 January 2006
12
13
14   cc (via overnight delivery):
15
16          Attorney for Willis:
17
18          Daniel M. Becker
19          FISH & NEAVE
20          1251 Avenue of the Americas
21          New York, N.Y. 10020-1104
22
23          Attorney for Gunderson:
24
25          HUNTON & WILLIAMS LLP
26          INTELLECTUAL PROPERTY DEPARTMENT
27          1900 K Street, N.W.
28          Suite 1200
29          Washington, D.C. 20006-1109
```

# EXHIBIT S



Analysis
As of: Oct 16, 2007

## UNISYS CORPORATION v. AMPERIF CORPORATION

### CIVIL ACTION NO. 92-1966

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1992 U.S. Dist. LEXIS 12557*

**August 19, 1992, Decided**
**August 20, 1992, Filed**

**DISPOSITION:** [*1] IT IS HEREBY ORDERED that said Motion is DENIED.

**COUNSEL:** For UNISYS CORPORATION, PLAINTIFF: ERIK N. VIDELOCK, JOH A. BAUGHMAN, PEPPER, HAMILTON & SCHEETZ, 18TH & ARCH STS., 3000 TWO LOGAN SQUARE, PHILA, PA 19103, USA.

For AMPERIF CORPORATION, DEFENDANT: ERNEST J. BUCCINO, JR., GROSS & BUCCINO, P.A., 1211 CHESTNUT STREET, STE. 503, PHILA, PA 19107, USA. M. JOHN CARSON, M. JOHN CARSON, MICHAEL S. ELKIND, ROBBINS, DALGARN, BERLINER & CARSON, 201 N. FIGUEROA ST., 5TH FL., LOS ANGELES, CA 90012, USA.

**JUDGES:** WALDMAN

**OPINION BY:** BY THE COURT; JAY C. WALDMAN

**OPINION**

*MEMORANDUM*

**WALDMAN, J.**

**August 19, 1992**

**I. *BACKGROUND***

Plaintiff Unisys Corporation ("Unisys") filed this patent infringement action against defendant Amperif Corporation ("Amperif") on April 3, 1992. The law firm of Pepper, Hamilton and Scheetz ("Pepper") represents Unisys in this matter. Amperif has moved to disqualify

Pepper from its representation of Unisys as Amperif is a former Pepper client.

An opportunity for hearing and argument was provided on August 13, 1992, supplemented by a deposition on August 14, 1992.

**II. *FACTS***

The pertinent facts are as follow. Pepper is a large law firm with offices throughout the United States and in Europe. Michael W. Monk, Esq. was a partner in Pepper's labor department at the Los Angeles office between December 1987 and September 1990. During that period, he was responsible for the representation of Amperif and supervised associates who worked on Amperif matters. *See* Monk Aff., PP 1-2; Baughman Aff., P 3. [1] Pepper's representation of Amperif was focused solely on labor related legal matters, including:

> 1    Jon A. Baughman, Esq. is the Chairman of Pepper's litigation department.

[*2]

> advice regarding employee discipline and discharge; employee resume issues, layoffs, employment discrimination matters, insurance, maternity rights, drug policies, and employee relations questions.

Monk Aff., P 3.

1992 U.S. Dist. LEXIS 12557, *

In his affidavit, Mr. Monk recites the names of eleven attorneys whom he supervised at Pepper but states that he cannot precisely identify which of those attorneys worked on Amperif matters. Monk Aff., P 2. He acknowledges that Pepper's monthly billing records would furnish the information as to what work had been done for Amperif, who performed it and the amount of time expended by each attorney in doing so. Id.

Unisys (Pepper) appends to the affidavits of Mr. Baughman and John E. Pooler, Jr. [2] the firm's complete billing records for Amperif. [3] These records detail that Mr. Monk was the "Billing Partner" or "Handling Attorney" for the representation. During the nearly three year period in which Pepper represented Amperif, the records reveal that only four associates worked on amperif matters. Mr. Monk billed a total of 15 hours to the account and the associates billed a total of 18.50 hours. No associate accumulated more than nine hours. In total, Pepper [*3] provided 33.5 hours of legal services for Amperif between December 1987 and September 1990.

2    Mr. Pooler is the law firm's controller.

3    These records were not filed with the clerk of court for the stated reason that Unisys was concerned that Amperif might object to public disclosure of them. The records were, however, appended to the copy of the affidavits served upon Amperif, and no objection was forthcoming. Also, Amperif included with submissions filed with the clerk copies of its invoices reflecting much of the same information. Accordingly, the court will docket all of the billing records.

None of the attorneys who worked on Amperif matters currently work at Pepper. [4] One associate left the firm on

4    One of the eleven attorneys supervised by Mr. Monk is still at Pepper but he never worked on any Amperif matter. Schaper Aff., P 4.

[*4] April 14, 1989, a second associate left on August 23, 1989, another left in early October 1990 and the fourth associate, Lori Krop, was on unpaid leave of absence from September 27, 1991 until August 5, 1992 when she was terminated.

While on leave, Ms. Krop had no substantial responsibilities, had no substantive discussion of client matters with any Pepper attorney and performed no work for any firm client. See Krop Dep. at 16, 19, 24, 26-7 and 62. The only work she ever performed for Amperif was to review and assess the impact of a ride sharing regulation, apparently promulgated by the City of Los Angeles. See Krop Dep. at 37-41 and 63. Aside from this project, she

had no substantive discussions with any Pepper attorney about Amperif or its business or legal affairs. See Krop Dep. at 33. She had no knowledge of the current litigation prior to her deposition on August 14, 1992. See Krop Dep. at 63. It is uncontested that Ms. Krop's termination had nothing to do with this litigation. [5]

5    The parties submitted a copy of the transcript of Ms. Krop's deposition to the court but did not file one with the clerk for the stated reason that it includes "personal and/or internal information" regarding Pepper. The parties have relied on and cited to portions of the transcript in their supplemental briefs, and the court has read and considered the transcript in reaching its decision. Accordingly, it should be filed and made part of the record in this case. The court will direct the clerk to file under seal pages 12-15, the only portion containing references to matters appropriately characterized as confidential.

[*5] Mr. Monk left Pepper at the end of September 1990, and retained Amperif as a client at his new firm. See Baughman Aff., P 8; Monk Aff., P 6. It is uncontroverted that Pepper has not represented Amperif in any matter since that time.

### III. DISCUSSION

In this district, the ethical conduct of attorneys is governed by the Code of Professional Responsibility adopted by the Supreme Court of Pennsylvania. See Eastern District Local Rule 14 (Rule IV). As of April 1, 1988, Pennsylvania adopted the Rules of Professional Conduct to supersede the Code of Professional Responsibility. See Rules of Professional Conduct, 42 Pa. Cons. Stat. Ann. at 33 (supp. 1992); United States v. Moscony, 927 F.2d 742, 748 n.7 (3d Cir. 1991).

Relying on Rule 1.9, Amperif contends that Pepper should be disqualified from representing Unisys. In full, this rule states:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after full disclosure [*6] of the circumstances and consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would

permit with respect to a client or when the information has become generally known.

Rule 1.9 (emphasis added). [6]

6   Pennsylvania's Rules of Professional Responsibility are not identical to the American Bar Association's Model Rules of Professional Conduct as adopted in 1983 and amended thereafter. In fact, Model Rules 1.9 and 1.10, the rules at issue herein have been the subject of recent ABA revision. These revisions are not significant as discussed *infra*.

The underscored language makes clear that this rule governs the conduct of an *attorney* who has formerly represented a client in a matter. Absent consent, Rule 1.9(a) prohibits an attorney from representing a person on a basis materially adverse to a former client on a matter substantially related to the prior representation. Rule 1.9(b) precludes an attorney from utilizing any information [*7] obtained during a prior representation to the detriment of the former client, unless that information has become generally known. This rule would be applicable if, for example, Mr. Monk sought to represent an aggrieved employee in an employment discrimination claim against Amperif.

This rule does not apply when an attorney has terminated an association with a law firm and *that firm* seeks to undertake a representation adverse to a client who had been represented by the firm's former attorney. Rule 1.10(c) is the appropriate rule for determining whether Pepper should be disqualified in this litigation. This rule states:

When a lawyer has terminated an association with a firm, the firm *is not prohibited* from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer *unless:*

(1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; *and*

(2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(b) that is material to the matter.

Rule 1.10(c) (emphasis added). [7]

7   The ABA revised Model Rules 1.9 and 1.10 in 1989, essentially by moving then Model Rule 1.10(b) into Rule 1.9 and redesignating Model Rule 1.10(c) as Model Rule 1.10(b). Geoffrey C. Hazard & W. William Hodes, *The Law of Lawyering* § 1.10:101 (2d ed. 1990) [hereinafter "Hazard & Hodes"]. Thus, Model Rule 1.10(b) is virtually identical to Rule 1.10(c) in Pennsylvania with one insignificant distinction. The ABA modifies the description of the client against whom the present representation is adverse by including the phrase "and not currently represented by the firm" to the description of the client. *Id.,* at n.3.

[*8] By its express terms, this rule governs whether a firm is precluded from undertaking a representation adverse to a client who had been represented by one of its attorneys after the attorney has left the firm. *See* Hazard & Hodes, § 1.10:301 (noting that this rule applies when a lawyer has departed from a firm and the question is whether the remaining members of that firm can undertake a representation). The rule assesses whether the lawyer who has left a firm "has taken with him all of the 'taint'" that would disable the firm from a subsequent representation. *Id.,* § 1.10:104.

a. Substantial Relationship

"There is a substantial relationship between the two representations if facts pertinent to the problems for which the original legal services were sought are relevant to subsequent litigation." *United States Football League v. National Football League, 605 F. Supp. 1448, 1459 (S.D.N.Y. 1985).* To determine whether a substantial relationship is present, courts in this district examine three factors: (1) the scope of the prior representation; (2) the nature of the present action; and, (3) whether confidences might have been disclosed during the prior [*9] representation which are relevant to the present action. *INA Underwriters v. Nalibotsky, 594 F. Supp. 1199, 1206 (E.D. Pa. 1984). See also Reading Anthracite Co. v. Lehigh Coal & Navigation Company, Inc., 771 F. Supp. 113, 115 (E.D. Pa. 1991)* (following *Nalibotsky).* The moving party bears the burden of establishing the existence of a "substantial relationship," however, any doubts about whether disqualification is appropriate should be resolved in favor of the movant to ensure protection of client confidences. *Nalibotksy, 594 F. Supp. at 1207.*

The court concludes that the matters in which Pepper represented Amperif are not substantially related to the matter in which representation is now being provided. Over a three year period, a Pepper partner and four associates worked a total of 33.5 hours for Amperif. They provided legal advice on discrete labor issues, such as employee discharge, employee discrimination matters,

1992 U.S. Dist. LEXIS 12557, *

and employee maternity rights. *See* Monk Aff., P 3. This is a patent infringement case which presents distinct and unrelated issues. It involves a cache memory device for which Unisys holds a patent. [*10] The cache memory system expedites access to data stored in bulk storage devices, known as disk systems, common peripherals to computer processors. It is apparent that the facts pertinent to Amperif's labor representation would not be relevant in this complex and technical patent litigation. The representations are not related, much less substantially related. [8]

> 8 At oral argument, Amperif posited that there exists a substantial relationship between nonspecific financial information imparted to Mr. Monk while he provided Amperif with legal services concerning plant closings and this patent infringement action since the information might be relevant to Unisys's damages. The measure of damages in a patent infringement action is the pecuniary loss sustained because of the infringement. *See State Industries, Inc. v. Mor-Flo Industries, Inc., 883 F.2d 1573, 1577 (Fed. Cir. 1989).* The determination is necessarily product (patent) specific and general financial information would not be pertinent. Moreover, as damages are at issue in virtually all litigation, defendant's interpretation would permit clients to disable lawyers from ever undertaking future representations adverse to their interest merely by imparting general financial information to them. The *substantial* relationship test does not sweep so broadly.

[*11] **b. Confidential Information**

Amperif cannot satisfy the second prong of Rule 1.10(c)(2) unless an attorney remaining at the firm possesses confidential information from the prior representation which is *material* to the representation to be undertaken. Amperif must thus demonstrate that: (1) it imparted confidential information to a Pepper attorney; (2) the information is material to this patent litigation; and, (3) that attorney is currently at Pepper. Amperif focuses on the possibility that confidential information was disclosed. Amperif contends that "confidential information concerning specific items in [Amperif's] product line, including "cache memory" was disclosed to Pepper attorneys during meetings and discussions. *See* Amperif Br. at 7. While the disclosure of confidential information does not alone suffice to satisfy Rule 1.10(c)(2), scant evidence is adduced that any such information was disclosed.

Amperif's general counsel states that Mr.Monk was privy to conversations in which the company's financial condition was discussed. Fox Aff., P 5. He also recalls generally informing Mr. Monk about Amperif's opera-

tions, including "what cache memory is and what it [*12] does, and the connection between Amperif products and Unisys products." Fox Aff., P 7. Mr. Monk states only that he can recall a generalized discussion of Amperif's financial condition and a discussion of "the connection between the products of Amperif and Unisys and a particular kind of memory system." Monk Aff., P 5. Moreover, there is no evidence to support defendant's conjecture that Mr. Monk may have related this general discussion to other Pepper attorneys who remain at the firm. [9]

> 9 Given Mr. Fox's position and Mr. Monk's current interests, it must be assumed that they would have included in their affidavits any more precise knowledge they had about what information was imparted and to whom.

Rule 1.10(c)(2) expressly excludes any information that has become general knowledge from the ambit of "confidential" information. *See* Hazard & Hodes, § 1.9:401 (information "ceases to be protected by . . . the professional rule of confidentiality" when it has become general knowledge). Any information appearing [*13] on documents open to public inspection has passed into the public domain and become general knowledge. *Id.* This would encompass information about the products and services which a company provides to the consuming public.

Further, there is no showing that this general information is material to this patent litigation. Moreover, none of the Pepper attorneys who provided services to Amperif are currently associated with the firm and none have been actively associated with Pepper at any time since the initiation of this litigation.

**IV. *CONCLUSION***

Pepper's representation of Unisys in this patent litigation is not substantially related to the firm's previous labor work for Amperif. No current Pepper attorney possesses confidential information from Amperif material to this litigation. Amperif has failed to establish grounds for disqualifying Pepper from its representation in this case.

An appropriate Order will be entered.

***ORDER***

**AND NOW,** this 19th day of August, 1992, upon consideration of defendant's Motion for Disqualification and plaintiff's response thereto, following oral argument thereon and consistent with the accompanying memorandum, **IT IS HEREBY ORDERED** [*14] that said Motion is **DENIED.**

**BY THE COURT:**

**JAY C. WALDMAN, J.**